IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **JERRE PSAK,**<br>**6506 Fort Hunt Road**<br>**Alexandria, VA 22307**<br><br>       **Plaintiff,**<br><br>**v.**<br><br>**SALLY JEWELL, in her official capacity as**<br>**Secretary,**<br>**Department of the Interior**<br>**1849 C Street, NW**<br>**Washington, DC 20240**<br><br>       **Defendant.**<br><br>**Serve:**   **Sally Jewell**<br>              **Secretary,**<br>              **Department of the Interior**<br>              **1849 C Street, NW**<br>              **Washington, DC 20240**<br><br>              **Eric H. Holder, Jr., Esq.**<br>              **U.S. Attorney General**<br>              **U.S. Department of Justice**<br>              **950 Pennsylvania Avenue**<br>              **Washington, DC 20530-0001**<br><br>              **Ronald C. Machen, Jr.**<br>              **United States Attorney for**<br>                 **the District of Columbia**<br>              **555 4th Street, NW**<br>              **Washington, DC 20530** | **Civil Action No. _____**<br><br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT FOR DECLARATORY, INJUNCTIVE,
## AND MONETARY RELIEF AND JURY DEMAND

1.    This is an action for declaratory, injunctive, and monetary relief alleging unlawful

discrimination in the employment due to Plaintiff's disabilities (Post Traumatic Stress

Disorder ("PTSD") and Major Depressive Disorder) and in retaliation for prior protected activity in violation of Plaintiff's rights under Section 501 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 701 *et seq* and under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16.

## JURISDICTION

2.  This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331, as this matter contains a federal question, 42 U.S.C. §12117 and §2000e-5(f)(3).

## VENUE

3.  At all times relevant to this Complaint, Plaintiff was and is employed at the Department of the Interior, National Park Service, in Washington, DC. A substantial part of the acts and omissions complained of occurred in or failed to occur in Washington, DC. Accordingly, venue lies within this judicial district pursuant to 28 U.S.C. §§ 1391 and (b)(1) and (2).

## PARTIES

4.  Plaintiff, Jerre Psak, is an adult citizen of the United States, domiciled in the City of Alexandria, Virginia at all times relevant to this Complaint.

5.  Plaintiff is and at all times relevant to this Complaint a qualified individual with a disability within the meaning of 29 U.S.C. § 705(20).

6.  Plaintiff was and is an "employee" within the meaning of 42 U.S.C. § 2000e-16(a). At all times relevant to this Complaint, Plaintiff was employed by the U.S. Department of the Interior, National Park Service, which is located in Washington, DC.

7.  Defendant, Sally Jewell, is the Secretary of the Department of the Interior. She is named in her official capacity.

8.  Defendant is an "employer" within the meaning of 42 U.S.C. § 2000e-16(a).

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

9.   On January 13, 2009, Plaintiff filed an equal employment opportunity complaint with
     Defendant based on the allegations and facts outlined herein.

10.  On February 24, 2010, Plaintiff sought a Final Agency Decision pursuant to 29 C.F.R.
     §1614.110.

11.  The Agency issued its Final Decision on August 26, 2010.

12.  Plaintiff appealed to the Equal Employment Opportunity Commission's Office of Federal
     Operations ("OFO") and received a decision affirming the Agency's Final Decision on
     April 23, 2013.

13.  On May 22, 2013, Plaintiff filed a Request for Reconsideration with the OFO and received
     a decision denying her request on November 1, 2013.

14.  The OFO's decision provided Plaintiff 90 days to file a civil action; as such, the instant
     Complaint, filed on January 29, 2014, is timely.

## FACTUAL BACKGROUND

15.  Plaintiff has held the position of Canine Officer for the United States Park Police, National
     Park Service, National Capital Region in Washington, D.C., since November 1998.

### Prior EEO Activity

16.  On December 17, 2003, Plaintiff first applied for a Canine Officer position, unrelated to the
     position at issue in this complaint, at the San Francisco Field Office ("SFFO").

17.  Plaintiff learned of her nonselection for the position noted in Fact 16 in 2005 and timely
     contacted Equal Employment Opportunity ("EEO") Counselor, Lynette Walden, to allege
     discriminatory non-selection.

18. After Plaintiff contacted Ms. Walden when Ms. Walden conducted an investigation into Plaintiff's EEO complaint relating to the 2003 non-selection, including January 2006 interviews with Sergeant Jeffrey Quinn and Major Gerard McCarthy.

19. Plaintiff's 2005 administrative EEO complaint was still pending in or around the time the 2007 selection process for the Canine Officer position in the SFFO, at issue in this complaint, was occurring.

20. On May 7, 2008, Plaintiff initiated an administrative EEO complaint against Defendant for hostile work environment, which is unrelated to this current action, and an investigation was conducted in or around May 2008.

