## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **JERRE PSAK,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Civil Action Nos: 1:14-cv-00116-RDM** |
| | ) **1:18-cv-00115** |
| **SALLY JEWELL, SECRETARY,** | ) |
| **U.S. Department of the Interior,** | ) |
| | ) |
| **Defendant.** | ) |
| | ) |

### OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

Plaintiff Jerre Psak hereby submits her Opposition to Defendant's Motion for Summary Judgment in this consolidated lawsuit.[1] Concurrently filed are Plaintiff's Statement of Genuine Issues, the Declaration of Jerre Psak, and relevant Exhibits.

### INTRODUCTION

When ruling on a motion for summary judgment, the Court must draw all justifiable inferences in the nonmoving party Plaintiff's favor and accept the nonmoving party Plaintiff's evidence as true. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The nonmoving party Plaintiff, however, must establish more than "the mere existence of a scintilla of evidence" in support of her position. *Id.* at 252. The nonmoving party Plaintiff may defeat summary judgment through factual representations made in a sworn affidavit if she "support[s] [her] allegations . . . with facts in the record," *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999) (*quoting Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993)), or provides "direct testimonial evidence," *Arrington v. United States*, 473 F.3d 329, 338 (D.C. Cir. 2006). Following therefore is Plaintiff's presentation of the evidence supporting each of her pleaded causes of action.

---

[1]  For the Court's convenience in this consolidated case, this brief adopts Defendant's Motion's convention of referring to Plaintiff's Amended Complaint, Case 1:14-cv-00116 (Dkt 34), as "Complaint-14," and referring to Plaintiff's Complaint, Case 1:18-cv-00115 (Dkt 1), as "Complaint-18." Defendant numbered the Motion's exhibits, so Plaintiff is lettering her exhibits.

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.     All of Complaint-14's Causes of Action Are Sufficiently Supported By Evidence To Withstand Defendant's Motion.**

### A.     Complaint-14, Count 1: 2007 Nonselection - Discrimination and Reprisal.

Plaintiff Jerre Psak, an Asian female, engaged in EEO protected activity when she filed an EEO complaint against Defendant (Park Police) in 2004 concerning her nonselection for a position in San Francisco. Psak Depo. at 15. Sergeant Quinn, her supervisor, knew about that nonselection. ROI-09,[2] B-10 (Exh. 12, Quinn Aff.), pp. 1-2; ROI-09 B-11 (Exh. 15, Psak Rebuttal), p. 7. Likewise, Major Gerard McCarthy was aware of that nonselection at the time. ROI-09 B-6 (Exh. 5, p. 4). **Creating a question of fact**, Maj. McCarthy denied knowing about the 2004 nonselection. *Id.*

In May 2007, Ms. Psak applied for the Canine Officer position located in the San Francisco Field Office ("SFFO") of the Park Police. Psak Depo. at 15-16. The selecting official was the same Maj. McCarthy. *Id.* at 16. Jason Wu was the recommending official. Wu Depo. at 26-29. Wu recommended Officer Jesse Peterson, no prior protected activity, for the position. Wu Depo. at 29. The evidence allows the inference that Officer Peterson was selected as the result of discrimination and reprisal. According to Defendant's Statement of Material Facts ("SOF"):

> Mr. Wu said that his recommendation of Mr. Petersen for the position was based on the following factors: "(1) Selection from within the SFFO will not only promote morale but lateral mobility opportunity in this rather stagnate field office. (2) There would be no fiscal impact to the SFFO budget as there would be no PCS cost (Permanent Change of Station) or by not having to add another FTE (Full Time Employee). (3) Officer Petersen has demonstrated to be an excellent officer during b;- (sic) tenure at the SFFO. (4) Officer Petersen has long demonstrated a keen interest in being a K9 officer."

SOF No. 9, *citing* Def. Exh. 3, Wu Aff., ¶ 2; Def. Exh. 2 at 19, 28-29, 35.

Ms. Psak factually contests the selection decision as discriminatory and retaliatory.  A non-selection is an adverse action when it "materially adverse consequences affecting the terms, conditions, or privileges of her employment or her future employment opportunities such that a

---

[2] ROI-09 refers to the Department of the Interior Report of Investigation, Case No. NPS-08-0564, completed in 2009, excerpts attached as Exhibit B, subnumbered B-1 through B-21.

reasonable trier of fact could conclude that the plaintiff has suffered objectively tangible harm." *Brown v. Brody*, 199 F.3d 446, 457 (1999).  Ms. Psak sought the transfer to get out of the discriminatory and hostile environment she experienced in her current duty station.  She sought to change the "conditions of her employment." Whether or not Ms. Psak can legally "prove" an EEO cause of action of discrimination or hostile environment, the evidence set forth in ROI-09 and in this Opposition brief show Ms. Psak was suffering workplace conditions that drove her to take extended sick leave.  Transferring to San Francisco undoubtedly would change those "conditions of employment."  Denial of that opportunity to change the conditions constituted an adverse employment action. Moreover, Defendant's stated reasons for selecting Mr. Peterson over Ms. Psak could be rejected as un worthy of credence. The desire to improve "morale" was not specific to SFFO, as low morale was a Force-wide issue. Psak Decl. 5.[3]  The Department of Interior Inspector General conducted a comprehensive assessment of the Park Police. Psak Decl. 5, *citing* PI-WV-NPS-0001-2007. The IOG report, released in February 2008 indicated that "many employees stated that morale is the lowest it had ever been during their employment with US PP." *Id*., quoting PI-WV-NPS-0001-2007, p. 34. The purpose of the competitive process was to fill the vacancy for canine handler, not to improve morale in the SFFO.

Defendant's stated concern about "fiscal impact" did not consider the larger picture. Selecting Mr. Petersen was likely more costly than a PCS because the Force had to purchase a "green" (untrained) dog probably for at least $20,000 and the Force had to pay Mr. Petersen's salary to him without receiving any police service from him for the duration of his training as a basic patrol dog handler (approximately 14 weeks) and an additional 8 weeks for narcotics detector training. Psak Decl. 5. Had the recommending and/or selecting official informed Ms. Psak that the Force could not afford to pay for the best qualified applicant to PCS, she would have paid for her own move from DC to San Francisco. *Id.* Additionally, a jury could reject Mr. Wu's assertion that "having to add another FTE" would be somehow be detrimental to SFFO . Psak Decl. 5. Both field

---

[3] "Psak Decl." refers to Ms. Psak's Declaration supplied in support of this Opposition brief, with the following numeral referring to the numbered paragraph therein.

offices are always hoping to add personnel to respective locations to increase manpower. *Id.* Commanders of field offices are happy to simply get rookies straight out of FLETC. To suggest that it would be bad to add a FTE with specialized training and experience specifically for the position announced is the opposite of the truth. Psak Decl. 5. Ms. Psak had plainly exhibited she was not only an excellent officer but especially an exemplary canine handler for which she was recognized both regionally and nationally. Psak Decl. 5.

Additionally **creating both triable issues of fact and the inference of pretext** are the facts that: (1) Officer Peterson was given extra time to take the written examination when other applicants were not given such time; (2) Deputy Chief Hay asserted reasons why Officer Peterson was selected but could not explain that exam delay time; and (3) Chief Lauro concurred with the selection but did not know the reasons for it, and admitted not knowing why the exam delay time was allowed. ROI-09 B-6, p. 2; ROI-09 B-8; ROI-09 B-7; *see* ROI-09 B-1 (Background Statement) (investigator's summary of obtained testimony).

Ms. Psak testified there existed an informal policy that current canine officers would receive first consideration for open positions, and the union steward Officer Ramos provided a memo to that effect to Maj. McCarthy, the same as was done for two prior Canine Handler officers in 2001 and 2003. ROI-09 B-6, p. 4; ROI-09 B-11, p. 4; Psak Depo. at 22-23 & exhibit 1 (memo). **Creating a question of fact and pretext**, Chief Lauro denied any such policy existed. ROI-09 B-7, p. 2. Moreover, according to the Canine Handler position description, the selectee must have "specific knowledge of police canine techniques" and the knowledge, skills and abilities to include:

- Skill in developing and carrying out both written and oral presentations concerning canine involved searches, rescues, and other activities of the unit

- Knowledge of both local and federal laws as they affect the canine unit in combating crime

- Ability to instruct peers and supervisors on the most effective manner to utilize the canine unit in accomplishing the patrol function

- Ability to effectively handle and deploy a police canine in high stress law enforcement situations as well as routine law enforcement duties

- Basic knowledge of diseases and other health related problems that may effect a

police canine.

ROI-09 B-12 (Exh. 16, Canine Handler position description), pp. 4-5.  Not one of these skill sets

supported Officer Peterson's selection. *See* ROI-09 B-9 (Exh. 11, Wu Aff.), pp. 1-2.

Objective evidence shows Ms. Psak was far more qualified than Officer Peterson for the

San Francisco Canine Handler position. ROI-09 B-4 (Exh. 1), p. 16 (highlight information in table

below); *see* ROI-09 B-15, Exh. 20 (Ms. Psak's evaluation criteria comparison data, certificates of

training, and memos and certificates of commendation and appreciation).

| Officer Peterson | Officer Psak |
|---|---|
| Won an *office* award for Officer of the Quarter | Won a Professional K9 Association award |
| Master Patrol Officer - special assignment above & beyond the duties of a normal patrol officer | National K9 Patrol Case of the Quarter (competing against K9 handlers from 25 regions across the United States) |
| No Canine Officer experience | Canine Officer - special assignment above & beyond the duties of a normal patrol officer |
| Collateral Duties as Court Liaison Officer | Collateral Duties as Crisis Negotiator |
| No known accolades. | Received Certificate of Appreciation from U.S. Department of Justice for meritorious service serving as a negotiator for a barricade situation that made National News |
| Seniority Score = 14.72 | Seniority Score = 20 |
| Test Points = 22.62 | Test Points = 40 |

According to the Defendant's position announcement, "pertinent knowledge, technical

skills or qualifications" were supposed to be considered as "40 percent" of the selection decision.

