# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **JERRE PSAK,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action Nos: 1:14-cv-00116-RDM** |
| ) | **1:18-cv-00115** |
| **SALLY JEWELL, SECRETARY,** ) | |
| **U.S. Department of the Interior,** ) | |
| ) | |
| **Defendant.** ) | |

## PLAINTIFF'S STATEMENT OF GENUINE ISSUES

Defendant filed its Statement of Material Facts As To Which There Is No Genuine Issue ("Defendant's Statement"), which is found as part of Defendant's Motion for Summary Judgment ("Defendant's Motion") in this matter.  Plaintiff disputes several of Defendant's individually-numbered statements of material facts.  Following below are Defendant's numbered statements that Plaintiff disputes, using Defendant's numbering convention.  Citations to Plaintiff's concurrently-filed Declaration are indicated as "Psak Decl." followed by the paragraph number of the Declaration.

1. Plaintiff, Jere Psak, an Asian female, worked in the Canine Unit for the Park Police until she retired in late 2017. Complaint, Civil No. 18-0115, ¶ 5.

**Disputed.**  Plaintiff retired on April 22, 2017.  Plaintiff's first name is spelled "Jerre."  Psak Decl. 3.

3. Plaintiff was employed in Washington, D.C. and had never worked in the SFFO.

Ex. 1 at 16, 18.

**Disputed as incomplete and misleading.** The vacancy for canine handler (SFFO) and the intent

to fill it was a Force-wide announcement. There was no requirement for the prospective selectee

to have ever worked in the SFFO. Previous to the 2007 vacancy announcement, the Force

selected two WM canine handlers who were assigned to a field office to fill vacancies for canine

handler in DC. In approximately 2002, Jeffrey Daugherty had never worked in DC, yet in he

transferred as a canine handler (patrol dog) from SFFO to fill the vacancy for canine handler

(patrol dog) in DC. In 2003, Jeffrey Bartlett had never worked in DC, yet he transferred as a

canine handler (bomb dog) from the NYFO to fill the vacancy for canine handler (bomb dog) in

DC. As fully trained and experienced canine handlers, officers Daugherty and Bartlett were given

first consideration to fill the vacancies for canine handler over officers with no training or

experience as a canine handler. Psak Decl. 4.


9. Mr. Wu said that his recommendation of Mr. Petersen for the position was based

on the following factors: "(1) Selection from within the SFFO will not only promote morale

but lateral mobility opportunity in this rather stagnate field office. (2) There would be no fiscal

impact to the SFFO budget as there would be no PCS cost (Permanent Change of Station) or by

not having to add another FTE (Full Time Employee). (3) Officer Petersen has demonstrated to

be an excellent officer during b;- (sic) tenure at the SFFO. (4) Officer Petersen has long

demonstrated a keen interest in being a K9 officer." Ex. 3, Affidavit of Jason Wu, ¶ 2; Ex. 2 at

19, 28-29, 35.

**Disputed.** (1) Low morale was a Force-wide issue, not limited to SFFO.  The Department of Interior Office of Inspector General conducted a comprehensive assessment of the United States Park Police (PI-WV-NPS-0001-2007). The IOG report, released in February 2008 indicated that "many employees stated that morale is the lowest it had ever been during their employment with US PP." (PI-WV-NPS-0001-2007 p. 34) The purpose of the competitive process was to fill the vacancy for canine handler, not to improve morale in the SFFO. (2) In fact, there was a fiscal impact that was likely more costly than a PCS. The Force had to purchase a "green" (untrained) dog probably for at least $20,000 and the Force had to pay Jesse Petersen's salary to him without receiving any police service from him for the duration of his training as a basic patrol dog handler (approximately 14 weeks) and an additional 8 weeks for narcotics detector training. Had the recommending and/or selecting official informed plaintiff that the Force could not afford to pay for the best qualified applicant to PCS, she would have paid for her own move from DC to San Francisco. Mr. Wu implying that "having to add another FTE" would be somehow be detrimental to SFFO is disingenuous at best. Both field offices are always hoping to add personnel to respective locations to increase manpower. Commanders of field offices are happy to simply get rookies straight out of FLETC. To suggest that it would be bad to add a FTE with specialized training and experience specifically for the position announced is absurd. Plaintiff had plainly exhibited (application packet) that she was not only an excellent officer but moreover, an exemplary canine handler for which she was recognized regionally as well as nationally. Psak Decl. 5.

3

10. At the time he made his recommendation, Mr. Wu had no knowledge of any prior

EEO complaints having been made by plaintiff, had never met her, and did not know what she

looked like. Ex. 2 at 47-48.

**Disputed.** Mr. Wu was indeed aware that plaintiff engaged in protected activity. In January 2006,

EEO counselor Lynette Walden interviewed Constance Leonard, Gerard McCarthy, and Jeffrey

Quinn among others about the selection process for the 2003 SFFO canine vacancy. During this

interview Ms. Walden made it clear that the purpose of her interview was in response to

plaintiff's protected EEO complaint January 14, 2004.  It is inconceivable that RMOs who

participated in Ms. Walden's inquiry did not make Mr. Wu aware of what was going on; that

would go against the USPP culture of sharing controversial information, especially an officer's

claim of discrimination. Psak Decl. 6.


14. One of the main reasons for the selection, which was supported by the union, was

to select someone from the SFFO Office in order to give an officer an opportunity to have a

specialized position. Ex. 4 at 74-76, 78.

**Disputed.**  Defendant relies on a statement which McCarthy seems uncertain of ("As far as I

know") and based on McCarthy's complete fabrication ("and it was something the union

supported") as one of the MAIN reasons Petersen was selected. The Agency has not provided

one scintilla of evidence that the union supported selecting Petersen or any other applicant with

no experience in working  a police canine. In fact, Jason Raymos, Executive Chief Steward

(Union) for the SFFO sent a memorandum to Gerard McCarthy on behalf of the plaintiff to give

her first consideration to fill the SFFO canine handler vacancy as the Force has done in the past,

beginning with Officer Jeff Daugherty.   In follow up conversations with plaintiff, Raymos said

he had discussed this request with McCarthy in person. Psak Decl. 7.


15. Mr. McCarthy did not know of plaintiff's prior EEO Complaint at the time he

selected Offier Petersen. Ex. 4 at 110.

**Disputed.**  McCarthy did, in fact, know of plaintiff's prior EEO complaint at the time he selected

Officer Peterson. In January 2006, EEO counselor Lynette Walden interviewed Constance

Leonard, Gerard McCarthy, Jeffrey Quinn among others about the selection process for the 2003

SFFO canine vacancy. During this interview Ms. Walden made it clear that the purpose of her

interview was in response to plaintiff's protected EEO complaint January 14, 2004. When

McCarthy provided his declaration on July 29, 2008, he used "tricky wording" to conceal his

knowledge of plaintiff's prior EEO activity. McCarthy said that he was not aware of plaintiff's

"May 7, 2008 EEO complaint" ignoring the fact that he was well aware of plaintiff's 2004

complaint (first non-selection for canine handler SFFO), inasmuch as Ms. Walden interviewed

him about the EEO on January 12, 2006. Also, in that declaration, McCarthy claims he doesn't

know anything about plaintiff. This is not true. Plaintiff has testified under penalty of perjury that

she placed a phone call to McCarthy prior to the selection. Plaintiff testified that during this

phone call, she told McCarthy that she was interested in transferring to SFFO to be closer to her

family and that she was not selected the last time she applied for the canine vacancy.


Plaintiff also called with the same Force-issued cell phone and spoke with Phil Cholak before the

selection was made. Plaintiff documented the call to Mr. McCarthy in her timeline when she

5

asked him to furnish documents relied upon to make the selection and he did not reply. Karlyn

Payton replied for Mr. McCarthy and summarily denied Plaintiff's request. This conduct

appeared to violate the LMA, which requires these documents "shall be" provided to all the

nonselected applicants within 14 days of the selection. Karlyn Payton's claims that she is not

familiar with certain things in the LMA are false.  If she is involved in special circumstances

surrounding grievances, she should know how the selection process works for special

assignments. Her ignorance is simply not believable. Psak Decl. 8.


16. Plaintiff has no first-had knowledge of the selection process for Mr. Petersen or

Mr. Petersen's qualifications for the position. Ex. 1, at 18-20.