21. As part of the investigation into Plaintiff's May 2008 EEO complaint, relating to hostile work environment, management officials in the Washington Metropolitan Region were interviewed.

22. These same management officials, as referenced in Fact 21, were involved in the matters comprising the claims of this complaint.

**Retaliatory Non-Selection**

23. On April 23, 2007, the Agency listed a vacancy announcement for a Canine Officer in the SFFO.

24. Upon learning of the 2007 vacancy announcement for the Canine Officer position in the SFFO, Plaintiff contacted Major McCarthy and expressed her interest in the position and reminded him that she had applied, but not been selected, for the 2003 vacancy for the Canine Officer position in the SFFO.

25. The 2007 vacancy announcement for the Canine Officer position in the SFFO was the first time Major McCarthy and Plaintiff interacted since the 2003 non-selection.

26. Plaintiff applied for the vacant Canine Officer position in the SFFO on or around May 7, 2007.

27. At the time of the selection process, Defendant had an informal practice of providing current canine handlers with first consideration to fill vacancies.

28. On or around May 30, 2007, Officer Jason Raymos, Executive Chief Steward, wrote to Major McCarthy requesting that Plaintiff receive first consideration for the 2007 vacant Canine Officer Position in the SFFO, in light of Defendant's practice of giving Canine Officers first consideration when a vacancy is announced for a Canine Officer position.

29. The relevant Knowledge, Skills, and Abilities for the Canine Officer position were:

    a. Specific knowledge of police canine techniques and a willingness to keep abreast of the ever-changing procedures in this field;

    b. Skill in written and oral presentations concerning canine-involved searches, rescues, and other activities of the unit;

    c. Knowledge of both local and federal laws as they affect the canine unit;

    d. Ability to deal effectively with supervisors, peers, and others;

    e. Ability to instruct peers and supervisors on the most effective manner to utilize the canine unit in accomplishing the patrol function;

    f. Ability to handle and deploy a police canine in high stress law enforcement situations; and

    g. Knowledge of diseases and other health-related problems that may affect the police canine.

30. The Chief of the United States Park Police convened an evaluation committee, consisting of Lieutenant Jeffrey Wasserman and Private Anthony Kang, to rate the applicants on

5

Evaluation Sheets, placing them into "Well Qualified" and "Qualified" categories, based on their seniority status, their test scores, awards earned, and past discipline.

31.   On or around April 25, 2008, a memorandum was issued to all employees, naming the "Qualified" and "Well Qualified" applicants for the 2007 vacant Canine Officer position in the SFFO.

32.   Out of the nine applicants who applied for the 2007 vacant Canine Officer position in the SFFO, five were deemed "Well Qualified."

33.   Plaintiff was one of the five applicants deemed "Well Qualified" and had a score of 67, the second highest score of the nine applicants for the vacant Canine Officer position in the SFFO.

34.   Captain Jason Wu served as the recommending official for the 2007 SFFO Canine Officer position.

35.   Major McCarthy served as the selecting official and made the final determination as to which candidate would fill the SFFO Canine position.

36.   Chief Salvatore Lauro approved Major McCarthy's selection of Officer Petersen for the 2007 Canine Officer position in the SFFO.

37.   Chief Lauro admits that he had been aware of Plaintiff's prior EEO activity at the time he approved of Major McCarthy's selection for the 2007 vacant Canine Officer position in the SFFO.

38.   On or around June 16, 2008, Plaintiff was notified of the selection of Officer Petersen for the 2007 vacant Canine Officer position in the SFFO.

39.   Selectee, Officer Petersen, was also deemed "Well Qualified" by the evaluation committee, with a score of 46.34, the fourth highest score of the nine applicants for the position.

40. The selecting official, Major McCarthy, stated he selected Officer Petersen for the position because: (1) he was the most appropriate and qualified applicant; (2) he demonstrated good work ethic, including winning an office award for being "Officer of the Quarter;" (3) he attained Master Patrol Officer status; (4) he assumed duties collateral to the position description; and (5) he had acquired familiarity with the SFFO.

41. Plaintiff was better qualified, and a plainly superior applicant, for the 2007 vacant Canine Officer position in the SFFO than the selectee, Officer Petersen.

42. At the time she applied for the 2007 Canine Officer position in the SFFO, Plaintiff had over nine years' experience as a Canine Handler in the Special Forces Branch.

43. When Officer Petersen applied for the 2007 vacant Canine Officer position in the SFFO, he had no experience as a Canine Handler.

44. At the time she applied for the 2007 vacant Canine Officer position, Plaintiff had four years seniority over Officer Petersen.

45. At the time of the selection for the vacant Canine Officer position in the SFFO, Plaintiff had participated in more relevant training than selectee, Officer Petersen, including receiving certificates for training in: Police K-9 Behavior and Decoy Techniques, USPCA Training Seminars, Canine Legal Update Training, Tactical K-9 Seminars, Basic First Aid for the Law Enforcement Canine, and Patrol Dog Training Seminars.