ROI-09 B-14 (Exh. 19). "Achievement or special recognition" were to be considered as another

"20 percent."  *Id.* The undisputed evidence shows Ms. Psak far surpassed Officer Peterson in 60

percent of the evaluation factors, and no other factor conferred a significant advantage upon

Officer Peterson. Simply put, Ms. Psak was objectively the superior candidate for the position, but

she was not selected, while a less qualified individual was selected for reasons not related to actual

job performance merit.  Defendant's managers denied knowing about Ms. Psak's prior EEO

protected activity, and they professed ignorance or deny relevant facts to which Ms. Psak testified under oath. *See* ROI-09 B-1 (investigator's summary of relevant testimony of interviewed witnesses). **The contested facts present triable issues** while they also support a finding of pretext that allows the inference of discrimination or retaliation or both. The trier of fact's rejection of a defendant's proffered reasons and explanations will permit the trier of fact to infer the ultimate fact of intentional discrimination. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 147 (2000); *Thomas v. Dist. of Columbia*, 227 F. Supp. 3d 88, 100-01 (D.D.C. 2016) (pretext can be inferred where defendant employer's proffered reasons are "unworthy of credence"), *citing Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981). As such, Defendant's motion for summary judgment on Count 1 should be denied.

      **B.**      **Complaint-14, Count 2: Hostile Work Environment and Retaliation (Forced Relinquishing of Badge, Gun, Car, and Credentials).**

On January 3, 2009, Ms. Psak filed her formal complaint of discrimination. ROI-09 B-4.

1.  As the investigation proceeded, various of Defendant's managers and employees provide statements. When the statements were provided to Ms. Psak, and invited to submit rebuttals, she was surprised and upset by the untruths and half-truths in those statements.  ROI-09 B-11.

While the investigation of that complaint was pending, Ms. Psak contacted the Employee Assistance Program (EAP) on July 22, 2008, and requested sick leave, which was approved. ROI-09 B-6, p. 5 (item 5); Def. Exh. 7 (Brodie letter, Sept. 4, 2008).  By letter dated September 4, 2008, however, Commander Brodie threatened Ms. Psak with AWOL unless she reported for duty on September 15. Def. Exh. 7 at 1. At the same time, the letter both demanded additional medical documentation of her health situation *and* prohibited Ms. Psak from reporting for duty without her supervisor Quinn's approval. *Id.* at 1, 2.

Ms. Psak testifies in her Declaration at paragraph 12 that this threat of being charged AWOL was arbitrary and not based on any Force General Order, established Force policy, Agency regulation or OPM regulation. While the letter had Kenneth Brodie's signature at the bottom of it, he had no memory of writing it. (Brodie depo. at 23-24, referring to depo. exh. 1). Based upon

evidence, Ms. Psak states the driving force behind this threat of AWOL and subsequent threats of adverse personnel actions such as termination was RMO Karlyn Payton.  The September 4 letter was preceded by two separate phone conversations with Jacqueline "Jackie" Brown during which Ms. Psak assured Brown that she was under the care of a licensed clinical psychologist. Psak Decl. 12. On September 2, 2008 Brown left a bizarre voicemail on plaintiff's Force issued cell phone, complaining and asking why she had not received a doctor's note yet when Ms. Psak supposedly had promised it. Ms. Psak made no such promise. Brown, the Force's compensation manager, told Ms. Psak that she needed medical documentation to submit to OWCP – but a jury could determine that Brown's assertion was untrue. In fact, Ms. Psak had previously sent two email requests (July 24, 2008) for her supervisor Sergeant Quinn to provide a form CA-16 that she could take to her physician to complete, but Quinn did not answer the emails.  The fact was, Sandra Hammond, the Shift Commander, had granted the sick leave request on July 22, 2008 around 2200 hours. From that moment forward, Ms. Psak was using her accrued leave, both annual leave and sick leave (ROI-15,[4] Exh. 18, pp. 3-6). According to her time and attendance record, Ms. Psak was not absent without leave (AWOL) at the time of the September 8 letter's threat. Psak Decl. 12.

Notably, Ms. Psak testifies in paragraph 13 of her Declaration that she had been following the sick leave policy in described in General Order 33.01. The established policy and procedure at that time was to complete the USPP Form 4 (Sick Status Request), initiated by Dispatch, when the employee returned to work. Prior to her EEO complaint, in in more than 13 years on the job that Ms. Psak had never been required to submit medical documentation for her absence due to illness prior to her return to work. Psak Decl. 13; ROI-15, Exh. 18, pp. 7-8.

The psychologist, Dr. Fridy, nevertheless provided to Defendant a Treatment Summary for Ms. Psak dated September 8, 2008, indicating diagnoses of Major Depression Disorder and PTSD, and describing the ongoing course of treatment (psychotherapy and antidepressant medication). Def. Exh. 8. The prognosis was good, but Ms. Psak was advised not to return to work until her

---

[4] "ROI-15" refers to Report of Investigation, NPS-14-0392 & NPS-15-0098, excerpts attached as Exhibit C.

symptoms had improved. *Id.* at 2.  The Treatment Summary fulfilled the Defendant's demand for additional medical documentation. Psak Decl. 23. By letter dated September 26, 2008, Commander Pierce directed Ms. Psak to relinquish her service firearm, badge, vehicle, police credentials and service canine (Malu). Def. Exh. 9.  This directive treated Ms. Psak as though she were under suspicion of misconduct, which would reasonably fuel rumors and damage her reputation. Moreover, there was no regulation requiring Ms. Psak to turn over her police credentials. The applicable regulation, General Order 33.01, allows for taking the gun, badge and car, but not the credentials. *See* ROI-09 B-1, p. 10 (last paragraph); ROI-09 B-7, item 10; ROI-09 B-11, p. 15, item 9; Psak Decl. 15. A similarly situated employee, Officer Kimberli Bransom was on extended sick leave exceeding 30 consecutive days during the same time frame but was required to surrender only her assigned government vehicle. Psak Decl. 16.

Defendant's treatment of Ms. Psak's sick leave situation was contrary to two previous instances of her own and of other employees, and it violated policy by stripping her of police credentials for no reason. Psak Decl. 15, 16; ROI-09 B-11. This treatment, especially when imposed upon a person who is suffering depression and PTSD, is harassment that constitutes a hostile work environment. In addition, the hostile treatment came right when Ms. Psak's prior EEO complaint was recently filed and investigation was underway.  Retaliation for her EEO activity can be easily inferred from Defendant's conduct.

### C.    Complaint-14, Count 3: Hostile Work Environment and Retaliation (Forced Retirement of Canine Partner)

As noted in subsection (B) above, the September 4, 2008 letter demanded Ms. Psak give up and/or retire her canine partner, Malu. Def. Exh. 9. This demand occurred during the pendency of the prior EEO investigation, and while Ms. Psak was on leave due to depression and PTSD. There was close temporal proximity between Plaintiff's prior EEO complaint, the pending investigation, her mental health sick leave, and Defendant's gratuitous effort to deprive Ms. Psak of her canine partner and companion. The harassment and hostile environment aspect is palpable. As Ms. Psak testifies in paragraph 20 of her Declaration, the bond between a canine and handler is extremely powerful. Although the animal is government property, the canine is considered part of a handler's

family. Knowing the bond that Ms. Psak with Malu, the proposed kenneling of was deliberately used to inflict harm by punishing her financially, and by separating her from the only family she had in the area. Psak Decl. 20 (quotation marks omitted).

The financial impact is real as well. While on leave, a canine handler receives daily compensation for canine maintenance on assigned workdays. That hour of canine maintenance is deducted from the number of hours of leave used per day. So a canine handler who works a 10-hour shift will only use 9 hours of leave each day s/he is not "at work" as s/he must still perform one hour of work caring for the assigned canine even in a leave status. However, on assigned sign-off days, the handler is compensated in overtime hours for animal care. Psak Decl. 20 (quotation marks omitted). In addition, efendant treated Ms. Psak disparately concerning the canine partner. There were four other officers who had been on sick leave but kept their canine partners. ROI-09 B-6; Psak Decl. 20.  Demanding the dogs be kenneled during sick leave is "never done." Psak Decl. 20. Kenneling costs about $25 per day, and during that time the officer would lose an hour's compensation while having to pay any medical expenses that arise. *Id.* All of these circumstances could only fuel Ms. Psak's depression. *Id.*

Defendant's Motion asserts Ms. Psak "was not required to retire her dog," but that bare statement evades the truth. *See* SOF Fact. 36. Ms. Psak testifies in paragraph 21 in her Declaration that she only asked that her assigned canine partner be retired because it was mentioned in the letter from Defendant dated September 26, 2008. This was a forced choice to spare Malu from the cruelty of isolation from his pack leader (plaintiff) and two other canines in his pack. Ms. Psak requested retiring Malu also to prevent herself from further emotional distress she would have suffered without having her best friend beside her during what was already a very stressful time. Psak Decl. 21 (quotation marks omitted). The upsetting development is directly proximal to her recent and ongoing protected activity.

### D.    Complaint-14, Count 4: Hostile Work Environment and Retaliation (Reassignment to Explosive Detector Canine Handler Position)

As cited above, Ms. Psak had filed an EEO complaint in January 2008, and Defendant's managers knew about it because of their interviews. *See* ROI-09. After Ms. Psak returned to work

in non-Canine positions, and while her EEO case was pending a final agency decision, she was involuntarily assigned to the position of Explosive Detector Canine Handler in August 2010. Psak Decl. 33, 36, 37.  Ms. Psak testifies in paragraph 37 of her Declaration that she did not request to be reassigned, but was told by Robert LaChance and Jeffrey Quinn (that same supervisor who had known about Ms. Psak's prior EEOs and health issues) that she had to work a bomb dog. Well before Ms. Psak was reassigned, a male canine officer junior to her was trained to work a patrol dog. Officer Ernest Patrick attended training along with Sergeant Mike Wallace in the fall of 2009, so Officer Patrick was a better fit for the bomb dog job. In the entire history of the USPP Canine Unit, as Ms. Psak had known it, no handler had ever been involuntarily reassigned to a different canine discipline. The LMA prohibits involuntary reassignment of sworn Force members who hold the rank of Private except for disciplinary reasons. Plaintiff was a Private for her entire career and thus should not have been involuntarily reassigned. Psak Decl. 37 (quotation marks omitted).

A jury could reject as Defendant disingenuous claim that Ms. Psak volunteered for the bomb dog position, when in fact Ms. Psak had only once by email responded to an inquiry expressing generally a willingness to consider bomb dog work. Psak Decl 34. In the bomb dog position, Ms. Psak received less pay than before. Complaint-14, ¶¶ 103-04, 166. A jury could infer that assigning Ms. Psak to this position against her will and treating her different from others and in contravention of policy, reveals Defendant's managers' intentions to keep the pressure on her was part of the hostile environment they were maintaining.

**E.**    **Complaint-14, Counts 5-7, 9-12: Hostile Work Environment, Retaliation, and Violation of the Rehabilitation Act (Improper Medical Inquiries)**.