**Disputed.** Plaintiff did eventually have an opportunity to review documents which were relied

upon to select Petersen over her. Petersen submitted no training certificates to illustrate that he

had any kind of training or experience specific to canine deployment (use of force), canine

training or even basic canine behavior. Interestingly, Sergeant Hart generated three separate

commendations to tip the scales in Petersen's favor on May 1, 2007, about a week after the

announcement to fill the vacancy (ROI-09, Exh. 21, pp. 12-15). Knowledge about the way

applicants' raw scores were derived became evident in documents initially denied to Plaintiff in

violation of the LMA. The Agency however had to provide these documents for inclusion in the

ROI. The reason that RMOs refused to furnish the documents when Plaintiff requested them

(June 16, 2008) was because the Ad Hoc Committee seems to have used fuzzy math to generate

her raw score.  Either that or they intended to limit the number of points Plaintiff received to

make it appear that she was not the clearly superior applicant. Plaintiff submitted 18 items for

consideration as awards/commendations, not 13 as indicated (ROI-09, Exh. 20, p. 2). Plaintiff

received no points for being awarded the USPCA National Patrol Case of the First Quarter 2006

(p. 21), USPCA Region 3 Patrol Case of the Quarter 2006 (pp. 30-31), a group commendation

dated June 19, 2006 for contributions to Farthing Award Ceremony (p. 35), USPCA Certificate

of Appreciation May 10, 2006 (p. 36).  Plaintiff  received, .5 instead of 1.5, for USPCA

Certificate of Appreciation, May 5, 2005 (p. 41).  The commendation dated January 26, 2006,

solely recognized the efforts of K9 Malu and Plaintiff but was listed as a "group commendation"

and Plaintiff was subsequently assigned a half point less than a supervisory commendation.

Conversely, Officers Petersen and Campbell were recognized together for their contributions in

their roles as Master Patrol Officers. That award was not listed as a "group commendation,"

giving Petersen an extra half point. Finally, one of the more prestigious awards Plaintiff

submitted for consideration seems to have mysteriously disappeared from her application packet.

She received a Certificate of Appreciation from the United States Attorney's Office for the

District for Columbia May 12, 2005 (ROI-17, pp. 211-212). All of this kept her raw score at 67.

An award given by an outside agency should have been assigned 1.5 points each.  It is clear that I

should have been assigned an additional points 8 points for the improper calculation of my score

and Officer Petersen should have received a half point less than what the Ad Hoc Committee

gave him.  Psak Decl. 9.

Moreover, two points were deducted under the Discipline category for an Administrative

Complaint that had not been completed and adjudicated. The complaint was partially sustained

but Plaintiff received no discipline and she had filed a Step 1 grievance. She should not have had

a 2-point deduction for an improperly sustained complaint, which she was actively grieving. The

investigation revealed that Plaintiff was off duty and was not acting in an official capacity, yet

her interactions with members of the Uniformed Secret Service were deemed inappropriate and

they were held against her.  These errors kept her raw score from being the highest of all

applicants. Psak Decl. 9.


17.  Although plaintiff was already a Canine Handler and Officer Petersen was not, a

male Canine Handler who applied for the position also was not selected. Ex. 1, at 19-20.

**Disputed.** The vacancy was for a patrol dog handler. As indicated by Jeffrey Quinn in his

deposition, the SFFO had two established positions for a patrol dog handler and two established

positions for a bomb dog handler. Each of these positions has a distinct position number

associated with the respective position. While a male canine handler was also not selected, that

handler was a bomb dog handler with no experience or training in working a patrol dog. Working

a bomb (detector) dog who's sole purpose is to demonstrate a passive alert to the presence of

explosive odor, is completely unrelated to working a patrol dog trained to apprehend criminals.

Psak Decl. 10.

The announcement was to fill the vacancy for patrol dog handler.  The training, skills and patrol

duties of a patrol dog team are vastly different than the training and patrol duties of a bomb dog

team. A patrol dog team must demonstrate skills in obedience, patrol search (to find a hidden

person), criminal apprehension, handler protection, tracking, narcotics detection and evidence

recovery. Conversely, a bomb dog team need only demonstrate explosive detection skills through

odor recognition and locating explosives hidden on vehicles, in packages/luggage and in

buildings (attached). The male bomb dog handler who was not selected would have also had to

8

go through the very same training that Petersen did for the same duration with a new dog the

Agency would have to purchase. Psak Decl. 10.

18. July 23, 2008, plaintiff went out on "stress leave" for an indeterminate amount

of time, claiming it was related to her performance of duty. Ex. 1 at 31; Ex. 5.

**Disputed.**  Plaintiff completed a CA-2 (Notice of Occupational Disease/Illness) through the

Safety Information Management System (SMIS).This was an online process and Plaintiff was not

able to print out her completed submission.  However, she wrote a draft on a piece of paper what

she entered into SMIS. Plaintiff specifically reported that the stress was directly due to a Hostile

Work Environment. Everything plaintiff reported in CA-2 could be readily accessed by a number

of USPP employees. As the compensation manager for the Force, Jackie Brown had direct access

to the CA-2.  She also was in direct contact with OWCP case managers. The plaintiff's

immediate supervisor Jeffrey Quinn also had access to what she reported when he completed the

supervisory portion to address plaintiff's claim. It is surely more than coincidence that just 10

hours after plaintiff filed the CA-2, detailing the ongoing harassment over a period of several

years and identifying its causal effects on her health that Steven Booker, then sergeant assigned

to SFB, initiated an Administrative Complaint filled with false information against the plaintiff.

The complaint was never investigated and was classified as NFA (No Further Action). This same

kind of knee jerk retaliatory action by Booker would be seen again in 2015 when he ordered

plaintiff to attend the counseling session the very same day he attested to the accuracy and

truthfulness of his affidavit. It is common practice for Agency RMOs to attempt to create a false

9

record about an officer who has engaged in protected activity. Plaintiff has experienced this many

times throughout her career but the first time it was done to her is plain to see.  Psak Decl. 11.


20. By letter dated September 4, 2008, plaintiff was informed that she needed to

submit medical documentation to justify her continued absence from work or she would be

charged with Absence Without Leave. Ex. 7.

**Disputed.** This threat of being charged AWOL was arbitrary and not based on any Force General

Order, established Force policy, Agency regulation or OPM regulation. While the letter had

Kenneth Brodie's signature at the bottom of it, he had no memory of writing it. (Brodie Depo. at

23-24, referring to depo. exh. 1).This is the because the author of the aforementioned letter and

the driving force behind this threat of AWOL and subsequent threats of adverse personnel

actions such as "eventual termination from government service" was RMO Karlyn Payton who is

the Force's mastermind for devising a plan of action to deal with an employee who engages in

protected activity as well as create novel ways to retaliate against an employee. This letter was

preceded by two separate phone conversations with Jacqueline "Jackie" Brown during which

plaintiff assured Brown that she was under the care of a licensed clinical psychologist. On

September 2, 2008 Brown left a bizarre voicemail on plaintiff's Force issued cell phone

(202-345-2816) in which she (Brown) complained and asked why she had not received a doctor's

note yet when the plaintiff had promised it. Plaintiff made no such promise. Brown who was the

compensation manager for the Force, deliberately misled the plaintiff telling her that she (Brown)

needed medical documentation to submit to OWCP. Further, plaintiff had previously sent two

email requests (July 24, 2008) for her supervisor Sergeant Jeffrey Quinn to provide a CA-16 that

she could take to her physician to complete; both of which went unanswered. Regardless of what

kind of leave Sandra Hammond, the Shift Commander to whom plaintiff made her leave request

on July 22, 2008 around 2200 hours, plaintiff was granted that leave. From that moment forward,

plaintiff was using her accrued leave, both annual leave and sick leave (ROI (2015) Exh. 18 pp.

3-6). According to plaintiff's time and attendance record, she was not absent without leave

(AWOL) yet, in the letter Brodie threatened to charge her for Absence Without Leave. Psak Decl.

12.


21. This request for medical documentation was issued more than a month after

plaintiff had gone out on "stress leave" for an indeterminate amount of time and had not been

working. Compare Ex. 5 with Ex. 7; Ex. 1, at 83-84.