46. At the time of the selection for the vacant Canine Officer position in the SFFO, all of the trainings for which Officer Petersen received certificates were unrelated to the position of a Canine Officer.

47. Because of her extensive training, Plaintiff could work as a Canine Handler in any geographic location.

48. Further, Plaintiff had often responded to calls to assist other police departments outside of the Washington Metropolitan area.

### Additional Acts of Discrimination and Retaliation

#### 2008 Requests for Medical Documentation

49. Following the non-selection for the 2007 Canine Officer position in the SFFO, on or around July 22, 2008, Plaintiff contacted an Employee Assistance Program ("EAP") Counselor to discuss the discriminatory actions she was experiencing in the workplace.

50. On or around July 23, 2008, Plaintiff contacted the on-duty Shift Commander, Lieutenant Hammond, and requested to be put on sick leave.

51. While Plaintiff was on sick leave, she suffered from depression.

52. The depression referenced in Fact 51 was a result of Plaintiff's treatment in the workplace.

53. After speaking with the EAP Counselor, Plaintiff made an appointment with Tonya Fridy, a clinical psychologist and consulted her primary care physician as a result of the depression she was experiencing.

54. On or around September 4, 2008, Plaintiff was on sick leave due to her depression, when Mr. Kenneth Brodie sent Plaintiff a letter, indicating that Plaintiff would be charged Absent Without Leave ("AWOL").

55. Mr. Brodie's letter stated that if Plaintiff did not want to be charged AWOL, she had to report to duty by September 5, 2008 or submit the appropriate medical documentation to justify her absence.

56. The September 4, 2008 letter sent by Mr. Brodie to Plaintiff, as referenced in Facts 54-55, also stated that "[g]iven that you are claiming that you are incapacitated for duty due to an

alleged occupation disease, you cannot report to work for any reason without the sole
expressed authorization of your supervisor, Sergeant Jeffrey Quinn."

57. On or around September 8, 2008, Plaintiff's psychologist, Tonya Fridy, sent a treatment
summary to Defendant, indicating Plaintiff was diagnosed with Post-Traumatic Stress
Disorder and Major Depressive Disorder.

58. In the treatment summary, Tonya Fridy also stated that as a result of Plaintiff's Major
Depressive and Post Traumatic Stress Disorders, Plaintiff suffered from anxiety, sadness,
mental confusion, low self-esteem, negative thoughts, poor sleep, poor appetite, intense
anger, and feelings of inadequacy.

59. On or around October 2, 2008, Plaintiff submitted a request for advanced sick leave for
October 14, 2008 through December 8, 2008, based on the information included in the
September 8, 2008 treatment summary from Tonya Fridy.

60. On or around October 22, 2008, Defendant requested Plaintiff provide additional medical
documentation from her physician regarding her ability to perform her duties.

61. On or around October 30, 2008, Mr. Brodie denied Plaintiff's request for advanced sick
leave.

<u>Requirement That Plaintiff Relinquish Her Gun, Badge, Car, and Credentials</u>

<u>While on Sick Leave</u>

62. On or around September 26, 2008, Plaintiff learned that Defendant was requiring her to
relinquish her badge, gun, car, and credentials.

63. In 1996-1997 and 2001, during periods of extended sick leave following surgery, Plaintiff
did not have to relinquish her gun, badge, car and credentials.

64. During these previous periods of extended sick leave referenced in Fact 63, Plaintiff did not have any pending EEO complaints.

65. At least one other Canine Officer on limited duty or sick leave around the same time as Plaintiff in 2008 was permitted to retain his/her gun and badge.

66. United States Park Police General Order 33.01, Section VIILD does not mandate the surrender of credentials when an officer is to remain on sick leave status for more than thirty consecutive days.

### Forced Retirement of Plaintiff's Canine Partner

67. On or around September 26, 2008, Plaintiff learned Defendant was requiring that her canine either retire or go to a kennel.

68. In 1996-1997 and 2001, during periods of extended sick leave following surgery, Plaintiff's canine was not forced to retire or to go to the kennel.

69. During these previous periods of extended sick leave, as referenced in Fact 68, Plaintiff did not have any pending EEO complaints.

70. United States Park Police General Order 33.01, Section VIILD does not mandate the surrender of canines when an officer is to remain on sick leave status for more than thirty consecutive days.

71. The Canine Partner of at least one other canine officer was not forced to retire while the officer was on extended sick leave.

72. The memorandum recommending the retirement of Plaintiff's canine was submitted by Officer James Materese, Canine Unit Trainer, and did not contain a reason for the retirement of Plaintiff's canine.

73. Defendant pays for the medical expenses and care of all Canine Partners.

74. Defendant also provides six hours of overtime every pay period to Canine Officers for the time spent caring for their Canine Partners.