The Rehabilitation Act, 42 U.S.C. § 12112 as amended, defines "prohibited examinations and inquiries":

(4)  Examination and inquiry.

(A)  *Prohibited examinations and inquiries*. A *covered entity shall not require a medical examination and shall not make inquiries of an employee* as to whether such employee is an individual with a disability or as to the nature or severity of the disability, *unless such examination or inquiry is shown to be job-related and consistent with business necessity*.

(B)  Acceptable examinations and inquiries. A covered entity may conduct voluntary medical examinations, including voluntary medical histories, which are

part of an employee health program available to employees at that work site. A covered entity may make inquiries into the ability of an employee to perform job-related functions.

(C)  Requirement. Information obtained under subparagraph (B) regarding the medical condition or history of any employee are subject to the requirements of subparagraphs (B) and (C) of paragraph (3).

42 U.S.C. § 12112(d)(4) (emphasis added).

The above-referenced "subparagraphs (B) and (C) of paragraph (3):" state:

(3)(B)  information obtained regarding the medical condition or history of the applicant is collected and maintained on separate forms and in separate medical files and is treated as a confidential medical record, except that–

(i)  supervisors and managers may be informed regarding necessary restrictions on the work or duties of the employee and necessary accommodations;

(ii)  first aid and safety personnel may be informed, when appropriate, if the disability might require emergency treatment; and

(iii)  government officials investigating compliance with this Act shall be provided relevant information on request; and

(3)(C)  the results of such examination are used only in accordance with this title.

42 U.S.C. § 12112(d)(3)(B)&(C).

Regardless of whether she has a "disability known or unknown" to her employer, Plaintiff Ms. Psak may allege a Rehabilitation Act violation against the Defendant employer for its having imposed a medical inquiry or examination that is unlawful under 42 U.S.C. § 12112(d)(4)(A). *Conroy v. N.Y. State Dep't of Corr. Servs*., 333 F.3d 88, 94 (2d Cir. 2003) (citing several sister circuit precedents), *followed by Blake v. Balt. Cty*., 662 F. Supp. 2d 417, 422 (D. Md. 2009), *and Lewis v. Gov't of D.C.*, 282 F. Supp. 3d 169, 188-89 (D.D.C. 2017). "[A]n employer cannot 'make inquiries of an employee' as to the existence or extent of her disability unless such knowledge is 'shown to be job-related and consistent with business necessity.'" *Lewis*, 282 F. Supp. 3d at 188, *quoting*  42 U.S.C. § 12112(d)(4)(A).

"The business necessity standard is quite high, and is not to be confused with mere expediency." *Lewis*, 282 F. Supp. 3d at 188, *quoting Cripe v. City of San Jose*, 261 F.3d 877, 890 (9th Cir. 2001) (internal quotation marks and citation omitted).  Defendant here "must prove: (i) that the asserted 'business necessity' is vital to the business, (ii) that the examination genuinely

serves the asserted business necessity, and (iii) that the request is no broader or more intrusive than necessary." *Blake*, 662 F. Supp. 2d at 422, *quoting Conroy*, 333 F. 3d at 98 (internal quotation marks and ellipsis omitted).

In this summary judgment context, Defendant must prove all three elements with undisputed evidence. *See Doe v. Gates*, 981 F.2d 1316, 1324 (D.C. Cir. 1993) (affirming summary judgment where holding "enough undisputed evidence exists in the record" to support the defendant agency's defense); *Mahnke v. Wash. Metro. Area Transit Auth*., 821 F. Supp. 2d 125, 133 (D.D.C. 2011) (holding "the defendant must demonstrate that undisputed evidence conclusively establishes" the factual defense in order to obtain summary judgment).

Complaint-14 alleges seven causes of action based upon unlawful medical inquiries that occurred in the 2008 time frame.

### 1.     September 4, 2008 Medical Inquiry.

As discussed and cited above, Ms. Psak requested and obtained permission on July 22, 2008, to take sick leave for reasons of stress arising from the hostile working environment. ROI-09 B-6, p. 5 (item 5).  Ms. Psak took annual and sick leave from that point on. Psak Decl. 12. On July 24, 2008, she emailed requests to her supervisor, Sergeant Quinn, to provide a form CA-16 for her physician to complete, but Quinn did not answer the emails. *Id.*; *see* ROI-09 B-5 (Exh. 3) (Sept. 5, 2008 Memo confirming the requests).

Then Commander Brodie's September 4, 2008 letter demanded additional medical documentation of her health situation. Def. Exh. 7 at 1, 2.  Neither the letter itself nor Defendant's Motion have supplied undisputed evidence to prove the three elements of business necessity: (1) a "vital" agency necessity; (2) the medical information is "genuinely serves" the agency's necessity; and (3) the request for medical information "is no broader or more intrusive than necessary." *Blake*, 662 F. Supp. 2d at 422, *quoting Conroy*, 333 F. 3d at 98.

Defendant's Motion refers to the medical inquiries issue but nowhere meets the summary judgment standard of proof of the three elements by undisputed evidence.  *See* Def. Mot. at 39-41. All three elements are missing from Defendant's argument. Even if the Motion's general, evidence-free assertions about agency necessity were accepted, the Motion does not even attempt

to show that the September 8 letter sought medical information "no broader or more intrusive than necessary."  Defendant's Motion has failed to establish any of the three elements necessary to prove the business necessity defense to 42 U.S.C. § 12112(d)(4) liability.

**2.      October 22, 2008 Medical Inquiry.**

Continuing in the time frame as above, Dr. Fridy provided to Defendant a Treatment Summary for Ms. Psak dated September 8, 2008, indicating diagnoses of Major Depression Disorder and PTSD, and describing the ongoing course of treatment (psychotherapy and antidepressant medication). Def. Exh. 8. The prognosis was good, but Ms. Psak was advised not to return to work until her symptoms had improved. *Id.* at 2. The Treatment Summary fulfilled the Defendant's demand for additional medical documentation. Psak Decl. 23.  This medical information informed Defendant about Ms. Psak's health situation and what the plans were.

Shocked by the September 4 letter, Ms. Psak responded with information directly relevant to her health condition with her September 5 letter, stating in pertinent part:

> I hope you realize that my unscheduled leave constitutes a true emergency to me. If you are aware of my conversation with Lieutenant Hammond, then you should also be aware that *I sought 24 hour counseling services from the Federal Occupational Health Employee Assistance Program (EAP) that night*. I am in a state of crisis and *getting phone calls and letters like yours has only served to exacerbate the stress.* I am dealing with from management officials on the Force. Had I slashed my wrists that night, or had I suffered a chemical accident and been temporarily blinded and unable to work, would I be harassed about medical documentation?

ROI-09 B-13 (Exh. 18), p. 3 (emphasis added).

Ms. Psak's September 5 letter provided additional health condition facts, which were confirmed by Dr. Fridy's September 8 Treatment Summary. Subsequently, Ms. Psak requested advance sick leave via the appropriate form on October 2, 2008. ROI-09 B-21 (Exh. 30). Psak indicated her request was based upon her need for a "convalescence period." *Id.*

Then by letter dated October 22, 2008, Commander Brodie demanded "detailed medical information from your physician concerning your current ability to perform your duties ... [including] the medical basis for any conclusions that are reached." Def. Exh. 12 at 1.  This demanding letter mentioned Dr. Fridy's Treatment Summary but seemed to ignore its contents and ignore the previous information provided. In fact, Defendant had enough information to know

what Psak's condition was: She was not yet ready, for verified medical reasons, to return to work.

Ms. Psak's Declaration testimony establishes:

> Dr. Tonya Fridy's letter dated September 8, 2008 met the demands of Agency RMOs: to provide documentation for plaintiff's continued absence. The last paragraph indicated plaintiff was responding well to treatment and had a positive prognosis. Dr. Fridy clearly stated that she recommended the plaintiff "not return to her job until her symptoms have stabilized." Had the plaintiff been able to return to duty on or before October 22, 2008, she would have done so.

Plaintiff's Statement of Genuine Issues ( Pltf. Stmnt.) Nos. 40-41, *citing* Psak Decl. 23.

The October 22 letter said the information was needed to "properly consider and accommodate" Psak's condition.  In fact, Psak had *not requested any accommodation*, so the letter's request was not genuine and did not seek information necessary on that ground. Psak Decl. 22. A jury could regard the October 22 letter's demand for more medical information as mostly harassment, (as ironically confirmed by Defendant's October 30, 2008 letter rejecting Psak's request for sick leave. ROI-09 B-20 (Exh. 27).  The rejection letter admitted: "The authority to grant advance sick leave is *left solely to the discretion of the agency*." *Id.* at 1.)  The "sole discretion" of the agency means the Defendant's Commander Brodie did not have to deny the advanced leave request – but *he chose to deny it.* Commander Brodie's letter recites several policy factors he could consider, including "the reason for the request, the nature and duration of employment, and any supporting documentation received in conjunction with the request." *Id.* Commander Brodie knew the serious reasons, knew Psak's employment history, and had received documentation about her mental health situation, diagnosis, treatment, and prognosis.  He was also on notice of her pending EEO matter.  He could have granted the requested leave – he opted instead to add the pressure to a woman suffering from major depression and PTSD.  He gave no good reason to make this situation harder for Psak than it already was.  Commander Brodie's letter noted Psak had used up all of her leave except for 121 hours of leave earned from performance awards. *Id.*  No benefit of the doubt, no recognition of Psak's years of service – Commander Brodie just cut her off because he could.

### 3.    December 12, 2008 Medical Inquiry.

Farther along in the same time frame above, on November 15, 2008, Psak's physician, Dr.

Karesh, provided to Defendant his report of Psak's medical health condition. Def. Exh. 13. Dr. Karesh described Psak's greatly improved condition, the course of future care, and his opinion that she would be ready to return to duty on November 16, the following day. *Id.* at 2.

Dr. Karesh completed every document that Responsible Management Officials (RMOs) specially created for her and also furnished an additional one and one half page clinical summary. Psak Decl. 24. Dr. Karesh reviewed each document, followed the instructions and thoroughly completed each section. He clearly stated, "Jerre Psak is capable of performing all of the essential duties described in this packet." On the page marked B4, item number 7 instructs the physician to, "List any medication requirement(s) (prescription and non-prescription-type and dosage) that would, or does affect performance, behavior or safety concerns that are directly related to the position." Dr. Karesh provided a complete response indicating, "Prescribed medication shouldn't negatively impact abilities or interfere with performance of duties." Psak Decl. 25. The two items (8,9) that followed provided an opportunity for Dr. Karesh to identify any concerns or reservations with respect to Psak's medications or if he had any additional medical concerns at all. His clear response to item 8 was "none" and his response to item 9 was "none." Psak Decl. 26. Dr. Karesh cleared plaintiff for full duty. Requiring Psak to provide information about ongoing treatment she received on her personal time was neither job-related nor consistent with business necessity. Plaintiff considered it an invasion of her privacy. Psak Decl. 27.