 **Disputed.**   This request for medical documentation prior to plaintiff's return to duty was not

based on any, Force, Agency or OPM regulation. The plaintiff was following the sick leave

policy in described in G.O. 33.01. The established policy and procedure at that time was to

complete the USPP Form 4 (Sick Status Request), initiated by Dispatch, when the employee

returned to work. This was the first time in more than 13 years on the job that plaintiff was being

told to submit medical documentation for her absence due to illness prior to her return to work

(ROI (2015) Exh. 18 pp. 7-8). Plaintiff, contrary to Defendant's claim, had been working up until

October 2, 2008 when she was forced to retire her canine partner Malu to avoid the cruel

alternative of sending him to a kennel until plaintiff was able to return to duty. Part of every

canine handler's job is to provide for the daily health and maintenance of his/her canine partner

even on his/her designated sign off days. This routinely happens at the handler's domicile.

Plaintiff continued to perform this duty and was compensated for the work she performed. Psak

Decl. 13.

22. At the time this letter was issued, plaintiff had provided no medical documentation to support

her failure to return to work. Ex. 6, at 55.

**Disputed.**  See response to 20 and 21. Psak Decl. 12-14.

26. By letter dated September 26, 2008, plaintiff was informed that Park Police

officers were coming to retrieve her badge, gun, car and credentials while she was off work on

extended sick leave. Ex. 9.

**Disputed.**  In the letter dated September 26, 2008, Jonathan Pierce improperly informed plaintiff

that she must relinquish her Force issued credentials while she was out on extended sick leave.

The applicable regulation, General Order 33.01, allows for taking the gun, badge and car, but not

the credentials. *See* ROI (2009), pp. 10 (last paragraph), 81 item 10; ROI (2009), p. 124 item 9;

Psak Decl. 15.

27. U.S. Park Police General Order 33.01, Section VIII, D, states that: "An officer

who remains for 30 consecutive days in sick leave status shall surrender the Force-issued

firearm(s), breast badge, and (if applicable) cap badge to the appropriate property officer within

72 hours after the 30th day." Ex. 10.

**Disputed.**  Nowhere in USPP G.O. 33.01, Section VIII, D is there any mention of a requirement for an officer on extended sick leave to relinquish his/her Force issued credentials, yet she was ordered to relinquish them. (Defendant admits the order in Statement 26 above.)  Further, another similarity situated employee, Officer Kimberli Bransom was on extended sick leave during the same time frame. Officer Bransom was only required to surrender her assigned government vehicle. Despite remaining for 30 consecutive days in sick leave status, Officer Bransom was not required to surrender her Force-issued firearm(s), breast badge, and cap badge to the appropriate property officer at any time during her extended sick leave.  When plaintiff was on extended sick leave prior to engaging in protected activity (1996), her law enforcement authority was not suspended and she was not required to surrender any of her Force-issued property.  Psak Decl. 16.

29. While plaintiff was on sick leave she was not working. Ex. 1, at 83-84.

**Disputed.**  A police officer is on duty 24 hours a day, 7 days a week and is expected to assist law enforcement in any jurisdiction in whatever way he/she is able.  Psak Decl. 17; Psak Depo. 157:4-15.

31. An officer's credentials identify the person as a police officer with law enforcement authority. Ex. 6, at 110.

**Clarification of fact.**  Because plaintiff's law enforcement authority was suspended without cause, plaintiff was not able to identify herself as a sworn law enforcement officer had there been a need to assist law enforcement in any jurisdiction.  Psak Decl. 18.

32. When the law enforcement authority to work has been suspended, the Park Police

can retrieve the officer's credentials. Ex. 6 at 110.

**Disputed as incomplete and misleading.**   The only condition that warrants the suspension of

the law enforcement authority of a sworn Force member is when s/he has reportedly engaged in

misconduct. Plaintiff had never engaged in misconduct but was treated as if she had. According

to G.O. 31.01, Plaintiff should have been formally notified that her law enforcement authority

was being suspended.  She would have never known that her law enforcement authority had been

officially suspended had she not been sent to the Training Branch to work in a LD capacity in

October 2016. While assigned to the Training Branch, Plaintiff decided to review her official

training file.  When she opened the folder with her name on it, she was shocked to see the top

page.  It was a memorandum that was never sent to her from the Commander of OPR (Jackie

Burks).  The memorandum dated August 26, 2010 indicated that her law enforcement authority

was reinstated effective immediately. *See* General Order 31.01, ROI (2017) (NFS 16-0522), pp.

247, 928-930; Psak Decl. 19.


34. A Canine Officer's dog used for work is the property of the Park Police. See Ex.

1 at 46.

**Disputed as incomplete and misleading.**   A Force canine is more than "the property of the

Park Police." A Force canine is a highly trained and expensive tool. As such, not retired simply

for convenience. The bond between a canine and handler is extremely powerful. Although the

animal is government property, the canine is considered part of a handler's family. Knowing the

bond that plaintiff had with her assigned canine, the proposed kenneling of Malu was deliberately

used harm her in two ways; first to punish her financially, and second, to separate her from the only family she had in the area. While on leave, a canine handler receives daily compensation for canine maintenance on assigned workdays. That hour of canine maintenance is deducted from the number of hours of leave used per day. So a canine handler who works a 10-hour shift will only use 9 hours of leave each day s/he is not "at work" as s/he must still perform one hour of work caring for the assigned canine even in a leave status. However, on assigned sign-off days, the handler is compensated in overtime hours for animal care. By removing Malu from plaintiff's domicile, she would have to use an additional 8 hours of leave per pay period to cover her absence and it would also put an immediate end to her compensation for animal care on her designated sign-off days. A handwritten note from timekeeper Linda Garvey shows that RMOs intention was to immediately stop overtime compensation for animal care.  RMOs did not pay Plaintiff for animal care she performed prior to Malu's forced retirement but Ms. Garvey made the discovery and submitted a correction on her behalf. No similarly situated employee was ordered to surrender his/her Force canine partner while on extended sick leave; not Officer Bransom, not Officer James Austin who was also on extended sick leave during the same time frame as plaintiff. Despite having informed management about the seriousness of his disease (Wegener's) and the loss of vision in one eye before his eventual medical retirement from law enforcement, Austin's canine partner, Krypto, was never sent to a kennel. Austin did not have to retire Krypto, despite the dog not having performed work for months and not until after the dog developed medical problems sometime after March 2010. Psak Decl. 20.


36. Plaintiff was not required to retire her dog. Ex. 9.

**Disputed as incomplete and misleading.**   Plaintiff only asked that her assigned partner be retired because it was mentioned in the letter dated September 26, 2008. This was a forced choice to spare Malu from the cruelty of isolation from his pack leader (plaintiff) and two other canines in his pack. The plaintiff's request to retire Malu was also to prevent herself from further emotional distress she would have suffered without having her best friend beside her during what was already a very stressful time. Psak Decl. 21.


37. By letter dated October 22, 2008, plaintiff was informed that she needed to submit additional medical documentation to justify her continued absence from work. Ex. 12.

**Disputed as incomplete and misleading.**  On October 22, 2008, plaintiff was under the care of healthcare providers who had not determined she was able to return to duty yet. Agency RMOs were trying to rush plaintiff's return to duty. The motivating force was Karlyn Payton-Williams who has claimed "if an employee can breathe, he can work." Plaintiff had not requested an accommodation, yet Agency RMOs deemed it necessary to provide detailed medical information to "properly consider and accommodate" plaintiff's condition. The letter was not a request; it was an ultimatum. Similar to the letter dated September 4, 2008, it also included an unwarranted threat of adverse personnel action, specifically "up to and including removal from Federal government service" if plaintiff failed to comply with arbitrary demands of administrators with a hidden agenda of reprisal. This second letter, also likely penned by Payton-Williams who sees herself as the Force disciplinarian in her affidavit dated (ROI NPS-16-0522, p. 337), is another example of just how easy it is for a USPP RMO identified in a formal complaint to retaliate against an employee who has engaged in protected activity. No medical doctor or other qualified

16

medical practitioner requested the additional medical information. The Force did not begin

contracting medical services with FOH until FY2010. Agency RMOs wanted detailed medical

information so that they could place plaintiff in "the penalty box" (Dispatch as LD assignment)

indefinitely and ultimately deem her unfit for duty. If RMOs truly had the plaintiff's well being

in mind, they would have waited to see if she even needed an accommodation. The amateurish

attempt to reference the legal authority for RMOs demands was weak at best. Agency RMOs

were neither acting in compliance with, nor in conjunction with 5 CFR Part 339. Had they been

following 5 CFR Part 339, they would have offered plaintiff an examination and the Agency

would have paid for it. Instead they told plaintiff that she would be responsible for any costs

incurred to meet RMOs demands. Psak Decl. 22.