75. When Plaintiff's Canine Partner was retired, she was forced to assume all medical care and other expenses for the canine.

76. When Plaintiff's Canine Partner was prematurely retired, she no longer received an additional six hours of overtime every pay period.

Denial of Plaintiff's Return to Work After Plaintiff Cleared to Return to Duty

77. On or around November 15, 2008, Plaintiff's physician, Dr. Charles Karesh, prepared a letter to Defendant documenting Plaintiff's increased depression and anxiety and clearing Plaintiff for duty.

78. Specifically, in the letter referenced in Fact 77, Dr. Karesh noted that in July 2008, he had increased the dosage of Plaintiff's antidepressant medication and prescribed a new medication and that Plaintiff's new medicinal regimen would not negatively impact her abilities or interfere with the performance of her duties as a Canine Officer.

79. On or around November 16, 2008, Dr. Charles Karesh submitted the letter referenced in Facts 77-78 to Defendant.

80. On or around November 16, 2008, Plaintiff contacted the Shift Commander, Lieutenant Arthur L. Gaither, to report for duty.

81. Lieutenant Gaither contacted Captain Robert MacLean, Commander of Special Forces Branch, regarding Plaintiff's return to duty, who told Lieutenant Gaither that Plaintiff could not return to duty until she underwent a fitness for duty examination.

82. On or around November 16, 2008, Plaintiff was instructed by Lieutenant Gaither not to report for duty.

11

83.   On or around December 12, 2008, Defendant contacted Plaintiff and requested that
      Plaintiff provide additional medical documentation regarding Plaintiff's medicinal regimen.

84.   On or around January 8, 2009, Plaintiff contacted Defendant and stated she had previously
      provided all of the medical documentation requested by the Agency.

85.   On or around March 24, 2009, Mr. Brodie wrote to Plaintiff, notifying her that she could
      return to duty on April 16, 2009 if she passed a fitness for duty exam because the medical
      documentation received from Dr. Karesh on November 16, 2008 allegedly did not contain
      Plaintiff's medicinal regimen.

86.   The letter referenced in Fact 85 stated that Plaintiff's failure to report for duty on April 16,
      2009 would result in Plaintiff being placed on Absence Without Leave Status ("AWOL").

87.   By April 16, 2009, Defendant had not contacted Plaintiff to schedule a fitness for duty
      examination.

88.   On or around November 13, 2009, Defendant sent Plaintiff a memorandum directing her to
      return to duty on December 1, 2009.

89.   On or around December 1, 2009, Plaintiff reported for duty at the Central District Station.

90.   On or around December 1, 2009, Plaintiff was placed on limited administrative duty.

91.   When Plaintiff reported for duty as referenced in Facts 89-90, Defendant did not return her
      gun, badge, credentials, or car.

92.   On or around April 21, 2010, Defendant sent Plaintiff a memorandum stating that Plaintiff
      needed to undergo a "return to duty examination."

93.   Defendant requires all employees over the age of forty to undergo a yearly physical
      examination, which Plaintiff underwent on May 4, 2010.

94.   Plaintiff did not undergo a separate "return to duty examination."

95. In or around May 2010, Defendant requested additional information from Dr. Karesh regarding Plaintiff's DSM-4 diagnosis.

96. On or around, June 30, 2010, Dr. Karesh provided Defendant with the additional medical documentation as referenced in Fact 95.

<u>Reassignment to Explosive Detector Dog Handler Position</u>

97. On or around August 15, 2010, Plaintiff was reassigned from a Patrol Canine Handler to an Explosive Detector Canine Handler.

98. This reassignment, as referenced in Fact 97, changed Plaintiff's Full-Time Equivalent ("FTE").

99. Defendant did not provide Plaintiff with a reason for the reassignment.

100. When Plaintiff was reassigned to the Explosive Detector Canine Unit, as referenced in Facts 97-99, her shift changed.

101. When Plaintiff's shift was changed, as referenced in Fact 100, she was no longer entitled to night differentials.

102. When Plaintiff's shift was changed, as referenced in Facts 100-101, she no longer received double Sunday premiums.

<u>Damages</u>

103. As a result of the discrimination and retaliation, Plaintiff has suffered frequent headaches and stomach aches, loss of appetite, and insomnia.

104. As a result of the discrimination and retaliation, Plaintiff has also endured depression, anxiety, panic attacks, lack of libido, and feelings of hopelessness, humiliation, and anger.

105. As a result of the discrimination and retaliation, Plaintiff became short-tempered, experienced intense anger, sadness, and feelings of inadequacy.

106. As a result of the discrimination and retaliation, Plaintiff sought aid from a psychologist, who diagnosed her with Major Depressive Disorder and Post-Traumatic Stress Disorder.

107. Plaintiff's physician, Dr. Charles Karesh, prescribed Plaintiff medication to combat the somatic symptoms of her Major Depressive and Post-Traumatic Stress Disorders.