On December 12, 2008, Commander Brodie indicated that he was requiring Psak undergo a fitness-for-duty examination (FFD), claiming that he had "no indication from your physician as to what your medicinal regimen is and the affect that it can have on your ability to function and perform." Def. Exh. 14 at 1.  Commander Brodie's statement was patently false. As described above, Dr. Karesh had provided considerable details in his November 15 letter – and where asked for additional insights about negative effects or limitations, Dr. Karesh indicated "none."

The demand for the FFD was not defensible as a legitimate business necessity under the three elements and thus constituted a violation of the Rehabilitation Act. *Blake*, 662 F. Supp. 2d at 422.  The FFD demand did manage to increase the negative pressure on Psak, however.  It was part of the pattern of harassment creating the pervasive hostile environment Psak had to endure.

**4.    A Jury could Infer That All Three Medical Inquiries Constituted Unlawful Retaliation.**

Especially applicable here, the statutory "ban on discrimination includes a prohibition on improper medical inquiries, 42 U.S.C. § 12112(d)(1), and evidence of the latter, *even if not actionable in its own right, may bolster [plaintiff's] disparate-treatment and retaliation clai*" *Porfiri v. Eraso*, 121 F. Supp. 3d 188, 198 (D.D.C. 2015) (emphasis added).  In the retaliation context, the Defendant's actions, even if *arguendo* "not rising to the level of 'adverse actions' for purposes of a discrimination claim, would plausibly suffice for a retaliation claim — the latter 'requir[ing] less' of a showing of material adversity than a non-retaliation claim." *Porfiri,* 121 F. Supp. 3d at 199, *quoting Joyce v. Office of Architect of Capitol*, 966 F. Supp. 2d 15, 23-24 (D.D.C. 2013). It bears repeating: "The Rehabilitation Act bars acts that 'a reasonable employee would have found . . . materially adverse, which in this context means it well might have dissuaded a reasonable worker from' engaging in a protected activity."  *Porfiri*, 121 F. Supp. 3d at 199, *citing Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67-68 (2006) (citation and quotation marks omitted). The three medical information / examination demands with their concomitant threats of adverse employment actions (September 4, October 22, and December 12) came hard on the heels of Psak's filing her EEO complaint and her taking months of sick time (depleting her accrued sick and annual leave) due to work-related major depression and PTSD.  Psak, trying to survive in the hostile environment to complete her federal law enforcement career, developed major depression and experienced PTSD. There is no way a reasonable person in that condition would have filed an EEO complaint, unless it was to challenge a major suspension penalty or dismissal – if the person knew the agency would be *stepping up the pressure* via unlawful medical information demands and threats.  Even more so when these demands and threats accompanied other official actions stripping the person of her professional honor, taking away all of her law enforcement equipment and credentials, and even taking away her canine companion. The hostile environment and retaliation were fully evident – Defendant's Motion fails to provide the necessary undisputed evidence to foreclose a finding of harassment and hostile environment.

### F.   Complaint-14, Count 8: Hostile Work Environment, Retaliation, and Violation of the Rehabilitation Act (Improper Medical Inquiry)

During the period from December 2008 through 2014, Plaintiff continued to engage in EEO protected activity by prosecuting her EEO claims and filing the instant lawsuit on January 14, 2014, litigating the claims raised therein. Per Sergeant Waldman's December 19, 2013 email requiring a physical examination, Psak made an appointment for and completed her annual medical examination on February 27, 2014. Psak Decl. 40.  Learning from personal experience, but also knowing the culture of managers openly discussing employees Protected Health Information (PHI) with each other, Psak used extreme care to ensure only FOH *medical* staff had access to her PHI. She made clear in writing on the FOH Authorization for Disclosure of Information, that no one from the Agency had permission to access her PHI. *Id.*

On July 21, 2014, Sgt. Waldman opened a package from the FOH, which contained the results of physical examinations for several officers, including Psak's results. Def. Exh. 19, at 5. By doing so, Waldman violated Psak's written directive regarding her PHI as well as HIPAA. Psak Decl. 41.  Defendant might contend Waldman did not review Psak's actual physical exam results, but he did keep the copy of information, he had access to it, he had ample opportunity to share the information with others in management, and he readily provided that information to the EEO investigator, so much so that the investigator had to stop him from reading it aloud to her. Psak Decl. 43.  Indeed, Sgt. Waldman told Psak by telephone that he was "the Medical Review Sergeant," and that his job was to review employees' medical information. ROI-15, Exh. F-1, p. 6. Waldman had no need to review the information, however, as he was not a medical or healthcare practitioner; his real job was to schedule medical appointments and handle record keeping. *Id.* He did not have permission to review Psak's records, especially after she made it abundantly clear that she gave no permission to anyone. *Id.*

On August 12, 2014, Defendant requested additional medical information from Psak's physician. Def. Exh. 19, at 17, 21.  The demand was that information be provided to Sergeant Waldman.  ROI-15, Exh. F-1, p. 7. Then, on August 26, 2014, Psak questioned Sgt. Waldman (the Clinic Liaison Supervisor)  about why he had accessed her medical documents when she had

expressly stated in writing that no one at the Agency had permission to access them. He treated her in a threatening manner, asserting that he was the "Medical Review Sergeant," and because he signed a confidentiality form, he could review medical records. ROI-15, Exh. F-1, p. 10.

The way this 2014 physical exam and medical documents matter was handled by Sgt. Waldman and whomever he received orders from, follows the pattern of making things intrusive and difficult for Psak.  Simply put, it was harassment that continued the hostile environment. Psak had a basis to believe that as of August 15, 2014, Waldman knew of her protected EEO activity being underway. ROI-15, Exh. F-1, p. 4. Her lawsuit had been filed earlier that same year, so other Defendants' managers knew.[5] ROI-15, Exh. F-1, p. 4. Per the legal authorities cited above, even if the jury believes Sgt. Waldman's denials regarding Psak's pending EEO complaint, the demand for more medical information without a proven business necessity and the deliberate unauthorized access to medical information, constitute evidence of Rehabilitation Act violations.

## G.    Complaint-14, Count 13: Hostile Work Environment (Sexual Harassment)

On December 4, 2014, Psak was performing her duties in the roll call room of the Special Forces Branch working on a computer, and several male officer were present in the same work space. Def. Exh. 1 at 116. The officers were loudly playing a You Tube video that violated agency policy regarding inappropriate language in the work place because it was laden with profanity and sexually explicit insults toward women. *See* ROI-17,[6] pp. 185-186 (report detailing offensive content). Although Psak made it known she was offended by the language, the male Officers continued to play the video. Lt. Jeff Schneider who was present in the work space did nothing to

---

[5] Defendant's Motion at page 32 states the applicable law: "The Court of Appeals has unequivocally stated that there can be no retaliation if the acting official had no knowledge of the prior protected activity. *Jones v. Bernanke*, 557 F.3d 670, 679 (D.C. Cir. 2009). Absent direct evidence of knowledge, at the prima facie stage a plaintiff can try and prove circumstantial evidence of knowledge by showing that *the employing agency knew of the protected activity and an adverse action occurred very close in time. Walker v. Dist. of Columbia*, 279 F. Supp.3d 246, 277-78 (D.D.C. 2017)"(emphasis added).  In Psak's case, she engaged in ongoing protected activity with EEO complaints filed and investigated from 2004 until 2017.  Defendant's managers in this small organization can hardly plead ignorance of her protected activities.

[6] "ROI-17" refers to the Report of Investigation,  NPS-16-0522, excerpts attached as Exhibit D. Cites in this brief are to the sequential Bates numbers of the ROI.

correct the situation. In addition, Cpt. Steven Booker became aware of the situation but did not

report it until after Psak had reported the incident. Pl. Ex. C, ROI-15, Exh. F-1, pp. 11-13.

There are issues of fact regarding Defendant's claim that Lt. Schneider did not hear the

offensive video. Psak testified:

> I reported that Schneider failed to take action during a violation of the Zero
> Tolerance policy when he allowed an inappropriate video, laden with profanity and
> gender slurs, to play in the SFB roll call room for about four minutes as he sat just
> seven feet across from (directly facing) the two white male SWAT officers
> enthralled by its derogatory content which I found to be offensive and degrading to
> me as a woman. The video content denigrated women. The discourse consisted of a
> raving white male U.S. Army Officer and an Iraqi translator. Throughout the tirade,
> the disgraceful soldier made threats of violence, called Iraqi police "too fucking
> pussy" and "a bunch of fucking women" "you're too much of a fucking woman"
> among other things and attributed cowardice, weakness and lack of leadership to
> women. To add insult to injury, the two "he men" found the video so amusing that
> once the tirade was over, one of them parroted the soldier, snickering and saying
> something unintelligible followed by pussy [and laughter].... All of which
> Schneider claimed he did not hear. Strangely everyone else in the room heard the
> video. Believe it or not, Schneider was the only one in the room who claimed that
> he did not hear a solitary word broadcast just seven feet away from him.

Pl. Ex D, ROI-17 at pp. 481-82 (Exh. F1E).

If this incident were a single occurrence in 15 years, it might be excused as an aberration,

but it was part of a sustained pattern of harassment creating a hostile environment. To determine

whether an actionable hostile work environment claim exists, courts "*look to 'all the*

*circumstances*,' including 'the frequency of the discriminatory conduct; its severity; whether it is

physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably

interferes with an employee's work performance.'" *AMTRAK v. Morgan*, 536 U.S. 101, 116

(2002) (emphasis added; citation omitted). "A hostile work environment claim is comprised of a

series of separate acts that collectively constitute one 'unlawful employment practice." *Id.* at 117,

*citing* 42 U.S.C. § 2000e-5(e)(1). Treatment that creates the hostile work environment includes

that which had the purpose or effect of unreasonably interfering with the work environment and/or

creating an intimidating, hostile, or offensive work environment. *See Henson v. City of Dundee*,

682 F.2d 897, 909 (11th Cir. 1982).

Over the period of years, Defendant's managers exploited ways to make work life difficult

for Psak, so much so that she took extended sick leave to deal with PTSD and major depression.