40. The Park Police had received no information from plaintiff's doctor since September 8, 2008.

See id.

41. Plaintiff was still not working. See Ex. 13.

**40/41 Disputed as incomplete and misleading.**   Dr. Tonya Fridy's letter dated September 8,

2008 met the demands of Agency RMOs: to provide documentation for plaintiff's continued

absence. The last paragraph indicated plaintiff was responding well to treatment and had a

positive prognosis. Dr. Fridy clearly stated that she recommended the plaintiff "not return to her

job until her symptoms have stabilized." Had the plaintiff been able to return to duty on or before

October 22, 2008, she would have done so. The unwarranted suspension of plaintiff's law

enforcement authority and the use of her assigned Force canine to inflict emotional harm upon

her just three weeks earlier proved counterproductive to her improvement. Agency RMOs sent

her (plaintiff) another threatening letter which only served to exacerbate her symptoms. Psak Decl. 23.

42. On November 15, 2008, plaintiff's doctor submitted a statement saying that plaintiff was capable of resuming her full duties as a canine police officer, that she was transitioning to a new medication which would be stabilized over the next two weeks, but that she could start work the next day, on November 16, 2008. Ex. 13.

**Disputed as incomplete and misleading.** On November 15, 2008, plaintiff's physician completed every document that RMOs specially created for her and also furnished an additional one and one half page clinical summary, with which some RMOs may not have been pleased. Plaintiff signed the medical release forms to comply with the demands of RMOs, despite feeling it was an invasion of her privacy to be required to provide her protected health information to administrators who do not treat confidentiality seriously. Psak Decl. 24.

43. The new medication was not identified. Id.

**Disputed as incomplete and misleading.** Dr. Karesh reviewed each document, followed the instructions and thoroughly completed each section. He clearly stated, "Jerre Psak is capable of performing all of the essential duties described in this packet." On the page marked B4, item number 7 instructs the physician to, "List any medication requirement(s) (prescription and non-prescription-type and dosage) that would, or does affect performance, behavior or safety concerns that are directly related to the position." Dr. Karesh provided a complete response indicating, "Prescribed medication shouldn't negatively impact abilities or interfere with

18

performance of duties." Dr. Karesh was only required to list plaintiff's medications that would affect her performance. He was not required to list any medications that would not affect plaintiff's performance. Psak Decl. 25.

44.  Although plaintiff's doctor stated that the prescribed medication shouldn't negatively impact plaintiff's abilities or interfere with the performance of her duties, no explanation was given for whether the stabilization process of the new medication could have any effect on plaintiff's performance of her job duties. Id.

**Disputed as incomplete and misleading.** No explanation of titration was specifically requested. The two items (8,9) which followed provided an opportunity for Dr. Karesh to identify any concerns or reservations with respect to plaintiff's medications or if he had any additional medical concerns at all. His clear response to item 8 was "none" and his response to item 9 was "none." Psak Decl. 26.

45.  No information was provided regarding the length of treatment plaintiff still needed. Id.

**Disputed as incomplete and misleading.** Dr. Karesh cleared plaintiff for full duty. Requiring Plaintiff to provide information about ongoing treatment she received on her personal time was neither job-related nor consistent with business necessity. Plaintiff considered it an invasion of her privacy. Psak Decl. 27.

46. On December 12, 2008, Kenneth Brodie, Commander of the Park Police's Services Division,

spoke to plaintiff's attorney and informed her that plaintiff would need to undergo a fitness for duty examination because plaintiff's doctor had given no indication as to the type of medicinal regimen plaintiff was on and how it could affect her ability to perform the duties of a law enforcement officer. Ex. 14 at 1.

**Disputed.**  Agency claims here that the requirement for plaintiff to undergo a FFD was because Dr. Karesh did not provide details of her medicinal regimen. These claims are plainly false. Agency RMOs discussed and devised a plan that the plaintiff would be forced to undergo a FFD long before she had ever attempted to return to duty. Plaintiff was denied the right to return to duty on November 15, 2008 at about 1930 hours. Robert MacLean told the Shift Commander, Lieutenant Arthur L. Gaither to inform the plaintiff that she could not return to duty without undergoing a FFD examination. Since the plaintiff was on LWOP having been denied the advanced leave she had requested, plaintiff's representatives immediately contacted Agency RMOs to inquire about the FFD requirement and ensure she was placed on Administrative Leave. Plaintiff's representatives argued that details about her medicinal regimen was neither job-related nor consistent with business necessity, as any medications she was taking would not and did not affect her job performance. The requirement for plaintiff to submit to a FFD Examination was unlawful. The requirement for plaintiff to undergo FFD was further reprisal for plaintiff's protected activity as well as discrimination based on plaintiff having a handicapping condition, especially a psychological condition. Psak Decl. 28.

47. Following this conversation, Karlyn Payton-Williams from the Park Police's

Office of Professional Responsibility, spoke with plaintiff's attorney, who questioned Ms.

Payton about the need for a fitness for duty examination. Ex. 15.

**Disputed.**  As previously stated, Payton-Williams was aware that plaintiff had named her as a

RMO in the formal EEO complaint filed on May 7, 2008. This is another example illustrating

that Payton-Williams is the Force's mastermind for devising novel ways to retaliate against an

employee who has engaged in protected activity. Psak Decl. 29.


48. Ms. Payton informed plaintiff's attorney that the Park Police might be able to

bring plaintiff back to work if she provided additional information about her medication. Id.

**Disputed.**  Counsel for plaintiff believed the requirement for FFD was unlawful and made

repeated requests for Agency RMOs to provide the legal authority for this requirement. Agency

RMOs failed to provide plaintiff's counsel with the legal authority to order a plaintiff undergo a

FFD. Psak Decl. 30.


49. Plaintiff declined to provide information about her medication. Id. at 2.

**Disputed as incomplete and misleading.** Plaintiff had already disclosed much of her protected

health information and did not feel the need to disclose information that was according to legal

counsel, neither job-related nor consistent with business necessity. Plaintiff had great concerns

that RMOs were intent on terminating her by using information she provided against her. Psak

Decl. 31.

21

50.  In the November 15, 2008 letter from plaintiff's doctor, he recommended that when plaintiff returned to work she should be reassigned to another canine unit. Ex. 13 at 2 & 4.

**Disputed.**  Dr. Karesh was not aware that there was only one canine unit. He stated, "if Jerre cannot be placed into another canine unit, I recommend switching her work shift to limit her contact with those supervisors with whom she feels uncomfortable until she feels contentious issues that give rise to her stress have been resolved." Dr. Karesh also mentioned a shift change on the form marked B4 which he completed. ROI-09, Exh. 26; Psak Decl. 32.

51. On March 24, 2009, plaintiff was directed to return to duty on April 16, 2009, with a temporary placement in the Communications Section. Ex. 14.

**Disputed as incomplete and misleading.** On March 24, 2009 plaintiff was directed to return to duty on April 16, 2009 with a temporary placement in communication section because the Agency was not able provide the legal authority for requiring her to undergo FFD. Plaintiff knew the "temporary" assignment to the penalty box would be dragged out indefinitely as is the case with officers who are under investigation for misconduct. This is a common punishment Agency RMOs use. Plaintiff's attorney questioned the reason for the proposed LD assignment to Dispatch. She referenced G.O. 33.06 and illustrated that plaintiff did not meet any of the three conditions under which an officer is placed in a limited duty assignment. Plaintiff's attorney also asked why plaintiff was being ordered to report to work on her assigned day off (Thursday). Plaintiff's attorney got no response.  Psak Decl. 33; ROI-09, Exh. 23-25.

52.  By email dated April 15, 2009, plaintiff stated that she would consider working in

the Explosive Ordinance Detector ("EOD"). Ex. 16.

**Disputed as incomplete and misleading.** Plaintiff responded to Jeffrey Quinn's group email

dated April 8, 2009. Quinn's email to "All" (patrol canine handlers) was to identify future needs

of the canine unit. He asked if any handler would be interested in working a bomb dog and said

that he needed to know by April 15th. Although plaintiff did not want to switch disciplines

(patrol dog to detector dog), she sent a response indicating that she would consider working a

bomb dog when she was allowed to return to full duty. Plaintiff never requested to be reassigned;

either formally or informally. Psak Decl. 34.


53. Communications continued between plaintiff's attorney and the Park Police

regarding her return to duty. Ex. 16.