108. As a result of the discrimination and retaliation, from October 2, 2008 to November 14, 2010, Plaintiff lost $17,496 in wages for animal care.

109. As a result of the discrimination and retaliation, from October 2, 2008 to November 14, 2010 Plaintiff paid $1,581 in medical care for her retired Canine Partner.

110. As a result of the discrimination and retaliation, from October 2, 2008 to November 14, 2010, Plaintiff paid $1,600 in dog food for her retired Canine Partner.

111. As a result of the discrimination and retaliation, Plaintiff used 272 hours of Leave Without Pay.

112. As a result of the discrimination and retaliation, Plaintiff used 160 hours of animal care previously built into Plaintiff's tour of duty.

113. As a result of the discrimination and retaliation, Plaintiff also seeks other damages which continue to the present.

## COUNT 1: DISCRIMINATORY NON-SELECTION ON THE BASIS OF RETALIATION IN VIOLATION OF TITLE VII, CIVIL RIGHTS ACT OF 1964

114. Plaintiff incorporates the allegations contained in paragraphs 1-113, as if stated herein.

115. It is an unlawful employment practice for an employer to not select an individual for a position due to the individual's prior EEO activity or opposition to discrimination.

116. Plaintiff engaged in protected activity in or around January 2005 when she contacted an EEO Counselor, alleging discrimination.

117. In or around May 2007, Plaintiff applied but was not selected for the position of Canine Officer in SFFO.

118. Management officials responsible for Plaintiff's nonselection were aware of her previous protected EEO activity.

119. A nexus exists between Plaintiff's prior EEO activity and her discriminatory non-selection, as Plaintiff's 2005 administrative EEO complaint was still pending at the time the 2007 selection process was occurring.

120. A nexus also exists because the 2007 vacancy announcement for the Canine Officer position in the SFFO had been Major McCarthy's, the selecting official, first opportunity to retaliate against Plaintiff since she had filed her 2005 administrative EEO complaint.

121. Defendant has proffered reasons for Plaintiff's non-selection.

122. However, Defendant's proffered reasons for Plaintiff's non-selection are pretext for retaliation.

123. Plaintiff's qualifications are plainly superior to that of Officer Petersen, and Plaintiff was higher rated than Officer Petersen.

124. These acts constitute a violation of 42 U.S.C. § 2000e-16.

125. These acts were taken in willful violation, with malice or reckless indifference to Plaintiff's rights under, of Title VII of the Civil Rights Act of 1964.

126. As the direct and proximate result of the acts and omissions of Defendant as described above, Plaintiff suffered loss of pay and benefits, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and other pecuniary and nonpecuniary.

**COUNT 2:  RETALIATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 (FORCED TO RELINQUISH BADGE, GUN, CAR, AND CREDENTIALS)**

127. Plaintiff incorporates the allegations contained in paragraphs 1-126 as if stated herein.

128. Under Title VII it is an unlawful employment practice to take any adverse action against an employee due to the individual's opposition to discrimination or other prior protected EEO activity.

129. In or around May 7, 2008, Plaintiff engaged in protected activity when she initiated an administrative EEO complaint against Defendant for hostile work environment, unrelated to the instant action, and she engaged in protected activity when she contacted an EEO Counselor in or around July 2008, regarding the matters underlying the instant Complaint.

130. As part of the investigation into Plaintiff's 2008 administrative EEO complaint relating to hostile work environment, management officials in the WMR, who are the same officials involved in the matters comprising the claims in this action, were interviewed.

131. The Responsible Management Officials were aware of Plaintiff's administrative EEO complaint prior to September 26, 2008.

132. On or around September 26, 2008, Defendant informed Plaintiff that she was required to relinquish her badge, gun, credentials, and car while on extended sick leave.

133. Prior to Plaintiff engaging in protected activity, Defendant never required Plaintiff to relinquish her badge, gun, credentials, and/or car while on extended sick leave.

134. Further, other Canine Officers on sick leave, in or around September 2008, were permitted to retain their guns and badges.

135. Defendant's requirement that Plaintiff relinquish her badge, gun, credentials, and car also violates Defendant's own policy.

136. In light of paragraphs 132-135, and the temporal proximity between Plaintiff's EEO activity and the adverse action, a nexus exists between the protected activity and the adverse action.

137. These acts constitute a violation of 42 U.S.C. § 2000e-16.

138. These acts were taken in willful violation, with malice or reckless indifference to Plaintiff's rights under, of Title VII of the Civil Rights Act of 1964.

139. As the direct and proximate result of the acts and omissions of Defendant as described above, Plaintiff suffered loss of pay and loss of benefits, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and other pecuniary and nonpecuniary losses.

## COUNT 3: RETALIATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 (FORCED RETIREMENT OF CANINE PARTNER)

140. Plaintiff incorporates the allegations contained in paragraphs 1-139 as if stated herein.

141. Under Title VII it is an unlawful employment practice to take any adverse action against an employee due to the individual's opposition to discrimination or other prior protected EEO activity.