This You Tube video incident was one more instance where males in the workplace do something to needle Psak, to provoke her sensibilities and offend her, and then see what she would do about it. The supervisor sitting in the very same room then acts ignorant in order to protect the harassers. All the *faux* apologies of the participants are like so many instances of school yard bullies -- followed by "I'm sorry, Teacher" and suppressed grins. Trying to do professional work in an environment where she was being watched, bothered, and harassed when possible, having to watch her back – was Psak's work life, and a jury could reasonably deem it a hostile work environment.

## II.   All of Complaint-18's Causes of Action Are Also Sufficiently Supported By Evidence To Withstand Defendant's Motion.

### A.   The Essential Background of the Allegations of Complaint-18.

Plaintiff Psak, for purposes of anti-discrimination, anti-retaliation law, can be described with categories: Asian, female/gay, disability-mental (Post Traumatic Stress Disorder (PTSD) and Major Depression) and disability-physical (car accident), and prior EEO activity in 2004, 2008, and 2015.  Psak served as a Private, Canine Officer assigned to the Canine Unit of the Park Police, working in the Special Forces Branch (SFB), under the Homeland Security Division. Psak worked continuously for that Canine Unit since August 15, 2010, continuing her career that started on July 16, 1995. ROI-17, p. 131 (Exh. F-1).  Her supervisor was Sgt. Jeffrey Quinn and her next level supervisor was Lt. Jeffrey Schneider. ROI-17, pp. 6-7 (Inv. Summ.).

From October 5, 2016  until December 3, 2016, Psak reported to Captain James Murphy. Beginning December 6, 2016 until December 16, 2016, she reported to Sgt. Quinn on Tuesdays and Wednesdays and Lt. Schneider on Thursdays and Fridays. When she returned to full duty on December 17, 2016, Sgt. Quinn became her immediate supervisor along with Lt. Schneider being her second level supervisor.  ROI-17, p. 7.

Defendant's managers were aware of her race, sex, sexual orientation, and disability. Psak was only the second Asian female hired by USPP.  The Responding Management Officials (RMOs) know her personally. ROI-17, pp. 131-132.

Per the investigator: Psak was in the SWAT & Canine Unit, a part of the Special Forces under the IPB, a Division of Homeland Security. There were 13 SP-0083-01 K9 Officers in the

Canine Unit. All the Officers were identified as white except Psak. Out of the 13 Officers there were only two females, including Psak. The Canine Unit included also two SP-0083-04 white male Sergeants and one white male SP-0083-05 Lieutenant. ROI-17, pp. 38-39.[7]

Psak observed that the USPP culture favored white males and did not welcome women. As described previously in this brief and based upon observation, Psak was targeted in a way that no male officer has. ROI-17, p. 7. Regarding disability, Psak filed her EEO complaint, and subsequently this lawsuit, on the basis of disability claiming management knew about her disability naming Karlyn Payton-Williams and Chief Robert MacLean as both knowing about her health condition since 2008. ROI-17, p. 7. Management was similarly aware of her condition since she reported it (major depression and PTSD) as work related and caused by a hostile work environment. ROI-17, p. 8. As noted above, prior to the 2016 complaint, Psak had filed three formal EEO complaints beginning in 2004. ROI-17, p. 135.  The second case (filed in 2008) and third case (filed in 2015) form the bases for Complaint-14. Some of the same RMOs in her past EEO complaints appeared also in her Complaint-18 case:  Payton-Williams, Maj. Steven Booker, Sgt. Michael Wallace, Chief MacLean and Lt. Schneider. ROI-17, pp. 9-13.

 Psak has testified she has been treated differently since she engaged in prior EEO activity beginning in 2004. She has felt the effect of being branded by her male managers as "disloyal," giving them reason in their minds to harass and retaliate. ROI-17, p. 135.  She has experienced retaliation via several means: disparate treatment with respect to the enforcement of Force General Orders,  investigating complaints against her, permanent reassignments with documented personnel actions, administration of counseling and threats of adverse action, lowered annual performance evaluation, illegally accessing her confidential medical information/protected health information, suspending her law enforcement authority for two years without justification, forcing the retirement of her canine partner due to her being on extended sick leave, imposing different

---

[7] Pl. Ex D, ROI-17 contains documentation from Beverly McKnight, Special Emphasis Program Manager for NPS, on July 16, 2014, about how the USPP is not welcoming to women.  Also included is an article in The Atlantic magazine, dated December 15, 2016, entitled, "The National Park Service Has a Big Sexual Harassment Problem," reporting a female-hostile environment that is endemic.  *See* ROI-17, pp. 185-86 (exh. F-lAb) & pp. 641-664 (exh. F-lG).

requirements for donating a dog to the USPP to become her K9 partner,  banning her from work premises, revoking her access to her work facilities, exclusion from training exercises despite having seniority as a Force Crisis Negotiator. ROI-17, pp. 8-9.

**B.      Complaint-18, Count 1: Failure to Accommodate.**

In Complaint-18, the first cause of action alleges: "Defendant violated the Rehabilitation Act by failing to accommodate Plaintiff's known disabilities." Complaint-18, ¶ 17.  The evidence establishing this violation follows: in August 2016, Psak sustained a head injury in an automobile accident. Complaint-18, ¶ 15; Psak Depo. at 144.  After some time off for recover, Psak returned to duty in a limited capacity for a period of time. Def. Exh. 1 at 144-45.  On or about October 11, 2016, she was informed that management had changed her work schedule when she returned to work. Complaint-18; ROI-17, pp. 392-393. Imposing the abrupt schedule change violated the then-current Labor Management Agreement (LMA), which provided the Agency must give an employee 14 days notice of a change in work schedule greater than four hours. Complaint-18; ROI-17, pp. 392-393 & p. 415 (encl. c).

Although Defendant approved Psak's request for light duty, albeit without engaging in a meaningful interactive process, Defendant assigned her to a position that was not appropriate given her medical issues and which exacerbated the symptoms from her injury and contrary to doctor's recommendations. ROI-17, p. 393 (Exh. F1b) & pp. 416-7 (encl. d1).  She experienced the work environment as exacerbating her symptoms from the concussion due to a work-related car accident: visual disturbances, nausea, headaches, noise sensitivity, cognitive processing difficulty resulting in slow reaction time, intermittent dizziness, and fatigue. On September 29, 2016, she reported to Lt. Schneider that the chaotic work environment in Dispatch which was counterproductive to her healing and more importantly was against her doctor's orders. ROI-17, pp. 393-394.[8]  Lt. Schneider replied the assignment was "temporary." *Id.* at 394.

---

[8] Pl. Ex. D, ROI-17, Exhibit F1B contains the supplementary interrogatories that Ms. Psak answered with detailed facts concerning the interactions and controversies that transpired concerning her attempt to return to work on "limited duty" or other accommodated status. ROI-17, pp. 390-409. The inference drawn from this document's contents is that Defendant's

On November 15, 2016, Psak's physician, Dr. Delasobera, submitted a report indicating Psak could return to police work but should be limited to four hours per day, increasing later to five hours per day. Def. Exh. 21. Psak's submission of Dr. Delasobera's report constituted an informal but effective request for reasonable accommodation. "To create an issue for the jury" a plaintiff must point to "sufficient evidence" in the record showing that she requested an accommodation and "that, after the request, [defendant] refused to make an accommodation." *Stewart v. St. Elizabeths Hosp.*, 589 F.3d 1305, 1308 (D.C. Cir. 2010), *quoted and followed by Stewart v. White*, 118 F. Supp. 3d 321, 325 (D.D.C. 2015). "In order '[t]o determine what an appropriate, reasonable accommodation would be, an agency should 'initiate an informal, interactive process with the qualified individual with a disability in need of accommodation.'" *Morris v. Jackson*, 994 F. Supp. 2d 38, 47 (D.D.C. 2013), *quoting Stewart*, 118 F. Supp. 3d at 324 (citation omitted). Defendant received Dr. Delasobera's report and recommendation and treated it as a request for accommodation. Adamchik Depo., Exh. 2 (Nov. 29, 2016 letter). Defendant should then have begun the interactive process. No interactive process occurred; Defendant refused to allow the four/five hour work schedule accommodation and simply ordered Psak to the duty Defendant preferred. *Id.* Defendant's conduct constituted a failure to accommodate.

### C. Complaint-18, Counts 2 & 3: Discrimination, Retaliation, and Hostile Environment.

In Complaint-18, the second cause of action alleges discrimination:

> Defendant violated the Rehabilitation Act and Title VII of the Civil Rights Act by subjecting Plaintiff to a hostile work environment and lowering her 2015 performance evaluation because of her sex, race and history of having a disability and filing complaints of discrimination.

Complaint-18, ¶ 20. The third cause of action alleges retaliation:

> Defendant violated the Rehabilitation Act and Title VII of the Civil Rights Act of 1964 by subjecting Plaintiff to a hostile work environment and by lowering her 2015 performance evaluation in retaliation for her seeking accommodation for her disabilities and filing complaints of discrimination.

---

managers looked for opportunities to make her return to work excruciating. There was no real reason to do that – unless they harbored discriminatory or retaliatory animus and were creating a hostile environment to drive her out.

Complaint-18, ¶ 20. In Psak's case, discrimination and retaliation by Defendant Agency are intertwined. Put simply, Psak falls within several categories, including Asian, female, and having a disability (actual or perceived) – and when she filed her EEO complaint alleging disparate treatment 2004 by management within the relatively small Park Police organization, the mostly white males and others outside Psak's categories never forgot her act of "disloyalty." Pl. Ex. D, ROI-17, pp. 136-137. She experienced harassment and a hostile environment ever since that 2004 EEO disparate treatment complaint. ROI-17, pp. 175-176, 178 (summarizing history). When opportunities arose to make her work life difficult, management took those opportunities. *See* ROI-17, pp. 8-9 (collecting many instances). Many of the same Agency employees and RMOs in 2004 remained through the 2008 EEO complaint period and up through the period in 2016 when the latest of the events took place. *See* ROI-17, pp. 9-15. The small organization is gossipy; personal information about employees, even when supposedly confidential, travels fast. ROI-17, Exh. F-1 (Psak Aff.), pp. 138, 144-145.