**Disputed as incomplete and misleading.** Plaintiff's attorney made repeated requests for

clarification of a number of questionable requirements the Agency placed on plaintiff as soon as

she was denied the right to return to duty on November 15, 2008. Plaintiff's attorney continued to

ask for the legal authority for the requirement for FFD and Agency was unable to furnish one.

She also repeatedly asked Agency RMOs, Payton-Williams and Brodie, to explain the specific

concern about plaintiff's medicinal regimen. Agency refused to respond to her repeated inquiries.

As it happened, there was a newly published Memorandum 3, entitled "Returning Sworn Officers

to Duty after an Extended Absence." This new Memo 3 fixed Defendant's RMOs problem that

was keeping them from compelling Plaintiff to submit to a FFD Examination.  Agency RMOs

had by now kept Plaintiff from returning to full duty for over 6 months.  The 2009 policy is likely

23

the only place the term "administrative limited duty" is found in any Force publication and, to Plaintiff's knowledge, still does not exist anywhere in Federal employment. The additional return to duty requirements were the "perfect punishment" for Plaintiff and/or any other Force member who was being harassed and targeted for engaging in protected activity. Those Force members in the "ole boy network" or those who had not engaged in protected activity would likely be exempted from the requirements set forth in Memo 3 by virtue of the fact that each extended absence would "be reviewed on a case by case basis to determine the officer's eligibility to participate in this type of return-to-duty training regimen." Psak Decl. 35.

56. Plaintiff returned to work December 1, 2009, in an administrative limited duty position. Ex. 1, at 102-104.

**Disputed as incomplete and misleading.** Plaintiff reported for "administrative limited duty" in December 2009 based only on advice of counsel. The term "administrative limited duty" exists nowhere in Federal employment. It was a work status that Agency RMOs completely made up just for plaintiff. This was punishment time for the plaintiff. Plaintiff remained in this phony status from December 1, 2009 until mid August of 2010. RMOs dragged their feet to schedule a medical examination for five months. Because the Agency had no legal basis the requirement for FFD, Robert MacLean informed plaintiff that the medical examination was a Return to Duty Examination. Plaintiff later learned that the medical examination she received was, in fact, a FFD. Plaintiff had requested copies of the results of all her physical examinations prior to retirement and discovered that the examining physician marked the block indicating the Agency requested a FFD. Plaintiff compared the paperwork between annual exam requirements and the

24

Return to Duty (FFD) and noticed a slight difference in procedures performed. Despite what

Robert MacLean told plaintiff, Agency RMOs improperly/unlawfully ordered a FFD from the

FOH Health Unit at HUD. Psak Decl. 36.


57.  In August 2010, plaintiff was reassigned to the position of Explosive Detector

Canine Handler. Complaint–14, ¶ 163.

**Disputed as incomplete and misleading.** Plaintiff did not request to be reassigned. Plaintiff was

told she would be working a bomb dog even though that was not her wishes.  Robert LaChance

and Jeffrey Quinn told plaintiff that she had to work a bomb dog. Well before plaintiff was

reassigned, a new male handler, an officer junior to her was trained to work a patrol dog. Officer

Ernest Patrick attended training along with Sergeant Mike Wallace in the fall of 2009. In the

entire history of the USPP Canine Unit, no handler had ever been involuntarily reassigned to a

different discipline. The LMA prohibits involuntary reassignment of sworn Force members who

hold the rank of Private except for disciplinary reasons. Plaintiff was a Private for her entire

career. Psak Decl. 37.


58. Under U.S. Park Police General Order 34.01, Park Police officers over the age of

40 are required to have an annual physical examination to ensure that they can meet the physical

and mental requirements of their position. Ex. 19, Affidavit of Matthew Waldman, at 9.

**Disputed.**  Periodic physicals, whether biennial or annual are part of a health monitoring

program and are performed to ensure sworn members meet basic medical requirements however

there is no component to evaluate the mental fitness of any Force member. Psak Decl. 38.

59. The physical examination is performed by the Federal Occupational Health

("FOH"), a Division of the U.S. Department of Health and Human Services, with which the Park

Police has a contract. See id. at 2-4, 9.

**Disputed as incomplete and misleading.** A Force member also has the option to have the

periodic physical examination performed by a private physician. Psak Decl. 39.


62.  On December 19, 2013, Sergeant Waldman sent an email to plaintiff and several

other officers informing them that they had to have the required annual medical physical

examination in January 2014. Ex. 19, at 3-4.

**Disputed as incomplete and misleading.** Plaintiff made an appointment for and completed her

annual medical examination on February 27, 2014. Learning from personal experience, but also

knowing the culture of managers openly discussing employees PHI with each other, plaintiff used

extreme care to ensure only FOH medical staff had access to her PHI. Plaintiff made clear in

writing on the FOH Authorization for Disclosure of Information, that no one from the Agency

had permission to access her PHI. Psak Decl. 40.


63. On July 21, 2014, Sergeant Waldman opened a package from the FOH which

contained the results of physical examinations for several officers, including plaintiff's results.

Id. at 5.

**Disputed as incomplete and misleading.** Agency representative Waldman violated plaintiff's

directive regarding her PHI as well as HIPAA. Beyond the HIPAA violation was the suspicious

timing of the MRO's findings. This occurred on the heels of plaintiff filing her civil action in

U.S. District Court (January 29, 2014). Psak Decl. 41.

64. Plaintiff's file, along with two others, was not stamped "medically qualified" to

be a Park Police Officer. Id. at 6.

**Disputed as incomplete and misleading.**  It is highly likely that the decision to not stamp

"medically qualified" to be a Park Police Officer came at the request of Karlyn Payton-Williams,

who stated she, among others with no medical background, is on the Medical Review Board.

This MRB is much like a kangaroo court in which select sycophants and members of the network

can try to disqualify from employment, a Force member who is viewed as a liability to the Force

network for having engaged in protected activity. In her sworn testimony Payton-Williams said,

"I will prepare the notice - I would prepare the notice that goes to FOH to put them on notice of

what we want." ROI-17, p. 339;  Psak Decl. 42.

65. Sergeant Waldman did not receive the results of plaintiff's physical examination;

instead, he received a medical review form which he logged in by signing his name and the date

received. Id. at 6.

**Disputed as incomplete and misleading.** Sergeant Waldman may not have received the

plaintiff's physical examination. He did however admit to keeping a copy of employee physical

examinations in his office. Plaintiff did not sign a release form with FOH to allow anyone from

the Agency to receive a copy of her medical records. The medical review form which Sergeant

Waldman admits to receiving had plaintiff's PHI, including her medical history, diagnosis and

prescribed medication. He admits to reviewing the medical information he received and

repeatedly referred to himself as the "Medical Review Sergeant" in the phone conversation with plaintiff. It is almost certain that Waldman immediately contacted Payton-Williams or Dennis Bosak to discuss the phone conversation as well as plaintiff's medical review form.  Waldman's job was to share vital information about officers with Dennis Bosak and Payton-Williams. Waldman readily shared plaintiff's PHI with the EEO investigator. Waldman began to read the medical review form to the investigator and she had to stop him from disclosing plaintiff's PHI. Psak Decl. 43.

66. Plaintiff's form, along with the form for one other officer, stated that her status was "medical determination deferred pending further documentation. Incumbent has medical findings which may hinder safe and efficient performance of essential job functions. Please provide the following detailed or diagnostic medical information." Id. at 17.

**Disputed.**  What is so suspicious is that the same MRO had previously (2012, 2013) reviewed results of plaintiff's annual physical and did not reach the conclusion that "medical determination deferred pending further documentation" and/or that "incumbent has medical findings which may hinder safe and efficient performance of essential job functions." Plaintiff was being required to provide detailed or diagnostic medical information in 2014. Conversely in 2013, before she filed her civil action, plaintiff's fasting glucose levels were outside the range of normal (high). When plaintiff received a copy of her physical exam, sent directly to her residence, it included a note from a FOH nurse simply telling her to follow up with her personal physician. Psak Decl. 44.

67. The request for additional medical information came from FOH. Id. at 21.

28

**Disputed as incomplete and misleading.** The request for additional medical information may have come from FOH but a request for MRO to re-evaluate her condition likely came from Payton-Williams or someone who answers to her. According to Payton-Williams, who works remotely from Atlanta, where the MRO is based, "I will prepare the notice - I would prepare the notice that goes to FOH to put them on notice of what we want." ROI-17, p. 339; Psak Decl. 45.