142. In or around May 7, 2008, Plaintiff engaged in protected activity when she initiated an administrative EEO complaint against Defendant for hostile work environment, unrelated to the instant action, and she engaged in protected activity when she contacted an EEO Counselor in or around July 2008, regarding the matters underlying the instant Complaint.

143. As part of the investigation into Plaintiff's 2008 administrative EEO complaint relating to hostile work environment, management officials in the WMR, who are the same officials involved in the matters comprising the claims in this action, were interviewed.

17

144. The Responsible Management Officials were aware of Plaintiff's administrative EEO complaint prior to September 26, 2008.

145. On or around September 26, 2008, Defendant required Plaintiff to either retire her Canine Partner or send her Canine Partner to the kennel.

146. Prior to Plaintiff engaging in protected EEO activity, Defendant never required Plaintiff to retire or send her Canine Partner to the kennel while on extended sick leave.

147. Further, Defendant did not require other Canine Officers to retire or to send their Canine Partners to the kennel when on extended sick leave unless the canine was determined unable to perform his duties.

148. At the time Defendant was requiring Plaintiff's canine to be retired or placed into a kennel, Plaintiff's canine had no health conditions preventing the performance of his duties, had no deficiencies noted in his training, and had never been deemed unfit for duty.

149. In light of paragraphs 146-148, and the temporal proximity between Plaintiff's EEO activity and the adverse action, a nexus exists between the protected activity and the adverse action.

150. Defendant never provided a reason for the forced retirement of Plaintiff's Canine Partner.

151. As a result of the forced retirement of her Canine Partner, Plaintiff experienced significant financial injuries.

152. These acts constitute a violation of 42 U.S.C. § 2000e-16.

153. These acts were taken in willful violation, with malice or reckless indifference to Plaintiff's rights under, of Title VII of the Civil Rights Act of 1964.

154. As the direct and proximate result of the acts and omissions of Defendant as described above, Plaintiff suffered loss of pay and loss of benefits, emotional pain and suffering,

inconvenience, mental anguish, loss of enjoyment of life, and other pecuniary and nonpecuniary losses.

## COUNT 4: RETALIATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 (REASSIGNMENT TO EXPLOSIVE DETECTOR CANINE HANDLER POSITION)

155. Plaintiff incorporates the allegations contained in paragraphs 1-154 as if stated herein.

156. Under Title VII it is an unlawful employment practice to take any adverse action against an employee due to the individual's opposition to discrimination or other prior protected EEO activity.

157. In or around May 7, 2008, Plaintiff engaged in protected activity when she initiated an administrative EEO complaint against Defendant for hostile work environment, unrelated to the instant action, and she engaged in protected activity when she contacted an EEO Counselor in or around July 2008, regarding the matters underlying the instant Complaint.

158. As part of the investigation into Plaintiff's 2008 administrative EEO complaint relating to hostile work environment, management officials in the WMR, who are the same officials involved in the matters comprising the claims in this action, were interviewed.

159. In August 2010, the Agency was processing Plaintiff's request for a Final Agency Decision.

160. The Responsible Management Officials were aware of Plaintiff's administrative EEO complaint prior to August 15, 2010.

161. When Plaintiff was finally reinstated to her Canine Officer position in the WMR on or around August 15, 2010, Plaintiff was reassigned from a Patrol Canine Handler to an Explosive Detector Canine Handler.

162. In light of the temporal proximity between Plaintiff's ongoing EEO activity and the adverse action, a nexus exists between the protected activity and the adverse action.

163. This reassignment, as referenced in paragraph 161, changed Plaintiff's FTE.

164. As a result of Plaintiff's reassignment to the Explosive Detector Canine Handler position, Plaintiff has experienced, and is continuing to experience, significant financial injuries.

165. These acts constitute a violation of 42 U.S.C. § 2000e-16.

166. These acts were taken in willful violation, with malice or reckless indifference to Plaintiff's rights under, of Title VII of the Civil Rights Act of 1964.

167. As the direct and proximate result of the acts and omissions of Defendant as described above, Plaintiff suffered loss of pay and loss of benefits, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and other pecuniary and nonpecuniary losses.

## COUNT 5: IMPROPER MEDICAL INQUIRIES IN VIOLATION OF THE REHABILITATION ACT

168. Plaintiff incorporates all the all the allegations contained in paragraphs 1-167 as if stated herein.

169. The Rehabilitation Act, 29 U.S.C. § 701 *et seq.* incorporates and operates with the same protections and standards outlined in the ADA and ADAAA.

170. Under the Rehabilitation Act it is unlawful for federal agency to make disability related inquiries of employees that are not job-related or consistent with business necessity.