Defendant's Motion recites standard precedent language asserting that proving unlawful retaliation requires a close temporal proximity, such as less than eight months between the plaintiff's engaging in protected activity and the employer's reprisal. Def. Mot. at 32, *citing, inter alia, Payne v. D.C. Government*, 722 F.3d 345, 354 (D.C. Cir. 2013). Demanding proof of short time gaps between activity and reprisal make sense, perhaps, in an organization where an employee is just one among hundreds, or where there is substantial turnover in managers. But what happens when *a small cohesive organization remains in the same workplace* for four, eight, or twelve *years*? An act of "disloyalty," an EEO complaint against a manager in 2004, known to everyone, is not forgotten in eight months. It is not forgotten in four or eight years hence, as the same people are in the working environment continuously. Where, as here, Psak pursued ongoing EEO from 2008 until the present, 2016, in a workplace inhabited by the same managers, there is absolutely no reason to think the protected activities somehow were forgotten and could not possibly affect managers' treatment of the complaining employee in 2016 and 2017.

In Psak's case, there is *direct evidence* that her protected activities were still on supervisors' minds many months and years later. In 2016, Sgt. Johnson in conversation said to

Psak, "I hear you like to sue people." Psak Depo. at 139-140 (quoting the statement);  Johnson Depo. at 40 (admitting the words but recharacterizing the context).  This comment dovetailed with a prior conversation with Sgt. Johnson in October 2014, where Psak responded to an accusation by saying, "You're the only [supervisor] I have a problem with," and "Johnson responded smugly in a sing song tone, 'That's not what I hear.'" ROI-17, p. 144.  Sgt. Johnson thus confessed (as of 2014) he had heard complaints about Psak from others in the organization, in particular discussions about prior EEO complaints and/or district court action based upon EEO complaints.  In 2016, he repeated the same awareness of attitudes among management. Contrary to Defendant's arguments, there is no statute of limitations on deep-seated resentment.

The discrimination, retaliation and hostile environment causes of action have many facts in common. Looking at the facts in the 2015-2016 time frame, with the long history of adverse and hostile events, there is no denying the "evidence indicating that there is something 'fishy' about the facts of the case at hand that raises an inference of discrimination." *Harding v. Gray*, 9 F.3d 150, 153 (D.C. Cir. 1993).  The same facts and history support an inference of retaliation as well.

Consider the several incidents in the record. As noted above, in October 2014, Sgt. Johnson remarked snidely that he had "heard" negative things about Psak's relations with other managers. ROI-17, p. 144.  On March 13, 2015, Psak heard Sgt. Johnson making unpleasant remarks about a fellow female employee. *Id.* at 146. Psak confronted Sgt. Johnson about the remarks; he denied them; she raised a cell phone to suggest that everything these days can be and might be recorded. *Id.* Sgt. Johnson engaged Psak in a both defensive and heated verbal exchange during which, in addition to other things, he ridiculed her for having made previous complaints of discrimination by stating that he had heard that she "liked to sue people." *Id.* at 146-147; Psak Depo. at 139-140.  Sgt. Johnson and Psak met with Maj. Guddemi during the extended exchange, and at one point Maj. Guddemi asked the two people, "are we good here?" ROI-17, p. 147. The matter was over, but two hours later, Sgt. Johnson filed an administrative complaint against Psak alleging she engaged in criminal activity by recording his abusive conversation, that she had engaged in unprofessional conduct and insubordination, and that she had failed to devote time and attention to her duties.  ROI-17, pp. 248-251.

An everyday person's response to the Sergeant's action would be: *"Really??"* But people harboring discriminatory animus and resentments will do such things to their targets. The Agency then made it worse by assigning Sgt. Wallace to carry out the internal investigation of the complaint. Sgt. Wallace had previously been named as a RMO, a person who discriminated against Psak and contributed to the hostile work environment. *See* ROI-17, p. 268; ROI-17, pp. 473:615-618; Exh. F1-E, p. 499:1806-1821. Ultimately, Sgt. Wallace recommended that the charge regarding the audio recording not be sustained – because in fact there had been no recording – while the charge regarding disrespect toward a supervisor should be sustained. ROI-17, p. 253. Notably, Sgt. Johnson, a male having no history of complaining about discrimination, was not cited for his threatening and abusive treatment of Psak in the same interaction.

Another instance of untruthfulness, retaliation and harassment occurred in 2015. On May 28, 2015, Lt. Schneider emailed Psak to attend a "meeting" with him and Captain Booker (later Maj. Booker). ROI-17, p. 158. This was not the first time Psak was lured to a "meeting" by RMOs named in an EEO complaint. *Id.* at 158-159 (describing instances). The meeting took place on June 17, 2015. *Id.* at 163. Psak was not told the meeting was for "counseling." *Id.* at 158. Psak appeared for the "meeting" that was supposed to deal with a "performance" issue, but Psak found it focused a lot upon her use of non-clinic sick leave although no one else had ever been "counseled" about use of non-clinic sick leave, which is an employee benefit all the officers enjoyed. *Id.* at 161-163. She was aware of a white male employee who had a long pattern of abusing non-clinic sick leave but was not "counseled" for it. *Id.* at 165.

Moreover, this "meeting" / "counseling" session came right on the heels of Psak's report of the offensive misogynist You Tube video in the workplace. *Id.* at 164. As evidence the meeting was more for intimidation than remediation of any real problem: It is unheard of for the third line supervisor to attend a counseling session with an employee, i.e., a Major coming in to counsel a Private – when the Private's immediate superior was not in the meeting. *Id.* at 162. The "meeting" / "counseling" session also addressed some public complaints that had come into the Agency but had not yet been adjudicated and thus had not yet been sustained. *Id.* at 163. Until a complaint is sustained, it is not ripe for use in a "counseling" session. *Id.*

Then again on October 24, 2015, Sgt. Quinn gave Psak a lower performance rating (3.75) for 2015 than her previous annual rating (4.0) for 2014. ROI-17, p. 166. Sgt. Quinn explained the lowered rating was justified by the single substantiated public complaint. *Id.* Sgt. Quinn testified also, however, that the reduced rating was due to having "received so many complaints." ROI-17, p. 692 (Exh. F-3 (Quinn Aff.)). There is deception, however, in this answer. First, a single complaint need not affect the overall performance rating for an entire year. ROI-17, pp. 166-167. Another employee, for example, got a ticket while driving on duty but did not suffer a rating reduction. *Id.* Second, if the complaints were not substantiated, then they lacked merit and should not have been used against Psak. But Sgt. Quinn used the raw number of complaints as a metric, not the number of *substantiated* complaints.

Sgt. Quinn's action fit the pattern of "whenever we have an opportunity to disadvantage Psak, let's do it." Confirming this truth is the fact that a member of the public called in *to praise Psak during the same period*, a comparatively rare occurrence, but no one in the organization acknowledged the praise report, and Sgt. Quinn did not include it in the performance evaluation report. ROI-17, pp. 166-167.

### III.   Sworn Testimony Reveals Extensive and Repeated Instances of Evidence of Pretext Supporting Plaintiff's Causes of Action.

After 12 years of sustaining a hostile work environment against Psak, the RMOs and colleagues became unable to tell the actual truth anymore. Sir Walter Scott's famous dictum applies especially to the dissembling and untrue testimony given in the most recent EEO investigation: "Oh! What a tangled web we weave, when first we practice to deceive."[9]

False statements, dissembling, and other factors weakening the credibility of an employer's explanations for its conduct constitute pretext, which is evidence of unlawful animus. It is axiomatic that "the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Reeves,* 530 U.S. at 147-48. Weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in Defendant's

---

[9] Walter Scott, *Marmion: A Tale of Flodden Field* (1808).

proffered legitimate reasons for its actions allow a reasonable juror to find them unworthy of credence and hence to infer that the employer did not act for the asserted non-discriminatory reasons. *Lichtenstein v. University of Pittsburgh Med. Ctr.*, 691 F.3d 294, 309-310 (3d Cir. 2012). In the 2016 EEO investigation, Defendant's managers and responsible persons were asked for the truth; Psak readily observed these people could not keep their stories straight.

Psak personally reviewed the statements and testimony of the Defendant's witnesses.  She prepared a single-spaced 60-page Rebuttal Statement to identify and expose the "weaknesses, implausibilities, inconsistencies, incoherencies and contradictions" in those witnesses' testimony, thereby revealing the pretest that supports an inference of discrimination and retaliation. *See* ROI-17, pp. 458 et seq (Exh. F-1E). The EEO investigator selected several of the clearest examples of sworn testimony infected with falsity to try to "defend" the treatment of Psak.  ROI-17, pp. 35-38. Some of those examples and others are presented here with citations to the record.

A.     **Rebuttal to Payton-Williams**

1. Asked what her "working relationship" was with Psak, Payton Williams stated Psak "is an employee ... just as I am." ROI-17, p. 765. That answer is misleading. Psak testifies: "We are not simply both employees with the USPP." Psak explains Payton-Williams has been involved in many personnel actions as the sole employee of the ELR Program for the USPP in Washington, D.C. Several are detailed in Psak's Rebuttal. ROI-17, 463-464 (Exh. F-1E).

2. Asked what race Psak is, Payton-Williams stated she did not know. The next question prompted Payton-Williams to consider whether she "read it," and she left the answer blank. ROI-17, p. 765. Her answer is misleading and lacks candor. Psak had identified her race in her past EEO complaints, and Payton-Williams was interviewed in those complaints. ROI-17, pp. 464-465. Payton-Williams testified that she responded to document requests for EEO complaints as part of her job. ROI-17, p. 766. Thus she saw Psak's prior EEO complaints that indicated her race. Her testimony was untruthful and/or not credible.

3. Asked whether she was aware of or perceived Psak's disability or impairment, Payton-Williams stated: "I am not aware of any disability or impairment" - and "I am not aware of the complainant suffering with a disability or impairment."  ROI-17, p. 766. Those answers are

untruthful and lack candor. As cited above, Payton-Williams testified that she responded to document requests for EEO complaints, and she was involved in seeking medical documents from Psak in previous instances leading to EEO complaints. ROI-17, pp. 465-466.

4. Asked whether she knew about the complaint filed against Psak by Sgt. Johnson, Payton-Williams testified, "I do not recall such a complaint. I would have to check my records." ROI-17, p. 768. This answer falls within a sequence of "I do not recall" answers in Payton-Williams' affidavit, and this one obviously lacks candor because she continues by saying she would have to "check her records." Her affidavit is a written question-answer document for which she has ample time to provide meaningful answers and to check records. ROI-17, p. 466. Payton-Williams' answer therefore is a *refusal* to provide information when required under oath. Her claim of ignorance is dissembling.