70. Plaintiff did not provide the requested information. Id. at 18.

**Disputed as incomplete and misleading.** Plaintiff immediately contacted her attorney who believed the timing was suspect as well. Psak Decl. 46.

71. No one in the agency sees the Medical Review Form except Sergeant Waldman and the employee. Id. at 7, 15.

**Disputed.**  It is possible that other Agency RMOs don't routinely see the Medical Review Form. If Bosak and Payton-Williams did not see plaintiff's medical review form, it is extremely likely that Waldman at the very least read it to them just as he did to the EEO investigator. Anyone on the Force Medical Review board has to review PHI in order to discuss an officer who they are targeting. Psak Decl. 47.

76. Plaintiff informed the officers that she found it offensive. Id.

**Disputed as incomplete and misleading.** Plaintiff looked at Edington and Monfette but her remarks were such that it was a message for the entire room, including Lieutenant Jeffrey Schneider. Psak Decl. 48.


77. Officer Edington apologized to plaintiff. Id.; Ex. 20, Deposition of Jeffrey Schneider, at 73-74.

**Disputed as incomplete and misleading.** Edington apologized because he knew his offense was far greater than upsetting plaintiff. Psak Decl. 49.


78. Plaintiff said nothing to the supervisor in the room, Lieutenant Jeffrey Schneider, who was behind her doing paperwork, and he did not say anything. Ex. 1 at 118, 125-27; Ex. 20 at 74.

**Disputed as incomplete and misleading.** Plaintiff's remarks were for a larger audience than the two offenders. Plaintiff had her back to the offending officers and Schneider as she worked at the computer. However, plaintiff turned away from the computer to speak, facing everyone seated around the formation of desks designed to conduct briefings. Plaintiff spoke loudly and clearly and long enough that even assuming Schneider did not hear the video broadcast, he heard every word of plaintiff's remarks, but said nothing in response. Psak Decl. 50.

79. Lieutenant Schneider did not hear the video. Ex, 20 at 45-46; 81-82.

**Disputed.**  Lt. Schneider is the only person who was in the roll call room during the incident who

claimed he did not hear any part of the video. Schneider claimed he did not hear the video to

protect himself from disciplinary action. Schneider did not take any action after hearing

plaintiff's comments and Edington's apology which he admits to hearing. Schneider did nothing

while the plaintiff closed her files and signed off the computer. Schneider did nothing when he

watched plaintiff walk out the door of the roll call room and into Sergeant Burnett's office.

Schneider did not attempt to reach plaintiff by Force-issued cell phone or over Force radio to

request she return to the roll call room. Schneider did nothing because he was concerned about

his own conduct - his failure to uphold the Agency's Zero Tolerance Policy as it was being

violated in his presence. Schneider did not speak to plaintiff that day or ever to express concern

about what happened or his failure to intervene. If Schneider was truly clueless as he claims, he

would have taken the time to explain his actions or inactions.  Psak Decl. 51.


80. Upon learning about the video, Lieutenant Schneider counseled Officer

Edington on the inappropriateness of his conduct and informed his supervisor, Captain Steven

Booker. Ex. 20 at 48-49; 75-79.

**Disputed as incomplete and misleading.** The actions that Schneider took following the incident

were not in accordance with established policy or procedure. According to G.O. 30.03 and 31.01

Schneider should have immediately requested a case number for an administrative complaint on

the officers who violated the Agency Zero Tolerance Policy. That is what someone without

consciousness of guilt would have done. Everyone who witnessed the incident would have been

asked to provide a statement for inclusion in the investigation. It is more likely that Captain

Booker instructed Schneider to counsel Edington and Monfette after plaintiff phoned Booker

following the incident. Psak Decl. 52.


81. Captain Booker spoke to Lieutenant Schneider about the video incident, and

counseled Lieutenant Schneider to be more aware of his surroundings. Ex. 21, Deposition of

Steven Booker, at 27, 33-34.

**Disputed as incomplete and misleading.** Captain Booker also failed to follow established

policy and procedure. Given the circumstances and the plaintiff's report to Schneider's

immediate supervisor, Booker should have investigated the incident and determined all Force

members who violated the Agency Zero Tolerance Policy. According to Director' Order #16E:

Sexual Harassment Policy, violation of the law on sexual harassment by any employee or

contractor of the National Park Service will result in disciplinary action, ranging from reprimand

to termination. ROI-17, Exh. F-29; Psak Decl. 53.


84. Plaintiff returned to work in a limited duty status. Ex. 1 at 145.

**Disputed as incomplete and misleading.** Despite plaintiff's physician's recommendations to

not place her in LD assignment in Dispatch, RMOs assigned her there. Psak Decl. 54.


85. Plaintiff did not request an accommodation. Id. at 150.

**Disputed as incomplete and misleading.** Agency Human Resources submitted prospective LD

assignments to plaintiff's physician for review and recommendation. Dr. Delasobera indicated

32

that plaintiff should not be placed in Dispatch but Agency RMOs placed her there anyway. Psak

Decl. 55.

86. When plaintiff returned to work she was assigned to work in Dispatch, which is

the Park Police's communications center. Id. at 145.

**Disputed as incomplete and misleading.** On day one, plaintiff raised concerns with Lieutenant

Schneider about being assigned to Dispatch in clear violation of her physician's

recommendations. Schneider indicated it was only temporary, until management could find

another assignment. Rather than immediately relocate plaintiff, RMOs waited an entire week to

reassign her to a worksite that her physician had not even approved. Plaintiff shared the same

physician with another officer (Kim) who sustained a head injury about the same time. Dr.

Delasobera made the same recommendation to not place (Kim) in Dispatch and management

honored the doctor's request. Kim had not yet engaged in protected activity. Psak Decl. 56.

88. Plaintiff was then assigned to the Training Branch, to sit at the reception desk and

answer the telephone and help anyone who came to the Branch. Id.

**Disputed as incomplete and misleading.** Plaintiff was also told that she would be sent to a

training course to learn data entry. Upon completion of the course plaintiff would be expected to

enter training records (hard copies) into the electronic records of the Force. Plaintiff maintained a

positive attitude and cooperated to carry out the mission. Psak Decl. 57.

89. Plaintiff informed Captain Murphy that she was finding it hard to work in the

Training Branch. Id. at 149.

**Disputed as incomplete and misleading.** Plaintiff told Captain Murphy that she was having

headaches and some visual disturbances when she looked at the computer screen or words on

paper. Psak Decl. 58.

90. On November 15, 2016, plaintiff's doctor provided a note that said plaintiff could

return to patrol duty for four hours a day, then increasing to five hours a day. Ex. 21.

**Disputed as incomplete and misleading.** Plaintiff's physician recommended resuming full

police duties for less than a full shift which is listed in G.O. 33.06 as one of three ways LD can

occur. According to G.O. 33.06, section III, A. 2. An employee is medically certified to return to

work on a part-time basis, but is able to perform the full range and/or scope of his/her official

duties and responsibilities, e.g., the employee is suffering with an injury wherein the actual duties

and responsibilities being performed should not reasonably be expected to aggravate the injury,

but the amount of time that the employee can do so is limited to a period of hours less than a full

shift. Psak Decl. 59.

91. Plaintiff could not perform her old patrol officer job because it could not be

guaranteed that her work day would always end after four hours. Ex. 22, Deposition of Mark

Adamchik, at 15-18, 32-34.

**Disputed as incomplete and misleading.** Adamchik's absurd claim was only contrived for his

deposition. In the memorandum dated November 29, 2016 Agency RMOs claimed Dr.

Delasobera's recommendation for "accommodation would be contrary to the operational needs of

the unit. It gave no specific reason and made no mention of concerns about keeping the plaintiff

beyond her partial tour of duty. In fact, officers are granted quick leave all the time. An officer

can call in before his/her assigned shift and if s/he has no assignments, his/her immediate

supervisor may grant leave for the entire day. Likewise, if an officer had reported to work and

decided it was a nice day and wanted to go golfing, s/he could ask his/her immediate supervisor

permission to take leave for the remainder of his/her tour of duty. Unit commanders will reassign

other units to make coverage of an officer who takes quick leave or has a special assignment

(SPA) for a block of time during his/her shift. It is common for canine handlers to periodically

take their dog to veterinary appointments. Appointments are commonly made for the last few

hours of the tour of duty. The detail clerk makes a note on the daily detail indicating (Vet appt)

rendering the canine team unavailable for calls. When a canine team goes to a school to perform

a static display (show & tell), the detail clerk makes a note on the detail (SPA) next to the

particular canine team indicating they will be unavailable for calls for the indicated time period.