171. On or around September 4, 2008, Mr. Kenneth Brodie sent Plaintiff a letter stating Plaintiff would be charged AWOL if Plaintiff did not submit medical documentation to justify her absence, which was not job-related or consistent with business necessity.

172. Plaintiff's psychiatrist provided Defendant with a treatment summary on September 8, 2008.

173. Defendant's actions in subjecting Plaintiff to improper medical inquiries constituted a violation of 29 U.S.C. § 701 *et seq.*

174. These acts were taken in willful violation, with malice or reckless indifference to Plaintiff's rights under, of the Rehabilitation Act.

175. As the direct and proximate result of the acts and omissions of Defendant as described above, Plaintiff suffered loss of pay and loss of benefits, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and other pecuniary and nonpecuniary losses.

## COUNT 6: IMPROPER MEDICAL INQUIRIES IN VIOLATION OF THE REHABILITATION ACT

176. Plaintiff incorporates all the all the allegations contained in paragraphs 1-175 as if stated herein, including the legal standards set forth in paragraphs 168-170.

177. On or around October 22, 2008, Defendant required Plaintiff to provide additional medical information regarding her ability to perform her duties, which was not job-related or consistent with business necessity.

178. On November 15, 2008, Plaintiff's physician submitted a letter to Defendant, clearing Plaintiff for duty and documenting Plaintiff's disabilities and treatment.

179. Defendant's actions in subjecting Plaintiff to improper medical inquiries constituted a violation of 29 U.S.C. § 701 *et seq.*

180. These acts were taken in willful violation, with malice or reckless indifference to Plaintiff's rights under, of the Rehabilitation Act.

181. As the direct and proximate result of the acts and omissions of Defendant as described above, Plaintiff suffered loss of pay and loss of benefits, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and other pecuniary and nonpecuniary losses.

## COUNT 7: IMPROPER MEDICAL INQUIRIES IN VIOLATION OF THE REHABILITATION ACT

182. Plaintiff incorporates all the all the allegations contained in paragraphs 1-181 as if stated herein, including the legal standards set forth in paragraphs 168-170.

183. On December 12, 2008, Defendant ordered Plaintiff to disclose her medicinal regimen, despite it not being job-related or consistent with business necessity.

184. Defendant's actions in subjecting Plaintiff to improper medical inquiries constituted a violation of 29 U.S.C. § 701 *et seq.*

185. These acts were taken in willful violation, with malice or reckless indifference to Plaintiff's rights under, of the Rehabilitation Act.

186. As the direct and proximate result of the acts and omissions of Defendant as described above, Plaintiff suffered loss of pay and loss of benefits, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and other pecuniary and nonpecuniary losses.

## COUNT 8: IMPROPER MEDICAL INQUIRIES IN VIOLATION OF THE REHABILITATION ACT

187. Plaintiff incorporates all the all the allegations contained in paragraphs 1-186 as if stated herein, including the legal standards set forth in paragraphs 168-170.

188. Following Plaintiff's yearly physical, the Defendant required Plaintiff again submit documentation regarding her DSM-4 diagnosis, even though it was not job-related or consistent with business necessity.

189. Defendant's actions in subjecting Plaintiff to improper medical inquiries constituted a violation of 29 U.S.C. § 701 *et seq.*

190. These acts were taken in willful violation, with malice or reckless indifference to Plaintiff's rights under, of the Rehabilitation Act.

191. As the direct and proximate result of the acts and omissions of Defendant as described above, Plaintiff suffered loss of pay and loss of benefits, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and other pecuniary and nonpecuniary losses.

## COUNT 9: RETALIATORY IMPROPER MEDICAL INQUIRIES IN VIOLATION OF TITLE VII

192. Plaintiff incorporates the allegations contained in paragraphs 1-191 as if stated herein.

193. Under Title VII it is an unlawful employment practice to take any adverse action against an employee due to the individual's opposition to discrimination or other prior protected EEO activity.

194. In or around May 7, 2008, Plaintiff engaged in protected activity when she initiated an administrative EEO complaint against Defendant for hostile work environment, unrelated to the instant action, and she engaged in protected activity when she contacted an EEO Counselor in or around July 2008, regarding the matters underlying the instant Complaint.

195. As part of the investigation into Plaintiff's 2008 administrative EEO complaint relating to hostile work environment, management officials in the WMR, who are the same officials involved in the matters comprising the claims in this action, were interviewed.

196. The Responsible Management Officials were aware of Plaintiff's administrative EEO complaint.

197. Defendant subjected Plaintiff to medical inquiries that were not job-related or consistent with business necessity.

198. September 4, 2008, Mr. Kenneth Brodie sent Plaintiff a letter stating Plaintiff would be charged AWOL if Plaintiff did not submit medical documentation to justify her absence, which was not job-related or consistent with business necessity.