5. Asked whether Psak was "treated differently from similarly-situated employees under similar circumstances," Payton-Williams said, "I cannot answer the question." ROI-17, p. 769. Her answer is not a denial and it is not even an explanation – it is a refusal. Psak offers that Payton-Williams knew Psak was treated vastly different from Officer Janet Kim, thus her refusal to answer is an evasion. ROI-17, pp. 466-467.

6. Asked about Psak's on-the-job vehicle accident, Payton-Williams confirmed she knew about the documents involved but guessed the date was in September 2016 (it was in early August), and said she did not even know "what her injury was." ROI-17, p. 774. Her answers were even more obviously evasive:

> Q: Tell me what you know about Complainant being out of work due to an injury on the job?
> A: I am not aware of what her injury was.

ROI-17, p. 774:34-36.

It does not require a law degree to see Payton-Williams there simply was not going to answer the question as asked. The question sought information about "Complainant being out of work," but she answered as though clueless. She could go "check her records" as with other questions, and had time to do so, but did not. Yet in the next questions of the affidavit, Payton-Williams testified about Psak's "change in work schedule" and what Psak's "doctor" had imposed

as limitations. ROI-17, p. 774-775.  But later on, Payton-Williams took the clueless tack again, slyly averring, "For the purposes of the responses to this complaint, *I have no idea* what the complainant's alleged disability is." *Id.*, p. 775:58-59 (emphasis added).  One might ask her: "How about 'for the purposes of testifying truthfully?'" Psak contends Payton-Williams outright lied about her ignorance of the injury and explains in detail why. *See* ROI-17, p. 512 (full discussion).

7. Asked what she knew about Psak's "being denied her reasonable accommodation request," Payton-Williams notably did not deny such a request was made. ROI-17, p. 776. But then she gave information that was misleading and/or untrue. She stated, for example:

> We were not able to accommodate this suggestion operationally because the schedule of a Canine Officer requires that the officer and his/her partner be able to work a full schedule of at least 8 hours per shift. If the officer is only eligible to work 4 hours per shift instead of the 10 hours she is assigned to work, it would not have been prudent to have another officer taken away from another beat or assignment to fulfill the balance of 8 hours in another capacity.

ROI-17, p. 776:104-109. Yet, Psak testifies there is no "requirement" that a canine team must work "8 hours per shift." ROI-17, Exh. F-1E, p. 55. Further, the claims about officers working a "beat" and having to draw officers from "another beat" to "fulfill the balance of 8 hours" are untrue and misleading. Psak testifies:

> In fact, canine teams are not assigned to [a] beat; rather, we are roving patrols with the latitude to patrol anywhere in the Washington Metropolitan area where the Force has jurisdiction. Allowing me to work 4 hours a day would have provided for additional hours of canine coverage, that the unit and the Force was not getting [otherwise]...

Pl.Ex D, p. 512:2434-2438.  Payton-Williams' untrue claims about canine team work schedules were aimed to defend the actions taken to disadvantage Psak again.

### B.     Rebuttal to Captain Stock.

Asked about whether Psak could grieve a sustained complaint when no disciplinary action has been taken, Capt. Stock contended she could not grieve such a complaint. ROI-17, p. 737. Psak testifies Capt. Stock's answer is incorrect, and strikingly so, since Capt. Stock had been Internal Affairs Commander before. ROI-17, p. 467; ROI-17, p. 736.  Whether Capt. Stock was lying or did not actually know the correct answer, the result of his testimony was to try to undermine Psak's efforts to get fair treatment.

### C.      Rebuttal to Major Booker.

1. Asked what is Psak's race, Maj. Booker stumbled, repeating himself, "I don't know."

ROI-17, p. 753.  Psak contends that testimony is false and misleading:

> In the middle of page 3, Booker lies about knowing what my race is. He knows my full name which he likely learned when he was assigned to HR, doing recruiting work.(encl aa) He knows that I have a Chinese middle name and he has called me by my full name in the past. Booker had access to my [personal identifying information] including my race and ethnicity. He, among many other Force members is well aware that I am from Hawaii and that I am not white. His answer is not truthful and it is clear by his stammering.

ROI-17, p. 468:375-381. Maj. Booker could have been candid but instead tried to hide knowledge he clearly had a basis and background to know or at least to offer a reasoned belief.

2. Asked whether he knew about Psak's "past EEO complaints," Maj. Booker admitted he worked in Human Resources but was "only aware of one" past complaint. ROI-17, p. 754. Psak points out why that testimony is false and misleading:

> First, Booker was assigned to work in HR as a Recruiting Sergeant and he would not have had any legitimate reason to discuss my protected activity [yet he somehow knew]. Second, he uses a qualifier (only) to attempt to minimize his knowledge[:] " ... but I was only aware of one." Unfortunately for Booker, this claim is a blatant lie that is in direct conflict with the response he offered in the affidavit he signed on May 26, 2015. In his quest to cast aspersions on my credibility, Booker volunteered remarks including, "... other than *the fact that Officer Psak has made numerous EEO complaints on other people ...* "

ROI-17, p. 468:391-398, *citing* ROI-17, pp. 363 et seq, enclosure LL17 (Booker Affidavit, emphasis added).

3. Asked whether he knew about the outcome of the "counseling session" concerning use of non-clinic sick leave, Maj. Booker said he "wasn't part of that counseling session" and never heard back from the management officials about how it went. ROI-17, pp. 757-758.  That answer does not make sense.  Maj. Booker said *he personally observed* how officers used their non-clinic sick leave and thus *he told* the Supervisor to "bring her in unofficially" for the meeting about her use of such leave. ROI-17, p. 757.  To not have "closed the loop" on that meeting and counseling, after having expressly instigated it, is not believable.  *See* ROI-17, p. 469:441-446.

### D.      Rebuttal to Lieutenant Schneider.

1. Asked whether he knew anything about the interaction between Sgt. Johnson and Psak on March 13, 2015, which involved Johnson's "you like to sue people" comment, Lt. Schneider

stated: "I do not have any first-hand knowledge of the event and do not know if the event actually occurred." ROI-17, pp. 699-700 (Exh. F-4, Quinn Aff.). That is a strong statement of ignorance of the event. But in the same affidavit, Lt. Schneider *recited as true* the essentials of Sgt. Johnson's administrative complaint arising out of that "event." *Id.*, p. 701.  Lt. Schneider's testimony first tried to disclaim any involvement or knowledge at the most basic level, but later grows to stating Sgt. Johnson's allegations as facts he accepts. The internal contradiction, the "evolving" truth, bespeaks falsity and dissembling.

2. Asked about his knowledge of the "counseling session," Lt. Schneider asserted he and Sgt. Quinn requested the "meeting" with Psak.  He further asserted the "meeting *was not called to discuss excessive sick leave use*[.]" ROI-17, p. 702:300-302 (emphasis added).  Of course this testimony means either he or Maj. Booker was lying.  Maj. Booker (cited above) testified he called for the meeting to discuss sick leave. Lt. Schneider directly contradicts that sworn testimony. Lt. Schneider stated the meeting was to discuss the "four complaints" against Psak. *Id.*, p. 702:302-303. The contradiction is open and obvious. Maj. Booker tried to downplay the meeting and take credit for it; Lt. Schneider elevated the meeting's importance to try to justify harassing and penalizing Psak with as-yet (and largely) unsubstantiated complaints.

3. Asked about whether Psak had suggested the "counseling session" was a form of harassment, Lt. Schneider both contradicted himself and lied:

> Q: Did Complainant express to you or any other management official of her belief that being ordered to a Counseling Session constituted harassment?
>
> A: *On multiple occasions,* when attempting to schedule the meeting, Officer Psak *refused to attend as she believed the meeting was an attempt* by Sgt. Quinn and I *to ambush her with a disciplinary action*. I repeatedly told her that was not the case and that there was no disciplinary action involved. Eventually, she agreed to the meeting. *Officer Psak never expressed* to me, nor anyone else to my knowledge, that *being invited to a supervisory meeting constituted harassment*.

ROI-17, 704:375-382. Bearing in mind Lt. Schneider's affidavit resulted from his answering written questions at his leisure, the above answer discloses astonishing duplicity. *If* he were telling the truth, then Psak did tell him *many times* she viewed the alleged "meetings" as "attempts to ambush her with a disciplinary action" – can there be a more overt form of supervisory harassment?  His denying she "expressed" that the attempts were harassment constitutes a self-

proved lie. Worse, however, is that Lt. Schneider lied entirely in his answer. Psak testifies:

> [In his affidavit] Schneider tells another blatant lie which supporting documents will easily refute [enclosures Q1-Q9]. I never once "refused to attend" the so-called meeting, nor did I ever mention "disciplinary action." ... Schneider's choice of words ["being invited"] at line 381, is an attempt to portray an image that I was being extended a privilege to attend a tea party where punch and cookies were being served. To be clear here, I was NEVER invited to a meeting --- I was ordered (by my third line supervisor) to a formal counseling session disguised as a meeting.

ROI-17, p. 479. The divergence between Lt. Schneider's assertion and Psak's rebuttal is huge and rather proves he was telling falsehoods to distance himself from the truth that would reveal discriminatory and retaliatory animus.[10]

4. Again in the same affidavit, Lt. Schneider lied to cover the truth concerning the "meeting." Asked about what he told Psak about the requested "meeting" or "counseling session," Lt. Schneider said he requested the meeting with Psak several times, and that "[o]nly *after multiple refusals*, did Officer Psak agree to meet." ROI-17, p. 704:404-410 (emphasis added). Regrettably, Lt. Schneider lied again despite the existence of disconfirming documents. Enclosures Q1 through Q9, which Psak submitted with her Rebuttal Statement, show *Psak not once refused any meeting.* ROI-17, pp. 258-266.

Unquestionably Lt. Schneider falsely accused Psak and falsely testified under oath. "Proof that the defendant's explanation is unworthy of credence is [another] form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Said v. AMTRAK*, 317 F. Supp. 3d 304, 328-29 (D.D.C. 2018), *quoting Reeves*, 530 U.S. at 147. Indeed, "[i]n appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Said*, 317 F. Supp. 3d at 329, *quoting Reeves*, 530 U.S. at 147. "[P]roving the employer's reason false becomes part of (and often considerably assists) the greater enterprise of proving that the real reason was intentional discrimination." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 517 (1993)). "[A] plaintiff's discrediting of an employer's stated reason for its employment decision is entitled to

---

[10] *See* ROI-17, p. 987 (email from Lt. Schneider to Maj. Booker noting his attitude toward Psak's legitimate questions concerning the meeting was that her questions constituted "expected resistance").

considerable weight." *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1290 (D.C. 1998) (en banc).