Adamchik's hypothetical nonsense in his sworn testimony is simply not true. Plaintiff once

observed an impaired driver while on her way to a dignitary escort. In this case, she advised

dispatch of her location and asked for the beat officer to respond. Plaintiff executed a traffic stop,

obtained the operator's license and registration and shortly thereafter, turned the stop over to the

arriving beat officer and continued on to her assignment. Plaintiff was not required to arrest the

impaired driver. Plaintiff has been held over past her tour of duty many times along with others

to monitor a spontaneous demonstration when officers who had important plans were released at

the end their shift at the discretion of the incident commander. In one instance, it was because an

officer's child had a school function he was to attend. Another case was when an officer had an

engagement dinner with his future in-laws. The concern Adamchik expressed about not being able to guarantee that plaintiff could be released after her prescribed shift is exaggerated and invalid.  Psak Decl. 60.

Further, the memorandum dated November 29, 2016 was signed by Willette Hardison.  However, it was only after Adamchik, Hardison and Payton-Williams conferred to devise a way to deny my doctor's recommendation.  In the training Payton-Williams conducted for NPS supervisors, she espoused the belief that, "if a person can work at least four hours a day, that we want to offer them meaningful work within their doctor's restrictions" (attach transcript from NPS training). The decision to not grant my doctor's request for this exact accommodation runs contrary to what Payton-Williams teaches. Psak Decl. 60.


92. Plaintiff is aware of no officers allowed to work as canine handler who worked

four or five hours. Ex. 1 at 151-55.

**Disputed as incomplete and misleading.** Plaintiff's response indicates that she was aware of no officer who was working a reduced shift at the time she was questioned. Had Ms. Braswell asked if any established Force policy or procedure existed which included a provision to allow any officer to work a reduced shift as part of a LD assignment, she would have described the provisions of G.O. 33.06. Psak Decl. 61.


93. Plaintiff was reassigned to work at a guard desk at the Park Police Office in at the

Anacostia Operations Facility. Id. at 152.

**Disputed as incomplete and misleading.** Plaintiff was assigned to a share a small guard booth

with a member of the guard force. The booth was designed to be a workspace for one person, having one desk, one phone, one computer. Only two Force members had been assigned to that location before plaintiff. Beuzard, a civilian dispatcher, was assigned there overnight while he was under investigation for domestic violence until he was terminated. Pianam, a sworn Force member was also assigned there following his arrest by MPD until his eventual termination. RMOs used this assignment to humiliate plaintiff, to make her as uncomfortable as possible and to restrict her freedom. Further evidence of the ill motivations of Agency RMOs was the inclusion of specific instructions for plaintiff about reporting her time and attendance. RMOs also falsely claimed that the G-18 post is a stationary post, when in fact, duties at this post include performing both interior and exterior patrols of the Anacostia Operations Facility. Plaintiff was told she would be reporting directly to the SWAT/K9 commander (normally her second line supervisor) who she identified as a RMO. This new supervisory role of Schneider to keep tabs on plaintiff was not consistent with plaintiff's LD assignments to Dispatch or the Training Branch. While assigned to Dispatch, plaintiff was under the direct supervision of the Dispatch Sergeant. While assigned to the Training Branch, plaintiff was under the direct supervision of Captain Murphy of the Training Branch. Although Sergeant Richard Stewart made the assignments for the guard force and plaintiff needed inform him of any leave she may need to attend medical appointments, it was Schneider or one of his designees who plaintiff was ordered to coordinate with should she need to be away from the post such a as a break. Schneider's designees were either RMO Johnson who had falsely claimed plaintiff had engaged in criminal activity or Quinn who conducted the improper counseling session with Schneider (ROI-17, pp. 412-414).  Less than two months after Adamchik's tactic was implemented, he was selected to

attend the FBI National Academy (ROI-17, p. 450;. Psak Decl. 62.

97. This was considered a standard rating by her supervisor, Sergeant Jeffrey Quinn.

Id. at 48.

**Disputed as incomplete and misleading.** This was not a standard rating for plaintiff who had

never before received from Quinn, a performance level 3 for any critical element. Psak Decl. 63.

98. In giving plaintiff this rating, Sergeant Quinn considered the fact plaintiff had

received three complaints against her for unprofessional conduct, plus an administrative

complaint, which were more complaints against her in a single rating period than Sergeant Quinn

had ever seen before Ex. 25 at 31, 49.

**Disputed as incomplete and misleading.** Number of complaints an officer receives in a given

period is not a specific performance measure by which officers are rated. General instructions for

the Employee Performance Appraisal Plan (EPAP) state, "Appraisals should fairly reflect the

overall performance of an employee during the rating period. The word "overall" is bold and

underlined. The instructions further state, "Generally, the performance level for a critical element

should not be selected based on only one instance of failure or success but on the employees

overall consistent level of performance as determined by the rating official." (italics and

underline as they appear in EPAP instructions). This rating period began in October of 2014, at a

time when anti police sentiment was growing due to controversial officer involved homicides of

Eric Garner (07/17/14), Michael Brown (08/09/14) and Tamir Rice (11/22/14). Plaintiff noticed a

high uptick in confrontational responses from citizens she stopped but she stilled continued to

perform traffic enforcement. The citizens who filed the complaints exhibited such egregious behavior during a routine traffic stop and their claims were baseless. The first and only citizen complaint that was partially sustained found that plaintiff failed to identify herself when she in fact, identified herself twice. Quinn was meticulous in counting complaints plaintiff received and named each one in the narrative summary for critical element 3, but failed to mention the documented phone call by a citizen to Dispatch to commend plaintiff. (ROI-17,  p. 285; Psak Decl. 64.

99. Plaintiff's 2014 performance appraisal was "Superior". Id.

**Disputed as incomplete and misleading.** Plaintiff's performance level for interpersonal skills was 4 (superior). Psak Decl. 65.

100. Plaintiff's 2016 performance appraisal was "Superior". Id.

**Disputed as incomplete and misleading.** Plaintiff received no citizen complaints for the entire rating period and achieved a performance level of 4 (superior) for interpersonal skills. In the narrative summary, rater (Quinn) mentioned two letters of praise about plaintiff from citizens, though she also received a commendation from a Force supervisor and another one from a citizen. Psak Decl. 66.

101. Plaintiff received no adverse consequences from having received a rating of "Superior". Id. at 143-44.

**Disputed as incomplete and misleading.** Plaintiff believed she would not receive a time off

39

award and felt betrayed/cheated. Plaintiff discovered over a year later that she had received a

TOA, possibly only due to clerical error, as the justification read, "TOA for receiving a level 4

performance rating FY2015." Psak Decl. 67.


102. In 2015 plaintiff and Sergeant Michael Johnson had a verbal exchange after

plaintiff heard him allegedly say something negative about a retired deputy chief. Ex. 1 at 131.

**Disputed as incomplete and misleading.** Sergeant Michael Johnson admits to making a

disparaging comment about a retired Deputy Chief in his sworn statement. The verbal exchange

was based on Johnson lying about making any such statement and false statements he previously

made about plaintiff's competence. ROI-17, pp. 144-145:566-615, p.147:697-705;  Psak Decl.

68.


104. During their verbal exchange, plaintiff and Sergeant Johnson made disparaging

remarks about each other. Ex. 1 at 131-41; Ex. 23, Deposition of Steven Booker, dated

September 10, 2018, at 13-15.

**Disputed as incomplete and misleading.** The branch commander, Guddemi, witnessed the

verbal exchange where it became contentious. Had Guddemi felt plaintiff's actions were

improper, he would have taken appropriate administrative action. After having stated in a

taunting tone to plaintiff, "I hear you like to sue people" (referring to her protected activity)

Johnson initiated an Administrative complaint against plaintiff in retaliation for that protected

activity. The complaint falsely alleged that plaintiff had engaged in criminal conduct and was

filled with false statements and critical omissions about conduct he only admitted to under direct

questioning by plaintiff's attorney during his deposition. Psak Decl. 69.

107. The incident between plaintiff and Sergeant Johnson was investigated. Ex. 23 at

15.

**Disputed as incomplete and misleading.** According to G.O. 32.04, III. B., normally, the Internal

Affairs Unit shall be responsible for the investigation of allegations against a Force officer or

member of the Guard Force that involve the commission of a criminal offense (ROI-17, p. 241).