199. Plaintiff's psychiatrist provided Defendant with a treatment summary on September 8, 2008.

200. Given the proximity between Plaintiff's ongoing protected EEO activity and the request for medical documentation a nexus between the protected activity and adverse action exists.

201. These acts constitute a violation of 42 U.S.C. § 2000e-16.

202. These acts were taken in willful violation, with malice or reckless indifference to Plaintiff's rights under, of Title VII of the Civil Rights Act of 1964.

203. As the direct and proximate result of the acts and omissions of Defendant as described above, Plaintiff suffered loss of pay and loss of benefits, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and other pecuniary and nonpecuniary losses.

## COUNT 10: RETALIATORY IMPROPER MEDICAL INQUIRIES IN VIOLATION OF TITLE VII

204. Plaintiff incorporates the allegations contained in paragraphs 1-203 as if stated herein, including the legal standards and facts set forth in paragraphs 193-197.

205. On or around October 22, 2008, Defendant required Plaintiff to provide additional medical information regarding her ability to perform her duties, which was not job-related or consistent with business necessity.

206. On November 15, 2008, Plaintiff's physician submitted a letter to Defendant, clearing Plaintiff for duty and documenting Plaintiff's disabilities and treatment.

207. Given the proximity between Plaintiff's ongoing protected EEO activity and the request for medical documentation, a nexus between the protected activity and adverse action exists.

208. These acts constitute a violation of 42 U.S.C. § 2000e-16.

209. These acts were taken in willful violation, with malice or reckless indifference to Plaintiff's rights under, of Title VII of the Civil Rights Act of 1964.

210. As the direct and proximate result of the acts and omissions of Defendant as described above, Plaintiff suffered loss of pay and loss of benefits, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and other pecuniary and nonpecuniary losses.

## COUNT 11: RETALIATORY IMPROPER MEDICAL INQUIRIES IN VIOLATION OF TITLE VII

211. Plaintiff incorporates the allegations contained in paragraphs 1-210 as if stated herein, including the legal standards and facts set forth in paragraphs 193-197.

212. On December 12, 2008, Defendant ordered Plaintiff to disclose her medicinal regimen, despite it not being job-related or consistent with business necessity.

213. The medical information Defendant originally requested from Plaintiff only required the disclosure of a medicinal regimen if the medication "would or does affect performance, behavior, or safety concerns that are directly related to the position."

214. Given the proximity between Plaintiff's ongoing protected EEO activity and the request for medical documentation, a nexus between the protected activity and adverse action exists.

215. These acts constitute a violation of 42 U.S.C. § 2000e-16.

216. These acts were taken in willful violation, with malice or reckless indifference to Plaintiff's rights under, of Title VII of the Civil Rights Act of 1964.

217. As the direct and proximate result of the acts and omissions of Defendant as described above, Plaintiff suffered loss of pay and loss of benefits, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and other pecuniary and nonpecuniary losses.

## COUNT 12: RETALIATORY IMPROPER MEDICAL INQUIRIES IN VIOLATION OF TITLE VII

218. Plaintiff incorporates the allegations contained in paragraphs 1-217 as if stated herein, including the legal standards and facts set forth in paragraphs 193-197.

219. Following Plaintiff's yearly physical, the Defendant required Plaintiff again submit documentation regarding her DSM-4 diagnosis, even though it was not job-related or consistent with business necessity.

220. Given the proximity between Plaintiff's ongoing protected EEO activity and the request for medical documentation, a nexus between the protected activity and adverse action exists.

221. These acts constitute a violation of 42 U.S.C. § 2000e-16.

222. These acts were taken in willful violation, with malice or reckless indifference to Plaintiff's rights under, of Title VII of the Civil Rights Act of 1964.

223. As the direct and proximate result of the acts and omissions of Defendant as described above, Plaintiff suffered loss of pay and loss of benefits, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and other pecuniary and nonpecuniary losses.

**WHEREFORE,** Plaintiff prays this Court to:

    a.  Grant judgment in her favor against Defendant;

    b.  Grant her declaratory and injunctive relief, including but not limited to assignment to the SFFO Canine Officer position with the Defendant;

    c.  Compensate her for lost benefits and otherwise make her whole;

    d.  Award her compensatory damages in an amount to be shown at trial;

    e.  Award her reimbursement of the attorneys' fees and costs she has expended in litigating this matter; and

    f.  Grant her such other and further relief as justice may require.

## JURY DEMAND

Plaintiff hereby demand a trial by jury on all claims so triable.

January 29, 2014

Respectfully submitted,

Gary M. Gilbert, Esq., Bar No. MD15808
gary@ggilbertlaw.com

Shannon C. Leary, Bar No. MD18396
sleary@ggilbertlaw.com
The Law Offices of Gary M. Gilbert
& Associates, P.C.
Attorneys for Plaintiff
1100 Wayne Avenue, Suite 900
Silver Spring, MD 20910
Telephone: 301-608-0880
Facsimile: 301-608-0881