If Lt. Schneider and his colleagues had nothing but pure motives, then there would be no reason to inflate one fact, diminish another, and lie about their reasons for actions. Yet under oath these individuals lack candor, shift focus, refuse to answer, and outright lie to escape the evident conclusion: They harbored discriminatory animus against Psak, and they retaliated against her, making the working environment intolerable, for as long as necessary to get rid of her.

Defendant's managers' testimony is riddled with these fatal problem. A "plaintiff may establish pretext by proving that the defendant's explanation for an employment decision is 'unworthy of credence' or that the defendant's explanation is false." *Supinger v. Virginia*, 259 F. Supp. 3d 419, 433-34 (W.D. Va. 2017), *quoting Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 269 (4th Cir. 2005) (*quoting Reeves*, 530 U.S. at 147)).  Of course, "the factfinder's rejection of the employer's legitimate, nondiscriminatory reason  for its action does not compel judgment for the plaintiff." *Supinger*, 259 F. Supp. 3d at 433-34, *quoting Reeves*, 530 U.S. at 146. Nevertheless, "it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation."  *Reeves*, 530 U.S. at 147. Thus,"[i]n appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Id.*

4. In different locations with his affidavit, Lt. Schneider took highly inconsistent positions about his conduct and purpose in the "meeting," so long as they tended to excuse him from misconduct.  Early in the affidavit, Lt. Schneider stated:

> The meeting was initiated by Sergeant Quinn and I to express our concern regarding Officer Psak's pattern of behavior and to try to help her and provide resources she may want to utilize *to help her in order to avoid* disciplinary action or *an adverse affect on her performance appraisal* for the critical element of "Interpersonal Skills".

ROI-17, p. 703:324-328 (emphasis added). But that statement about "help" was convenient window dressing. Lt. Schneider later stated:

> During that meeting Sgt. Quinn and I addressed Ofc. Psak's performance issues during the rating period and how they *could negatively impact* her EP AP rating.

ROI-17, p. 705:434-436 (emphasis added).

Unaware of his own duplicity, Lt. Schneider still later stated the damage was done and nothing really could "help" anymore: "...Officer Quinn and I advised Officer Psak that her pattern of performance and behavior (4 complaints in a 6 month period) *would likely negatively* impact her Annual Performance Appraisal[.] " ROI-17, p. 705:442-444 (emphasis added). But, only one of the four complaints was even substantiated. ROI-17, pp. 479-480. So the whole meeting or counseling session was premature, calculated to harass Psak yet again.

5. Asked in supplemental interrogatories about his role in selecting Psak's Alternative Work Assignment (AWA), Lt. Schneider testified that he and the Human Resources Department "*proposed* multiple AWA's [sic] for Officer Psak to return to work in a limited duty status ..." ROI-17, p. 717:139-140 (emphasis added). That statement attempted to minimize what really happened. In fact, Psak testifies she received no "proposals," she was flat *ordered* to the assignments. *See* ROI-17, pp. 513-514 (explanation citing enclosure). However, a jury could reject Lt. Schneider's attempt to insert a soft, caring distance between him and the harassing, hostile actions taken against Psak.

### E.    Rebuttal to Sergeant Quinn.

1. Asked what Psak's "race" is, Sgt. Quinn answered he knew neither her race or national origin. ROI-17, p. 685. Why not be candid and give a complete answer? The two individuals have worked together for years, and had discussed Psak's origin in Hawaii. ROI-17, p. 485.

2. Asked whether "other employees been ordered to Counseling Sessions under similar circumstances [as Psak's]?", and asked to provide specifics of any examples, Sgt. Quinn failed to answer the questions, which in a written interview constitutes refusing to answer the questions. *See* ROI-17, pp. 690-691.

3. Asked why in 2015 he gave Psak a 3.75 rating instead of a 4.0 rating like the prior year, Sgt. Quinn said it was because she had "received *so many complaints* in such a short amount of time." ROI-17, p. 692:382 (emphasis added). His explanation is not worthy of credence – even he had admitted *only one complaint* from the public had been sustained. *Id.*, p. 699:278-282. Important, too: Sgt. Quinn ignored the incoming public call that praised Psak's work.

What a dishonest response!  He contended Psak had a "a pattern of rude and discourteous

encounters with the public" – when there was but one sustained complaint, and when Sgt. Quinn said the prior year (2014) she had no complaints at all. His testimony did nothing but exaggerate to damage Psak in the EEO investigation. This kind of statement and conduct, like the many others described in this brief, created a hostile, intolerable climate in which Psak had to try to work.

4. Asked for information about the "Counseling Session," Sgt. Quinn contended it was mainly to address concerns about complaints and that the non-clinic sick leave issue was "not the primary focus of the counseling session." *Id.*, p. 690:273-290. He said they just letting her "know that she was getting close to using up all her non~clinic sick leave to prevent her from getting into a situation where she would have to be placed on non-clinic sick leave restriction ..." *Id.*, p. 690:289-292. Of course that directly contradicted Maj. Booker's testimony that he personally directed that the meeting take place because he personally was watching employees' non-clinic sick leave usage. (See discussion above.)

### F.    Rebuttal to Sergeant Johnson.

1. When answering questions about the circumstances of his filing an administrative complaint against Psak, Sgt. Johnson insinuated that Psak should not be in the Special Forces Branch (SFB) offices and that it was somehow unexpected to find her there. ROI-17, p. 666:86 ("for unknown reasons"), p. 666:88-89 ("did not know present" or "why she was present"). In fact, Psak was a canine handler assigned to SFB and was required to go to those offices to check her assigned mailbox, and did not have to announce her presence to anyone. ROI-17, p. 491. Sgt. Johnson was presenting a false narrative from the start.

2.  In his answer to the questions about the circumstances, Sgt. Johnson alleged "[ Psak] began to verbally attack me without provocation and then attempted to defame me with false accusations to Maj. Gudemmi." ROI-17, 666:89-91.  Psak entirely denies the allegation. ROI-17, pp. 491-492. It is not feasible here to place the entire several hundred words of testimony by both individuals and point out the divergences.  A single reading of Psak's description of the event (ROI-17, Exh. F-1 at pp. 144-158), Sgt. Johnson's description of the event (ROI-17, pp. 666-668, 670-671, 673-674), and Psak's detailed rebuttal (ROI-17, Exh. F-1E, pp. 162-170), presents a host of direct contradictions of fact that cannot be decided on summary judgment.

3. Asked whether he knew if Psak had filed an EEO complaint in the past, Sgt. Johnson effectively contradicted himself.  First he said he lacked "personal knowledge" that Psak had engaged in prior EEO activity. ROI-17, p. 669:211-214. Then he said he "heard rumors though word of mouth that she had filed lawsuits in the past," but he denied knowing their bases or outcomes. *Id.*, p. 669:214-216. Finally, he said he did "know" from word of mouth that Psak "had been the complainant in administrative complaints in the past, whether they were limited to administrative complaints or involved EEO" he was not sure. *Id.*, p. 669:216-218.   Basically, Sgt. Johnson admitted every salient fact except personal knowledge of a specific EEO complaint. His evasion is painfully obvious, given he had to admit he said "I hear you like to sue people." Johnson Depo. at 40.

G.     **Rebuttal to Sergeant Wallace.**

1. Asked why and by whom was he assigned to investigate Sgt. Johnson's administrative complaint, Sgt. Wallace said he did not know why he was selected to investigate instead of Psak's supervisor, but that Lt. Schneider appointed him to conduct the investigation. ROI-17, p. 745, 746. Psak contends appointing Sgt. Wallace as investigator, in a matter involving an allegation of criminal misconduct, violated General Order 32.04, which requires "the internal affairs unit" conduct the investigation. ROI-17, p. 173:1936-1943.

2. Asked whether he perceived Psak has any disability or impairment, and how he learned about any such information, Sgt. Wallace stated: "I learned this information through Officer Psak and HR between August 2016 - Present." ROI-17, p. 743:129-130.  Psak testifies directly to the contrary: "Michael Wallace must be hallucinating or there is another Officer Psak on the Force because I haven't spoken to him in years I could not tell you the last time that l saw him." ROI-17, p. 171.

3. Asked whom did he interview, Sgt. Wallace answered (in pertinent part): "I attempted to interview Officer Psak. However, her attorney requested she not respond to the complaint." ROI-17, p. 745. Psak vehemently rebuts his assertion, stating:

> My attorney Brian Bregman never requested me to not respond to the complaint. In fact I did respond to the complaint through my assigned counsel on May 1, 2015 (encl GG1-GG2). Wallace's assertion [is] completely absurd and it is a claim that

[is] baseless.

ROI-17, p. 171:1872-1875 (citing rebuttal enclosures GG1-GG2).

Here is another example of an RMO having time to give an accurate written answer to a simple question but choosing to make a false statement under oath that attempts to weaken Psak's EEO complaint. This pattern of inconsistencies and false statements, all of which incline against Psak, allows the inference of pretext and of discriminatory animus or retaliatory intention.

**CONCLUSION**

The big picture, supported by the record evidence, shows a protracted series of words and actions taken to impose fear, stress, difficulty, and emotional pain upon Ms. Psak by Defendant's managers in the cozy nearly all-male and all-white police officers' club. Disparate treatment, retaliation, and indignities continued over the years 2004 to 2017, sustaining a hostile environment Psak did not deserve and that no one should have to tolerate.  Ms. Psak was not "one of them," and once she complained about disparate treatment, the environment shifted such that she could never relax and just serve her agency and her nation.

Defendant's Motion contends that undisputed evidence shows that basically "nothing happened" actionable under the law. The massive collection of documents and testimony obtained in three EEO investigations and this federal court case reveal that indeed Ms. Psak was targeted, discriminated against, retaliated against, harassed, and made to endure a hostile environment for over 12 years. Defendant's managers seemed unable to consistently tell the truth in these investigations, and Ms. Psak has exposed their falsehoods and dissembling. At the very least, the massive evidence creates genuine issues of triable fact that could be decided against Defendant. Therefore, Defendant's Motion should be denied.

Respectfully submitted,

_/s/Richard L. Swick_____
Richard L. Swick
D.C. Bar No. 936930
SWICK & SHAPIRO, P.C.
1101 15th Street, NW, Suite 205
Washington, DC 20005
Tel. (202) 842-0300
Email rlswick@swickandshapiro.com
Attorney for Plaintiff