The incident was assigned to be investigated by Wallace who the plaintiff had claimed harassed

and intimidated her and had assisted Philip Beck in creating a HWE. Wallace failed to consider

the objective statement of Guddemi who stated, "at no time did Officer Psak state to me that she

had recorded the conversation" in direction contrast to Johnson's false claim. Guddemi also

never said that he viewed plaintiff's demeanor during these exchanges as rude, insolent or

demeaning of Sergeant Johnson's position as a Supervisor of the USPP (the basis of charge

sustained). Guddemi instead, described plaintiff using "stern" and "very passionate." Psak Decl.

70.

108.  Plaintiff was cited for being disrespectful to a supervisor. Complaint-18 at ¶ 11.

**Disputed.**  Plaintiff was cited for being disrespectful toward a supervisor.  When plaintiff tried to

grieve the disposition, RMOs repeatedly failed to respond to her FOP appointed attorney Brian

Bregman.  Mr. Bregman sent letters up the chain of command over several months (ROI-17, pp.

384-389, pp. 107-114).  Only when Mr. Bregman sent a letter to the highest ranking official and

41

identified RMO, Chief Robert MacLean, was there a response to Bregman's multiple inquiries.

MacLean directed Captain Keith Rogers to respond to Bregman.  Rogers and Payton-Williams,

through Booker claimed that the disposition of the Administrative Complaint could not be

grieved because no discipline had been administered is plainly false. (ROI-17, pp. 291-292).

Rogers determined, "Based on the merits of the grievance submitted, we consider the matter

closed."  About eight months later, Rogers was rewarded by being selected to attend the FBI

National Academy. Psak Decl. 71.


109.  In June 2015, plaintiff was ordered to attend a counseling session for having too

many complaints made against her during the rating period. Complaint-18 at ¶ 12; Ex. 1 at 141.

**Disputed as incomplete and misleading.** Agency RMOs attempted to ambush plaintiff when

her third line supervisor (Booker) instructed her second line supervisor (Schneider) to set up a

meeting with her. Neither Booker nor Schneider were involved in her daily supervision or her

performance appraisal. The USPP communicates by chain of command. It is not common

practice for a lieutenant and a captain to request a formal meeting with a private completely

bypassing his/her sergeant. The email notification to plaintiff suggested a certain formality to

what was to occur yet Schneider would not disclose the purpose for the meeting. Schneider sent

the email to plaintiff on May 28, 2015, the very same day that he attested to the truthfulness and

accuracy of his affidavit for the investigation of plaintiff's formal complaint about the violation

of the Agency Zero Tolerance Policy. Booker attested to the truthfulness and accuracy of his

affidavit just two days earlier. This meeting was a formal counseling session in disguise to

retaliate for plaintiff engaging in protected activity. The goal was to lure plaintiff into a formal

counseling session for which she was completely unprepared so Agency RMOs could pile on

charges without plaintiff having a union representative let alone any witness. Agency counsel

made no mention of the offer of EAP services for plaintiff which is eerily similar to the way

RMOs responded to plaintiff's initial request for EEO counseling. Agency RMOs Lopez and

Smith responded to plaintiff's protected activity with a formal referral to EAP and a

memorandum which began, "In light of recent events surrounding Ofc. Jerre Psak.  The

memorandum went on to compile false claims about plaintiff to portray her in a bad light (ROI

NPS-16-0522, pp. 255-257). This is a common practice RMOs use to harass and intimidate by

creating a false record about an employee who has engaged in protected activity. Though the

players change, the tactics from the RMO playbook remain the same.  Psak Decl. 72.


110. The person who gave this direction, Deputy Chief Steven Booker, did not intend

it to be a counseling session; he intended it to be a conversation. Ex. 23 at 17-21.

**Disputed.**  Email communication to and about plaintiff proves that Booker had every intention of

a formal meeting, not simply a conversation. ROI-17,  pp. 986-991; Psak Decl. 73.


111. Deputy Chief Booker was concerned about the number of complaints that had

been made against plaintiff and the amount of sick leave she had used and wanted to make sure

she was alright. Ex. 23 at 18-19.

**Disputed as incomplete and misleading.** A conversation to see if plaintiff was alright would not

have required a formal meeting. If Booker was truly concerned about plaintiff, he would have

asked Quinn for input as he was her first line supervisor and had more face to face time with

43

plaintiff than either Booker or Schneider. None of the emails between Schneider and plaintiff

mention anything about concern for her, only about "EPAP and performance measures."

Plaintiff's suspicions grew when she asked why her supervisor would not be in attendance.

Plaintiff was also initially told she could not bring a union representative to the meeting.

Plaintiff's union representative (Wilkins) sought guidance from a mentor, retired from U.S.

Capitol Police. Wilkins then asked to meet with Booker. It was only after Wilkins spoke with

Booker that things changed. It was decided that Booker would not attend the counseling session,

plaintiff's supervisor Quinn would instead be there with Schneider and plaintiff would be

allowed to bring her union representative. Psak Decl. 74.

Defendant chooses to ignore the fact that I was counseled about my use of non-clinic sick leave

although I had committed no violation. Even with the inaccurate count that RMO Booker

created, Plaintff could have used non-clinic sick leave another time and still would not have

violated G.O. 33.05 (ROI-17, Exh. F-21). Booker's inaccurate record keeping of Plaintiff's use

of non-clinic sick leave suggests he was either careless or deliberately ignoring her doctor's

notes.  It is not unusual for Dispatch personnel to make an error when an officer calls out for

illness/injury but Plaintiff had completed the Form 4 and provided a doctor's note to excuse her

absence (clinic sick leave) over a month before the counseling session took place (ROI-17,  pp.

189-191). Defendant also wants to ignore the fact that she was singled out to scrutinize her use of

non-clinic sick leave when no similarly situated employees were counseled about theirs. During

the counseling session, she expressed her disbelief that she was being counseled without having

committed any violation and the white male officer was not being counseled for his habitual

abuse of sick leave (ROI-17, p. 187) Everyone in the canine unit knew that this officer would

schedule his non-clinic sick leave to coincide with his sign off days and annual leave he

requested in advance. Clearly, this white male officer was not counseled about his abuse of sick

leave because he continued to do it.  Over a month after Plaintiff's counseling session, this

officer submitted leave requests for 07/09/15 and 07/16-7/29/15.  Quinn created the tentative

schedule for the explosive detector canine teams for pay period 16 of 2015 (ROI-17, pp.

279-280).  It reflected the officer's leave requests, his sign off days and the three days that he

should be at work for the period 07/09-07/29/15.  The schedule indicates this officer would be

working on 07/13-07/15/15 at 0900 hours.  In fact, this officer called in to Dispatch at least an

hour before his shift began on 07/13 to report that he would be taking 3 days of non-clinic sick

leave.  This officer performed this scam routinely.  Quinn's insinuation in his deposition (Quinn

Depo. at 44:14-45:16) that he could not prevent it from happening is ludicrous; he allowed this

white male squad mate of mine to schedule his non-clinic sick leave over and over.  In that

respect Quinn was complicit in committing abuse of sick leave. Psak Decl. 74.


114. Plaintiff's supervisor, Jeffrey Quinn, had never seen a Park Police Officer receive

so many complaints in the same time period. Ex. 25 at 22.

**Disputed as incomplete and misleading.** Plaintiff had never received so many complaints in the

same time period over her entire career. Plaintiff had never encountered citizens demonstrating

such a high degree of anti police sentiment and belligerence in the same time period. Psak Decl.

75.

116. Plaintiff received no more complaints after the counseling session. Ex. 25 at 22.

**Disputed as incomplete and misleading.** The counseling session was not the cause of plaintiff receiving no more complaints for the rating period. However, according to the LMA, "If an officer's performance is believed to be below a satisfactory level..." ... "the Officer shall have at least 90 days in which to improve deficient performance. At the end of that period, the Officer will be evaluated and the supervisor shall assign the performance rating. Although the plaintiff demonstrated improvement, her rating was still reduced in clear violation of the LMA. Psak Decl. 76.

Respectfully submitted,

*/s/Richard L. Swick*
Richard L. Swick
D.C. Bar No. 936930
SWICK & SHAPIRO, P.C.
1101 15th Street, N.W.
Suite 205
Washington, DC 20005
Tel. (202) 842-0300
Fax (202) 842-1418
Email rlswick@swickandshapiro.com

Attorney for Plaintiff