## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| JERRE PSAK, | |
| *Plaintiff*, | |
| v. | Civil Action No. 14-116 (RDM) |
| | Civil Action No. 18-115 (RDM) |
| DAVID BERNHARDT,[1] | |
| Secretary of the Department of the Interior, | |
| *Defendant*. | |

## MEMORANDUM OPINION AND ORDER

This case comes before the Court on Defendant's motion for summary judgment on all sixteen counts of Plaintiff's two operative complaints.  Dkt. 52; Dkt. 34 (Am. Compl.); No. 18-115 (Dkt. 1).[2]  These complaints, stemming from two suits brought by Plaintiff that have since been consolidated, Minute Order (Apr. 25, 2018), challenge a variety of Defendant's actions as violative of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 701 *et seq.*  *See* Dkt. 34 (Am. Compl.); No. 18-115 (Dkt. 1).  Plaintiff alleges that the U.S. Park Police ("Park Police"), a component of Defendant Department of the Interior, took various retaliatory actions against her because of her prior equal employment opportunity ("EEO") activity, thus violating Title VII.  Dkt. 34 at 15–20, 24–27 (Am. Compl. ¶¶ 116–69, 195–226) (Counts 1–4, 9–12); No. 18-115 (Dkt. 1 at 7) (Compl. ¶¶ 19–24) (Count 2–3).  She also alleges that the Park Police further violated Title VII by

---

[1]  Secretary Bernhardt is substituted for Ryan Zinke pursuant to Fed. R. Civ. P. 25(d).

[2]  All references to the docket in this Memorandum Opinion and Order refer to Case No. 14-116 unless otherwise specified.

subjecting her to a sex-discriminatory hostile work environment.  Dkt. 34 at 28 (Am. Compl. ¶¶ 228–31) (Count 13); No. 18-115 (Dkt. 1 at 7) (Compl.) (Count 2).  Finally, Plaintiff alleges that the Park Police violated the Rehabilitation Act both by making unnecessary requests for her medical information, Dkt. 34 at 20–24 (Am. Compl. ¶¶ 170–94) (Counts 5–8), and denying her reasonable request for an accommodation, No. 18-115 (Dkt. 1 at 6) (Compl. ¶¶ 16–18) (Count 1).

For the reasons that follow, the Court will **GRANT** in part and **DENY** in part Defendant's motion for summary judgment.  The Court will grant summary judgment on all claims except for Plaintiff's claims that the Park Police (1) retaliated against her by requiring her to choose between surrendering or retiring her canine partner, Dkt. 34 at 10–13 (Am. Compl. ¶¶ 69–98), (2) retaliated against her by requiring in December 2008 and January 2009 that she submit additional medical information or submit to a fitness-for-duty examination in order to return to work, *id.* at 26–27 (Am. Compl. ¶¶ 214–20), and (3) made unnecessary medical inquiries of her in December 2008 and January 2009 in violation of the Rehabilitation Act, *id.* at 22–23 (Am. Compl. ¶¶ 184–88).

## I.  BACKGROUND

### A.    Factual History

Because this case is before the Court on Defendant's motion for summary judgment, this section recounts only the facts that the parties do not dispute.  *See* Fed. R. Civ. P. 56.; *Angelex Ltd. v. United States*, 272 F. Supp. 3d 64, 67 n.1 (D.D.C. 2017).  Plaintiff Jerre Psak is an Asian-American female who was formerly employed as a canine officer within the canine unit of the Park Police in Washington, D.C.  Dkt 55-11 at 1 (Pl. SMF ¶¶ 1, 3).

1.      *2004 Non-Selection and EEO Complaint*

Around December 2003, while employed as a canine officer in Washington, D.C.,

Plaintiff first applied for an open canine officer position in the Park Police's San Francisco Field

Office ("SFFO").  Dkt. 55-1 at 3 (Psak Dep. 15:2–10).  In 2005, following her non-selection for

the position, Plaintiff filed an EEO complaint.  Dkt. 34 at 4 (Am. Compl. ¶¶ 19–21); Dkt. 55-1 at

3 (Psak Dep. 15:2–10).

2.      *2008 Non-Selection and EEO Complaint*

On April 23, 2007, the Park Police published a memorandum announcing another canine

officer position in the SFFO.  Dkt. 55-2 at 128 (Ex. B-14).  In May 2007, Plaintiff applied for

that position.  Dkt. 52 at 3 (Def. SUMF ¶ 2); Dkt. 55-1 at 3–4 (Psak Dep. 15:25–16:4).  At that

time, Plaintiff was still employed in Washington, D.C. and had never worked in the SFFO.  Dkt.

52 at 3 (Def. SUMF ¶ 3).  Another experienced canine handler from Plaintiff's own D.C.

office—Rob Berretta—also applied for the position.  Dkt. 52-1 at 5 (Psak Dep. 18–20:9),

Gerard McCarthy was the selecting official for the SFFO canine officer position, and

Jason Wu was the recommending official.  Dkt. 52 at 4 (Def. SUMF ¶ 4); Dkt. 52-2 (Wu Dep.

26:18–21).  Wu recommended that Officer Jesse Petersen be selected for the canine officer

position.  Dkt. 52 (Def. SUMF ¶¶ 7, 11); Dkt. 52-2 at 6 (Wu Dep. 35:2–15).  Petersen was

employed in the SFFO and was "on the well-qualified list of candidates" along with Plaintiff and

Berretta, but Petersen was not a canine handler at the time of he was selected for the position.

Dkt. 52 (Def. SUMF ¶ 11); Dkt. 52-2 at 3 (Wu Dep. 23:4–24:20); Dkt. 55-2 at 132 (Ex. B-15);

Dkt. 52-1 at 5 (Psak Dep. 18–20:9).  Plaintiff attests that she "didn't have any personal contact

with . . . McCarthy" prior to submitting her 2007 application but that, after she submitted the

application, she called him on the telephone to let him know that she "was very much interested

in filling the vacancy" and that "this was the second time [she] had applied, [and] that [she] had

been a handler in D.C. since [1998]."  Dkt. 55-1 at 4 (Psak Dep. 16:10–23).   Petersen was

selected on or about June 16, 2008.  Dkt. 55-10 at 53 (McCarthy Aff. ¶ 7).

On May 7, 2008, Plaintiff initiated a second EEO complaint against the Park Police,

alleging a hostile work environment, "unrelated to the instant action."  Dkt. 34 at 4 (Am. Compl.

¶ 22); Dkt. 55-2 at 4 (Report on Investigation).  In July 2008, Plaintiff alleges that she "contacted

an EEO Counselor . . . regarding the matters underlying the instant" action.  Dkt. 34 at 24 (Am.

Compl. ¶ 197).

3.    *2008–2009 Medical Leave*

On or about July 23, 2008, Plaintiff informed the Park Police that she would be taking a

leave of absence effective immediately for "stress[-]related reasons."  Dkt. 52 at 5 (Def. SUMF

¶ 18); Dkt. 52-1 at 4 (Psak Dep. 31:19–22, 32:12–20); Dkt. 55-2 at 117 (Ex. B-13); *id.* at 192

(Ex. B-19) (letter from Plaintiff's doctor stating that, during her July 25, 2008 visit, she "reported

feeling stressed and depressed over incidents at work—in particular a job prospect (transfer to

California that would have placed her closer to her family) was rejected").  On September 4,

2008, Kenneth Brodie, Commander of the Services Division of Park Police, sent Plaintiff a letter

confirming that she had notified her employer of her "stress leave" and that she "would not be

reporting for work for an extended period of time due to an alleged performance of duty injury."

Dkt. 55-2 at 117 (Ex. B-13).  The letter noted that, as of its date of issuance, "[P]laintiff had

provided no medical documentation to support her failure to return to work."  *Id.*  The letter

continued:

> This notice shall serve as our official notification that you are being required to
> report for duty as indicated below.  You will be allowed seven (7) calendar days
> from the date of this notice to submit medical documentation justifying your
> absence due to an alleged injury, from July 23, 2008, until the present.  If you

are suffering from an injury or condition that renders you totally incapacitated for duty, this must be indicated in your documentation as well as an expected return to duty date.  The Force does have alternate work assignments available for consideration by your doctor.  Otherwise, you must return to duty on September 15, 2008, at your assigned time and duty station.  You will be carried in an approved leave status until September 14, 2008.  Failure to report for duty as indicated or failure to submit administratively acceptable medical documentation will result in you being charged Absen[t] Without Leave beginning September 15, 2008.

*Id.*

Plaintiff responded to the request by submitting a September 8, 2008 letter from her psychotherapist, with whom she had been meeting twice a week.  Dkt. 52-8 at 1 (Ex. 8).  The letter explained that Plaintiff's symptoms, which "meet the . . . criteria for Post Traumatic Stress Disorder and Major Depression Disorder," "seem to exacerbate while she is at the workplace" and that Plaintiff "feels that she is unable to perform her job[-]related responsibilities in a professional manner."  *Id.*  The letter went on to note that Plaintiff's "prognosis is positive," but her doctor "strongly recommend[ed] that she does not return to her job until her symptoms have stabilized."  *Id.* at 2 (Ex. 8).

On September 26, 2008, the Park Police informed Plaintiff that "Park Police officers were coming to retrieve her badge, gun, car and credentials while she was off work on extended sick leave."  Dkt. 52 at 6 (Def. SUMF ¶ 26); Dkt 52-9 (Ex. 9).  In the same letter, the Park Police informed Plaintiff that it would either retrieve "the canine assigned to her or she could elect to keep her canine after the Park Police retired [the] dog," which was the property of the Park Police.  *Id.* at 7 (Def. SUMF ¶¶ 33–34); Dkt 52-9 at 1 (Ex. 9); Dkt. 52-1 at 5 (Psak Dep 75:12–76:24).  Plaintiff attests that she chose to retire her canine partner on October 2, 2008, so that the dog would not be kenneled.  Dkt. 55-1 at 15 (Psak Dep. 158:4–18, 159:12–15).

On October 22, 2008, the Park Police requested additional medical documentation from

Plaintiff.  Dkt. 52 at 7 (Def. SUMF ¶ 37); Dkt. 53-2 (Ex. 12).  In particular, it sought

> detailed medical information from [her] physician concerning [her] current
> ability to perform [her] duties.  Specifically, we need to understand how your
> condition [of Post Traumatic Stress Disorder and Major Depression Disorder]
> affects your ability to perform your job on a reliable and consistent basis.  We
> need to determine if there are any reasonable accommodations that your doctor
> can suggest, or any other form of accommodation that your physician deems
> possible, that [the Park Police] can consider.

Dkt. 53-2 (Ex. 12).  The Park Police included with this request a medical questionnaire to be

completed by Plaintiff's doctor.  *Id.* (Def. SUMF ¶¶ 38–39); *see* Dkt. 53-2 at 2 (Ex. 12).

On November 15, 2008, Plaintiff's doctor informed the Park Police by letter that that

Plaintiff, who had "been diagnosed with Post Traumatic Stress Disorder and Major Depressive

Disorder," had been addressing the "stress[]," "anxiety[,] and depression" that had caused her to

take leave through an "increase[]" of her antidepressant medication, the "add[ition] of "a new

medication," "regularly scheduled individual psychotherapy sessions," and exercise and

meditation.  Dkt. 55-2 at 192 (Ex. B-19).  The doctor stated that he believed that Plaintiff would

be "ready to return to duty beginning November 16, 2008" but recommended that she be

reassigned to a different canine unit upon her return to work and, if that was not possible, *id*. at

193, "switching her work shift to limit her contact with those supervisory officials with whom

she feels uncomfortable," Dkt. 52 at 9 (Def. SUMF ¶ 50); Dkt. 55-2 at 193 (Ex. B-19).  He noted

that "[c]onflicts with certain supervisory officials who she feels have harassed, threatened and/or

intimidated her have not been resolved, giving rise to a great deal of distress."  Dkt. 55-2 at 192

(Ex. B-19).  The letter stated that Plaintiff was "currently transitioning to a new medication

which should be stabilized over the next two weeks" but that she was ready to return to work.

*Id.* at 193 (Ex. B-19); Dkt. 52 at 8 (Def. SUMF ¶ 42).  Plaintiff's doctor also submitted to the

Park Police the completed medical questionnaire. Dkt. 55-2 at 194–96 (Ex. B-19). Where the questionnaire asked for a "list [of] any medication requirement(s) (prescription and non-prescription-type and dosage) that would, or does, affect performance, behavior or safety concerns that are directly related to the position," Plaintiff's doctor wrote "[p]rescribed medication shouldn't negatively impact abilities or interfere with performance of duties." *Id.* at 195. In response to a question about Plaintiff's "overall prognosis," Plaintiff's doctor wrote that the "[p]atient should remain stable on medication." *Id.* at 196.

On December 12, 2008, Brodie orally informed Plaintiff's attorney that Plaintiff "would need to undergo a fitness for duty examination because [her] doctor had given no indication as to the type of medicinal regimen [P]laintiff was on and how it could affect her ability to perform the duties of a law enforcement officer." Dkt. 52 at 8 (Def. SUMF ¶ 46); Dkt. 53-4 at 1–2 (Ex. 14). On January 8, 2009, Karlyn Payton-Williams, who worked in the Park Police's Office of Professional Responsibility, spoke to Plaintiff's attorney about the need for the fitness for duty examination and indicated that "the Park Police might be able to bring [P]laintiff back to work if she provided additional information about her medication;" Plaintiff, however, did not provide the requested information. Dkt. 52 at 8 (Def. SUMF ¶¶ 47–49); Dkt. 53-4 at 1–2 (Ex. 14).

On March 24, 2009, despite Plaintiff's failure to provide additional medical documentation, the Park Police directed her to return to work on April 16, 2009, "pending the probable scheduling of a [fitness-for-duty examination]" and notified her that she would be temporarily reassigned to the Communications Section. Dkt. 52 at 9 (Def. SUMF ¶ 51); Dkt. 55-2 at 189–90 (Ex. B-18). Plaintiff did not return to work on April 16, 2009. Dkt. 52 at 9 (Def. SUMF ¶ 54); Dkt. 52-1 at 7 (Psak Dep. 102:15–25). On April 15, 2009, Plaintiff informed the Park Police "that she would consider working in the [e]xplosive [o]rdinance [d]etector" unit.

Dkt. 52 at 9 (Def. SUMF ¶ 52); Dkt. 55-11 (Pl. SUMF ¶ 52); Dkt. 52-1 at 4 (Psak Dep. 104:1–4).

On November 13, 2009, the Park Police issued a memorandum directing Plaintiff to return to

work on December 1, 2009.  Dkt. 52 at 9 (Def. SUMF ¶ 55); Dkt. 53-8 (Ex. 18).  Plaintiff

complied with that direction and began working in an "administrative limited duty position" on

December 1, 2009.  Dkt. 52 at 9 (Def. SUMF ¶ 56); Dkt. 52-1 at 7 (Psak Dep. 102:15–103:11).

In August 2010, Plaintiff was moved to the position of explosive detector canine handler.  Dkt.

52 at 9 (Def. SUMF ¶ 57); Dkt. 52-1 at 7 (Psak Dep. 104:12–20).  Plaintiff's 2014 Amended

Complaint alleges that this reassignment negatively affected her pay.  Dkt. 34 at 13, 20 (Am.

Compl. ¶¶ 99–104, 166).

      4.    *Annual Physical and Follow-Up Information Request*

On December 19, 2013, Sergeant Matthew Waldman, Clinical Liaison Sergeant and

Supervisor for the Park Police's Medical Services Unit, informed Plaintiff, along with about 30

other officers, that they were due to have a required annual physical examination in January

2014.  Dkt. 52 at 10 (Def. SUMF ¶¶ 60, 62); Dkt. 53-9 at 3–4 (Waldman Aff.).  U.S. Park Police

General Order 34.01 provides that Park Police officers over the age of 40 must have an "annual

physical examination to ensure that they can meet the physical and mental requirements of their

position."  Dkt. 52 at 9 (Def. SUMF ¶ 58); Dkt. 53-9 at 8–11, 20 (Waldman Aff.).  The Park

Police contracts with Federal Occupational Health ("FOH") to perform such annual physical

examinations.  Dkt. 52 at 9 (Def. SUMF ¶ 59); Dkt. 53-9 at 2 (Waldman Aff.).  On July 21,

2014, Waldman received Plaintiff's "medical review form" from FOH, which was "not stamped

'medically qualified'" and "stated that her status was 'medical determination deferred pending

further documentation.  Incumbent has medical findings which may hinder safe and efficient

performance of essential job functions.'"  Dkt. 52 at 10 (Def. SUMF ¶¶ 63–66); Dkt. 53-9 at 5–6,

17 (Waldman Aff.).  The form also requested that Plaintiff send certain "detailed or diagnostic medical information" to a doctor at the FOH office.  Dkt. 52 at 10 (Def. SUMF ¶ 66, 68); Dkt. 53-9 at 17 (Waldman Aff.).  Waldman forwarded this form from FOH to Plaintiff, who did not provide the specific requested information.  Dkt. 52 at 11 (Def. SUMF ¶¶ 69–70); Dkt. 53-9 at 17–18 (Waldman Aff.).

5.  *2014 Video Incident*

On one occasion in December 2014, Plaintiff "was in the roll call room of the Special Forces Branch working on the computer" when "[s]he heard a video being played on an officer's phone" and observed that Officers Jack Edington and Todd Monfette were watching the video, which "included profanity and derogatory statements about women."  Dkt. 52 at 11 (Def. SUMF ¶¶ 73–75); Dkt. 52-1 at 8–9 (Psak Dep. 116:3–119:12).  Plaintiff told the officers involved that she found the video offensive.  Dkt. 52 at 11 (Def. SUMF ¶¶ 76–77); Dkt. 52-1 at 9 (Psak Dep. 118:8–16).  Lieutenant Jeffrey Schneider was "directly behind" Psak at the time and did not say anything about the video or the officers' actions; Schneider testified that he only became aware of what was going on when Psak voiced her objection to the video.  Dkt. 52 at 11 (Def. SUMF ¶¶ 78–79); Dkt. 52-1 at 9 (Psak Dep. 119:13–18); Dkt. 53-10 at 2 (Schneider Dep. 45:2–21).  When Schneider learned about the contents of the video, he provided Edington "oral counseling" that his conduct had been inappropriate for the workplace.  Dkt. 52 at 11–12 (Def. SUMF ¶¶ 80–81); Dkt. 53-10 at 2–3, 6 (Schneider Dep. 47:2–49:6, 77:3–15).

6.  *2015 Johnson Incident and Aftermath*

In 2015, Plaintiff heard Sergeant Michael Johnson, a supervisor who was "not in [P]laintiff's supervisory chain of command," "say something negative about a retired deputy chief."  Dkt. 52 at 14 (Def. SUMF ¶¶ 102–03); Dkt. 52-1 at 12 (Psak Dep. 131:16–22).  Plaintiff

and Johnson then had a "verbal exchange" in which they "made disparaging remarks about each other." Dkt. 52 at 14 (Def. SUMF ¶ 104); Dkt. 52-1 at 13–14 (Psak Dep. 136:15–137:12, 139:23–141:1). During this exchange, Johnson commented that he had "heard [Plaintiff] like[s] to sue people." Dkt. 52-1 at 14 (Psak Dep. 140:5–12). Johnson subsequently filed an administrative complaint against Plaintiff, Dkt. 52-1 at 14 (Psak Dep. 141:21–23), which was investigated, and Plaintiff was "cited for being disrespectful to a supervisor." Dkt. 52 at 10 (Def. SUMF ¶¶ 106–08); Dkt. 55-11 at 41 (Pl. SMF ¶¶ 107–08). In June 2015, Deputy Chief Steven Booker required Plaintiff "to attend a counseling session" based on Johnson's complaint, several complaints made against her by civilians, and her use of sick leave. Dkt. 52 at 10 (Def. SUMF ¶¶ 109–11); Dkt. 52-1 at 14 (Psak Dep. 141:11–16).

7.   *2015 Performance Review*

In 2015, Plaintiff received an overall performance appraisal rating of "Superior," which was the same overall rating that she had achieved in 2014 and eventually achieved in 2016. Dkt. 52-1 at 15 (Psak Dep. 143:16–23). On the "interpersonal skills" element of that overall rating, however, Plaintiff received a 25% reduction (a rating of 3 rather than the full 4) and was informed that this reduction was "because of the number of complaints that had been made against" her. *Id.* (Psak Dep. 143:3–144:22). Although Psak was concerned that she would not get a ten-hour time off award because of this reduced rating, she eventually learned that she still received the time off award. *Id.* (Psak Dep. 143:24–144:20).

8.   *2016 Head Injury and Return to Work*

In August 2016, Plaintiff was involved in a car accident and suffered a head injury. Dkt. 52-1 at 15 (Psak Dep. 144:23–145:2). Due to the resulting concussion, Plaintiff took time off work and eventually returned to work in a limited duty capacity in Dispatch, the Park Police's

"communications center."  Dkt. 52 at 12 (Def. SUMF ¶¶ 83–86); Dkt. 52-1 at 15 (Psak Dep.

145:3–8).  After a week in Dispatch, Plaintiff was reassigned to the Training Branch, but her

work there involved using a computer, which gave her headaches.  Dkt. 52-1 at 16–17 (Psak

Dep. 149:4–150:1).

On November 15, 2016, Plaintiff provided the Park Police with a doctor's note stating

that she could return to patrol duty for four hours a day, then five hours a day, and eventually

increasing to full 10-hour shifts.  Dkt. 53-11 at 1 (Ex. 21).  The Park Police told Plaintiff that it

would not "be possible" for Plaintiff "to come back part time to the [c]anine unit."  Dkt. 55-1 at

17 (Psak Dep. 151:24–152:3).  The Park Police, as a result, reassigned Plaintiff to staff a guard

desk at the Park Police Office in Anacostia prior to her return to working as a full-time canine

handler in January 2017.  Dkt. 52-1 at 17 (Psak Dep. 152:4–153:17).

## B.    Procedural History

Plaintiff initiated Case No. 14-116 on January 29, 2014.  Dkt. 1.  On November 9, 2016,

she filed an amended complaint, which is the operative complaint in that case.  Dkt. 34.  The

amended complaint asserts thirteen counts that can be grouped into several categories, as

follows: retaliation in violation of Title VII (Counts 1–4, 9–12), Dkt. 34 at 15–20, 24–27 (Am.

Compl. ¶¶ 116–69, 195–226); improper medical inquiries in violation of the Rehabilitation Act

(Counts 5–8), *id.* at 20–24 (Am. Compl.); and sex discrimination through the creation of a hostile

work environment in violation of Title VII (Count 13), *id.* at 28 (Am. Compl.).  The parties

engaged in mediation in a failed attempt to settle the case, *see* Dkt. 40, and then engaged in

discovery, *see* Minute Order (Mar. 14, 2017).

Plaintiff filed a second complaint initiating Case No. 18-115 on January 18, 2018.  *See*

Case No. 18-115 (Dkt. 1).  In that complaint, she alleged: failure to accommodate in violation of

the Rehabilitation Act (Count 1); discrimination based upon sex, race, and disability through the

creation of a hostile work environment and the lowering of her 2015 performance evaluation in

violation of Title VII and the Rehabilitation Act (Count 2); and retaliation through the creation of

a hostile work environment and the lowering of her 2015 performance evaluation in violation of

the Title VII and the Rehabilitation Act (Count 3).  *Id.* at 6–7 (Case No. 18-115 Compl. ¶¶ 16–

24).  On April 12, 2018, Plaintiff moved to consolidate the cases.  Dkt. 45.  The Court granted

that motion and consolidated Case No. 18-115 with Case No. 14-116, Minute Order (Apr. 25,

2018); discovery in both actions continued, *see* Minute Order (Sept. 25, 2018).  After discovery

closed, Defendant moved for summary judgment, Dkt. 52; Plaintiff opposed the motion, Dkt. 55;

and Defendant filed a reply, Dkt. 59.

## II.  LEGAL STANDARD

The Court must grant a motion for summary judgment if the moving party demonstrates

"that there is no genuine dispute as to any material fact and [that she] is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48

(1986); *Holcomb v. Powell*, 433 F.3d 889, 895–96 (D.C. Cir. 2006).  "'The mere existence of

some alleged factual dispute between the parties,'" moreover, "will not defeat summary

judgment; 'the requirement is that there be no *genuine* issue of *material* fact.'"  *Holcomb*, 433

F.3d at 895 (quoting *Liberty Lobby*, 477 U.S. at 247–48).  A fact is "material" if it is capable of

affecting the outcome of the litigation, *see Liberty Lobby*, 477 U.S. at 248; *Holcomb*, 433 F.3d at

895, and a dispute is "genuine" if supported by competent evidence sufficient to allow a

reasonable jury to return a verdict for the non-moving party, *see* Fed. R. Civ. P. 56(c)(1)(A); *Scott

v. Harris*, 550 U.S. 372, 380 (2007); *Liberty Lobby*, 477 U.S. at 247–48; *Holcomb*, 433 F.3d at

895.

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ." Fed. R. Civ. P. 56(c)(1)(A). "The Court is only required to consider the materials explicitly cited by the parties, but may on its own accord consider 'other materials in the record.'" *Smith v. Lynch*, 106 F. Supp. 3d 20, 37 (D.D.C. 2015) (quoting Fed. R. Civ. P. 56(c)(3)). In deciding a motion for summary judgment, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Liberty Lobby*, 477 U.S. at 255; *see also Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 850 (D.C. Cir. 2006).

"If there are no genuine issues of material fact, the moving party is entitled to judgment as a matter of law if the nonmoving party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Holcomb*, 433 F.3d at 895 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## III.  ANALYSIS

In considering whether all or some of this case is amenable to resolution on summary judgment, the Court must start with Plaintiff's forty-six-page statement of material issues of disputed fact. The difficulty that the Court immediately confronts, however, is that much of the support that Plaintiff invokes comes from her own affidavit from the administrative proceeding and her declaration in this case. *See* Dkt. 55-11. This is problematic because Plaintiff's affidavit, Dkt. 55-2 at 64–69 (Ex. B-6), and declaration, Dkt. 55-10, consist—in substantial part—of conclusory allegations, speculation, and arguments, rather than representations of fact based on personal knowledge. A plaintiff may, of course, defeat a motion for summary judgment based on evidence in the form of her own declaration, affidavit, or deposition

13

testimony setting forth her personal knowledge of facts. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 n.3 (1986) (quoting an earlier version of Federal Rule of Civil Procedure 56, which stated that "[s]upporting and opposing affidavits shall be made on personal knowledge, set forth facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein"); *accord Greer v. Paulson*, 505 F.3d 1306, 1315 (D.C. Cir. 2007) (quoting same); *EchoStar Commc'ns Corp. v. FCC*, 292 F.3d 749, 753 (D.C. Cir. 2002). But a plaintiff may not simply repackage conclusory allegations in the form of a declaration or affidavit, call those allegations evidence, and rely on them to defeat a motion for summary judgment. *See Cormier v. Pennzoil Exploration & Prod. Co.*, 969 F.2d 1559, 1561 (5th Cir. 1992) (refusing to consider plaintiff's affidavits in evaluating a motion for summary judgment because they were not based on personal knowledge); *Serv. Emps. Intl'l Union Nat'l Indus. Pension Fund v. Jersey City Healthcare Providers, LLC*, 358 F. Supp. 3d 12, 24 (D.D.C. 2019) (refusing to consider a declaration that "contains only unsupported allegations" and "provides no facts establishing personal knowledge"). Similarly, a plaintiff may only rely on a declaration containing assertions about the state of mind of others or events to which the declarant was directly privy if the declaration explains the basis for that belief and, where appropriate, attaches or references competent evidence to support that belief. *See Camara v. Mastro's Rests. LLC*, 952 F.3d 372, 375 (D.C. Cir. 2020) (explaining that, although "self[-]serving" affidavits are a "perfectly admissible [form of] evidence," an "affidavit lacking specific facts or support from the record" may be insufficient, by itself, "to create genuine factual issue"); *see also Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003) (explaining that, to create a genuine dispute of fact, a self-serving affidavit must be based on "personal knowledge," not "flights of

fancy, speculations, hunches, intuitions, or rumors about matters remote from that experience"
(quotation omitted)).

In resolving the pending motion, the Court must, accordingly, distinguish between
Plaintiff's factual assertions that are based on personal knowledge and the many conclusory
assertions, unsupported assertions about events that she did not personally witness, and
arguments. *See* Dkt. 55-11 (Pl. SMF); Dkt. 55-10 (Psak Decl.).

## A.      Disparate Treatment Claims

Where, as here, there is no direct evidence that the alleged adverse employment action
was motivated by unlawful discrimination, courts employ the burden-shifting framework set
forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–805 (1973).  *Holcomb*, 433 F.3d
at 895.  Under that framework, the plaintiff must first establish a prima facie case of
discrimination.  *Id.*  To establish a prima facie disparate treatment claim, a plaintiff must show
that "(1) she is a member of a protected class; (2) she suffered an adverse employment action;
and (3) the unfavorable action gives rise to an inference of discrimination."  *Wiley v. Glassman*,
511 F.3d 151, 155 (D.C. Cir. 2007) (quoting *Brown v. Brady*, 199 F.3d 446, 452 (D.C. Cir.
1999)).  "[N]ot everything that makes an employee unhappy," however, constitutes "an
actionable adverse action."  *Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001).  Rather, to
state an actionable claim, an employee must "experience[] materially adverse consequences
affecting the terms, conditions, or privileges of employment or future employment opportunities
such that a reasonable trier of fact could find objectively tangible harm."  *Forkkio v. Powell*, 306
F.3d 1127, 1131 (D.C. Cir. 2002).

"Once the plaintiff has established a prima facie case, the burden shifts to the defendant
to produce evidence that the plaintiff was rejected for a legitimate, nondiscriminatory reason."

*Holcomb*, 433 F.3d at 896.  The defendant's evidence-supported articulation of a

nondiscriminatory reason for its actions causes the presumption of discrimination to "drop[] out

of the picture."  *Burke v. Gould*, 286 F.3d 513, 520 (D.C. Cir. 2002) (quoting *St. Mary's Honor*

*Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)).  This leaves the "sole remaining issue [of]

discrimination *vel non*."  *Morgan v. Fed. Home Loan Mortg. Corp.*, 328 F.3d 647, 651 (D.C. Cir.

2003) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142–43 (2000)).  "[T]o

survive summary judgment the plaintiff must show that a reasonable jury could conclude from

all of the evidence that the adverse employment decision was made for a discriminatory reason."

*Holcomb*, 433 F.3d at 896–97 (quoting *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003)).

       1.     *Hostile Work Environment*

      Plaintiff alleges that she was subjected to a discriminatory hostile work environment

based on (1) an offensive video that male officers watched while she was present in the room in

2014 (2014 Count 13); and (2) the 2015 verbal confrontation with Johnson, after which he filed

an administrative complaint against her and she was required to attend a counseling session.

(2018 Count 2).  Defendant challenges Plaintiff's hostile work environment claim because the

incidents she points to "fail to rise to the level of severe [or] pervasive conduct that alters the

terms of employment."  Dkt. 52 at 19.

      A plaintiff may recover on a Title VII hostile work environment theory if "(1) she is a

member of a protected class; (2) she was subjected to . . . harassment; (3) the harassment

occurred because of her [gender]; and (4) the harassment affected a term, condition, or privilege

of her employment."  *Richardson v. Petasis*, 160 F. Supp. 3d 88, 123 (D.D.C. 2015).

Harassment may include "'discriminatory intimidation, ridicule, and insult' that is 'sufficiently

severe or pervasive to alter the conditions of the victim's employment and create an abusive

working environment.'"  *Durant v. District of Columbia Gov't*, 875 F.3d 685, 700 (D.C. Cir.

2017) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  "This standard is a

demanding one, as Title VII is not intended to function as a 'general civility code' that regulates

the 'ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-

related jokes, and occasional teasing.'"  *Burrell v. Shepard*, 321 F. Supp. 3d 1, 12 (D.D.C. 2018)

(quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).  The "[s]everity and

pervasiveness" of the challenged conduct is "determined by reference to 'all of the [alleged]

circumstances,' including 'the frequency of the discriminatory conduct; its severity; whether it is

physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably

interferes with an employee's work performance.'"  *Baird v. Gotbaum*, 792 F.3d 166, 169 (D.C.

Cir. 2015) (quoting *Harris*, 510 U.S. at 23).  "[O]n rare occasion[,] . . . a single, isolated incident

can alone create a hostile work environment" if, for example, that incident involves an "act[] of

serious, physical violence or sexual assault."  *Fields v. Vilsack*, 207 F. Supp. 3d 80, 94 (D.D.C.

2016) (collecting cases).  "[A]bsent such 'extreme circumstances,'" however, "'courts have

refused to hold that one incident is so severe as to constitute a hostile environment,'" and,

indeed, "'[e]ven a few isolated incidents of offensive conduct do not amount to actionable

harassment.'"  *Id.* (quoting *Stewart v. Evans*, 275 F.3d 1126, 1134 (D.C. Cir. 2002)).

Based on the record evidence, the Court concludes that the single occasion on which

Plaintiff observed other officers watching a video that included profanity and comments

offensive toward women was not sufficiently severe or pervasive to constitute unlawful

harassment.  Plaintiff has not provided evidence that would permit a reasonable jury to find in

her favor based on this incident.  Although the parties agree that the video was offensive and

inappropriate for the workplace, *see* Dkt. 52 at 42 (Defendant conceding that the video was

"clearly inappropriate and offensive"), that single incident—which was not directed personally at Plaintiff—was not "sufficiently severe or pervasive to alter the conditions of [Plaintiff's] employment and create an abusive working environment." *Durant*, 875 F.3d at 700 (quoting *Harris*, 510 U.S. at 21). The Court will, accordingly, grant Defendant's motion for summary judgment on Count 13 of the 2014 Complaint.

The Court also concludes that Plaintiff's confrontation with Johnson, his initiation of an administrative complaint against her, and the requirement that she attend a counseling session did not constitute harassment that was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Durant*, 875 F.3d at 700 (quoting *Harris*, 510 U.S. at 21). Plaintiff's verbal exchange with Johnson, which was entirely unrelated to the 2014 offensive video incident and bore no overt connection to her sex, was not sufficiently severe to alter the terms or conditions of Plaintiff's employment. *See Fields*, 207 F. Supp. 3d at 94. Nor does that fact that Johnson filed an administrative complaint against Plaintiff and that she was required to attend a counseling session change that conclusion. Although undoubtedly unpleasant events, the conduct at issue was neither "extreme" nor different in kind from "'the ordinary tribulations of the workplace.'" *Faragher*, 524 U.S. at 788 (citation omitted).

Finally, when the video incident and the unpleasant events relating to Plaintiff's conflict with Johnson are considered together, the Court remains unpersuaded that a reasonable jury could find that these isolated events gave rise to a hostile work environment. *See Harris*, 510 U.S. at 21–22. In *Baloch v. Kempthorne*, 550 F.3d 1191 (D.C. Cir. 2008), for example, the D.C. Circuit held that the plaintiff had not made out a hostile work environment claim where he "had several verbal clashes with his supervisor in the workplace," one in which his supervisor

"allegedly threatened to have [the plaintiff] arrested, led out of the building in handcuffs, and jailed," and his supervisor also "issued 'letters of counseling'" and a "letter of reprimand" to him, proposed that the plaintiff be suspended from work, and gave the plaintiff "a performance review of 'not achieved.'" *Id.* at 1195, 1201; *see also Brooks v. Grundmann*, 748 F.3d 1273, 1276–77 (D.C. Cir. 2014) (noting that performance reviews with "some legitimate bases" that "recommended areas of improvement" were not "the stuff of severe or pervasive workplace hostility"). The events that Plaintiff relies upon here were no more egregious—and, indeed, were less egregious—than those that the Court of Appeals held insufficient in *Baloch*.

The Court will accordingly grant Defendant's motion for summary judgment with regard to the discriminatory hostile work environment claim within Count 2 of the 2018 Complaint.

2.   *2015 Performance Rating (2018 Compl. Count 2)*

Count 2 of Plaintiff's 2018 Complaint also alleges that she was subjected to unlawful discrimination when the Park Police "lower[ed] her 2015 performance evaluation," Dkt. 1 at 7 (Compl. ¶ 23), by decreasing her interpersonal skills score by one point while still giving her the same overall ranking that she received in 2014 and 2016. Dkt. 52-1 at 15 (Psak Dep. 143:3–23). Defendant argues that this does not constitute an adverse employment action. Dkt. 52 at 17 ("Plaintiff's claim[] concerning . . . her disagreement with her 2015 performance appraisal[] do[es] not constitute [an] adverse action[] . . . under Title VII."). The Court agrees with Defendant.

"In order to present a viable claim of employment discrimination under Title VII, a plaintiff must show [that she] suffered an adverse employment action." *Douglas v. Donovan*, 559 F.3d 549, 551–52 (D.C. Cir. 2009). A negative performance review does not constitute an adverse employment action unless it affects the employee's terms and conditions of employment

or has some other tangible consequence.  *See Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir.

2003).  This means that "purely subjective injuries," including embarrassment, frustration, or

disappointment, will not suffice.  *Holcomb*, 433 F.3d at 902 (quoting *Forkkio*, 306 F.3d at 1130–

31).  Rather, an adverse employment action requires a "materially adverse consequence[]

affecting the terms, conditions, or privileges of employment or future employment opportunities

such that a reasonable trier of fact could find objectively tangible harm."  *Forkkio*, 306 F.3d at

1131.

Here, the fact that the only performance rating that Plaintiff challenges, her 2015

appraisal, featured the same overall result as her ratings from the preceding and following years

undercuts any argument that that the 2015 review constituted an adverse employment action.

More importantly, Plaintiff offers no evidence to counter Defendant's showing that her 2015

performance review had no tangible negative consequences on her employment or career.  *See*

Dkt. 52-1 at 15 (Psak Dep. 143:24–144:16) (conceding that the review did not have the tangible

adverse effect Plaintiff anticipated); Dkt. 55-11 at 39–40 (Pl. SMF ¶ 101) (asserting that Plaintiff

"believed she would not receive a time off award and felt betrayed/cheated" because of her 2015

performance rating but admitting that she did indeed receive the time off award for that year).

The Court will, therefore, grant Defendant's motion to dismiss the portion of Count 2 of

Plaintiff's 2018 Complaint that alleges unlawful discrimination based on her 2015 performance

review.

## C.      Retaliation

Plaintiff claims that several of Defendant's actions constituted unlawful retaliation based

on her prior EEO activity or on her requests that the Park Police accommodate her disabilities

under the Rehabilitation Act.  Dkt. 34 at 15–20, 24–27 (Am. Compl. ¶¶ 116–69, 195–226)

(Counts 1–4, 9–12); No. 18-115 (Dkt. 1 at 7) (Compl. ¶¶ 19–24) (Counts 2–3).  Plaintiff's prior

EEO activity includes a complaint that she filed in 2004 following her initial non-selection for an

SSFO canine handler position and a subsequent 2008 complaint that she filed following her

second non-selection for an SFFO canine handler position.  The allegedly retaliatory actions

include: (1) her non-selection for the second SFFO canine handler position (2014 Count 1); (2)

the required relinquishment of her badge, gun, car, and credentials while she was on an extended

leave (2014 Count 2); (3) the requirement that she agree either to the retirement or kenneling of

her canine partner (2014 Count 3); (4) her reassignment to an explosive detector canine handler

position (2014 Count 4); (5) seeking further documentation of and information about the medical

reasons for her leave (2014 Counts 9, 10, 11, 12); (6) "subjecting Plaintiff to a hostile work

environment" (2018 Count 3); and (7) "lowering her 2015 performance evaluation," (2018 Count

3).

Title VII's anti-retaliation provision "prohibits an employer from 'discriminat[ing]

against' an employee . . . because [she] 'opposed any practice' made unlawful by Title VII or

'made a charge, testified, assisted, or participated in' a Title VII proceeding or investigation.'"

*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 56 (2006) (quoting 42 U.S.C. § 2000e-

3(a)).  Courts apply the same general *McDonnell Douglas* burden-shifting framework to Title

VII retaliation claims as they apply to disparate treatment claims under the statute.  *Meadows v.

Mukasey*, 555 F. Supp. 2d 205, 210 (D.D.C. 2008).  "To establish a prima facie case of

retaliation, the plaintiff must present evidence that (1) she engaged in activity protected by Title

VII; (2) the employer took an adverse employment action against her; and (3) the adverse action

was causally related to the exercise of her rights."  *Holcomb*, 433 F.3d at 901–02; *see also Univ.*

*of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013) (requiring that the protected activity be a "but-for" cause of the employer's decision to take the adverse action).

With respect to the first element of the prima facie case, Defendant does not dispute that Plaintiff engaged in protected activity each time that she initiated administrative EEO proceedings. *See* Dkt. 52 at 38–53 (focusing solely on the second and third elements in its discussion of the retaliation claims). Defendant does, however, dispute whether Plaintiff has satisfied the second and third elements. "In the context of retaliation claims, an adverse employment action is one that 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Hinds v. Mulvaney*, 296 F. Supp. 3d 220, 237 (D.D.C. 2018) (quoting *Burlington N.*, 548 U.S. at 68). "[T]his standard involve[s] something short of what would ordinarily be considered a personnel action (e.g., denial of promotion, discharge, salary reduction) . . . and is therefore more lenient" than the adverse action requirement for a discrimination claim under Title VII. *Dorns v. Geithner*, 692 F. Supp. 2d 119, 132 (D.D.C. 2010) (internal quotations and citations omitted). Nevertheless, "[a]ctionable retaliation claims are [still] limited to those where an employer causes 'material adversity,' not 'trivial harms.'" *Id.* (quoting *Wiley*, 511 F.3d at 161) (emphasis omitted). Finally, "[a] plaintiff may satisfy th[e] third element of the prima facie case by showing [that] 'the employer had knowledge of the employee's protected activity, and . . . the adverse personnel action took place shortly after that activity,'" *Holcomb*, 433 F.3d at 903 (quoting *Mitchell v. Baldridge*, 759 F.2d 80, 86 (D.C. Cir. 1985)), although this is not the only way for a plaintiff to carry that initial burden.

Once the plaintiff has established her prima facie case of retaliation, "the burden shifts to the employer to provide a legitimate, nonretaliatory reason for its action." *Durant*, 875 F.3d at 697. At that point, "'the burden-shifting framework disappears' and the question becomes

'whether a reasonable jury could infer . . . retaliation from all the evidence.'" *Id.* (quoting *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009)).

The Court analyzes each challenged employment action in turn and concludes that, as to some, no reasonable jury could find that the agency's proffered rationale was pretextual and that the actual reason the agency took the action at issue was to retaliate against Plaintiff for her prior EEO activity and that, as to others, no reasonable jury could find that the agency action caused "*material* adversity" rather than mere "trivial harms" to Plaintiff. *Dorns*, 692 F. Supp. 2d at 132 (quoting *Wiley v. Glassman*, 511 F.3d 151, 161 (D.C. Cir. 2007)).   As to five of the seven actions Plaintiff identifies, the Court concludes that she has failed to offer sufficient evidence to withstand Defendant's motion for summary judgment.   The Court concludes, however, that Plaintiff has pointed to sufficient record evidence in support of her retaliation claim based on Defendant's requirement that she either relinquish or retire her canine partner and that she either provide additional information relating to her "medicinal regimen" or submit to a fitness-for-duty exam in December 2008 and January 2009.   The Court will, accordingly, deny Defendant's motion for summary judgment with respect to those two allegedly retaliatory actions and will grant Defendant's motion as to the other five actions.

     1.    *Non-selection for SFFO Canine Handler Position (2014 Am. Compl. Count 1)*

Plaintiff argues that she was not selected for the San Francisco position in 2007 because of her prior EEO activity.   Dkt. 55 at 2–3.   Defendant, in turn, responds that Plaintiff's non-selection occurred due to a legitimate, non-retaliatory reason—the agency selected "the individual who best met the needs of that office."   Dkt. 52 at 46, 48.   Defendant cites the affidavit of Jason Wu, the recommending official, as evidence of the reasons the SFFO hired

Petersen rather than Plaintiff.  Wu attests that his "recommendation [to the selecting official, Gerard McCarthy] was based on" four different factors:

> (1) Selection from within the SFFO w[ould] not only promote morale but lateral mobility opportunity in this rather stagna[nt] field office.  (2) There w[ould] be no fiscal impact to the SFFO budget as there would be no PCS cost (Permanent Change of Station) or by not having to add another FTE (Full Time Employee). (3) Officer Peterson ha[d] demonstrated to be an excellent officer during [his] tenure at the SFFO. (4) Officer Peterson ha[d] long demonstrated a keen interest in being a K9 officer.

Dkt. 52-3 at 1–2 (Wu Aff. ¶ 2).  To be sure, Wu "was not the selecting official" and "took no part in the recruitment or evaluation of the candidates;" his role was limited to "provid[ing] [his] recommendation." *Id.* (Wu Aff. ¶¶ 2–3).  But McCarthy "selected . . . Petersen based on . . . Wu's recommendation and his knowledge of . . . Petersen."  Dkt. 52 at 5 (Def. SUMF ¶ 13); Dkt. 52-4 at 2–3 (McCarthy Dep. 49:2–17, 74:3–20); *id.* at 5 (McCarthy Dep. 110:17–111:17) (testifying that he did not look at the applications of any of the candidates for the position and did not "consider any of the other applicants for the position in light of . . .Wu's recommendation"); *id.* at 5–6 (McCarthy Dep. 113:1–117:21).  The Court takes Wu's reasons for recommending Petersen into account because McCarthy made his final hiring decision based on Wu's recommendation.  Dkt. 52-4 at 4 (McCarthy Dep. 49:13–17) (attesting that the selecting official "pretty much . . . go[es] along" with the recommendation of the recommending official and "I trusted [Wu] so I . . . did support his recommendation in this case"); *id.* at 6 (McCarthy Dep. 117:3–21) (explaining that he "might have overridden" Wu's recommendation if he had "personal knowledge" that the recommended officer would not do a good job, "[b]ut those factors weren't in there.  So it was basically [Wu's] recommendation, and [McCarthy] had no reason to believe . . . that . . . Petersen wouldn't make a good K-9 officer").

Taken together, moreover, Wu's reasoning and McCarthy's decision to rely on Wu's recommendation satisfy Defendant's burden of coming forward with a legitimate, non-retaliatory reasons for Defendant's non-selection of Plaintiff.  *See Holcomb*, 433 F.3d at 896.  The presumption of discrimination therefore "drops out."  *Burke*, 286 F.3d at 520 (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 511).  The Court must, accordingly, decide whether a reasonable jury could conclude, based on "all of the evidence," that retaliation, rather than the legitimate non-retaliatory reason offered by Defendant, was a but-for cause of Plaintiff's non-selection for the position.  *Holcomb*, 433 F.3d at 896–97 (quoting *Lathram*, 336 F.3d at 1088); *Univ. of Tex. Sw. Med. Ctr.*, 570 U.S. at 362.

A plaintiff can prove that unlawful retaliatory discrimination motivated her non-selection by presenting evidence "to attack the employer's proffered explanation for its actions." *Holcomb*, 433 F.3d at 897; *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993) ("The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination.").  Although Plaintiff attacks the Park Police's proffered legitimate, non-retaliatory reasons for selecting Petersen over her, Dkt. 55 at 2–4, she fails to identify any evidence that would permit a reasonable jury to find that those reasons were pretextual.

First, Plaintiff argues that morale was generally low at all of the Park Police's offices, not just at the SFFO and that "[t]he purpose of the competitive process was to fill the vacancy for a canine handler, not to improve morale."  Dkt. 55 at 3–4; Dkt. 55-11 (Pl. SMF ¶ 9).  But the fact that morale was low elsewhere does not mean that Wu, who was the SFFO Commander of Operations, and McCarthy, who was SFFO Commander, Dkt. 52-3 at 1–2, lacked a particular

interest in the morale of their office.  Nor it is Plaintiff's or the Court's role to second guess the wisdom of their choice to consider office morale in making their selection.  *See Holcomb*, 433 F.3d at 897 (observing that courts do not "serve as a 'super-personnel department that reexamines and entity's business decisions"); *Vill. of Freeport v. Barrella*, 814 F.3d 594, 613 (2d Cir. 2016) (recognizing that Title VII does not "forbid[] favoritism, nepotism, or cronyism, so long as it is not premised on animus against a protected class").

Second, Plaintiff attempts to undermine Wu's assertion that, by hiring from within the SFFO, the office could save the change of station cost and the cost of employing another FTE. She argues that the cost of training Peterson to work as a canine handler and transitioning him to that role imposed costs that the office could have avoided by hiring her and that, if asked, she would have agreed to move to San Francisco without reimbursement from the Park Police.  Dkt. 55 at 3–4; Dkt. 55-11 at 2 (Pl. SMF ¶ 9).  She argues, in addition, that it would have been beneficial, rather than detrimental, to add another FTE to the SFFO.  Dkt. 55 at 3–4; Dkt. 55-11 (Pl. SMF ¶ 9).  Again, Plaintiff merely second guesses the wisdom of the business decisions that Wu and McCarthy made, and she does so without anything more than her own speculation about (1) the cost differential between adding an FTE and training an existing FTE to perform a new role, and (2) desirability of adding an FTE.  And, Plaintiff's assertion that she would have paid her own moving costs, if asked, has nothing to do with the information that Wu and McCarthy had when they made their respective decisions.

Plaintiff also argues that she was significantly more qualified than Petersen for the SFFO canine handler position and that this differential supports the reasonable inference that she was not chosen because of her prior EEO activity.  Dkt. 55 at 4–6; Dkt. 55-11 at 7 (Pl. SMF ¶ 16) (citing Psak Decl ¶ 9).  The legal premise of Plaintiff's argument is correct: a reasonable jury can

infer discrimination where the candidate selected for the position is substantially less qualified than the plaintiff.  *See Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1295 (D.C. Cir. 1998) (en banc); *Lathram*, 336 F.3d at 1091.  But, because courts refuse to act as "a super-personnel department that reexamines an entity's business decisions," *Barbour v. Browner*, 181 F.3d 1342, 1346 (D.C. Cir. 1999) (quoting *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986)), "[i]n order to justify an inference of discrimination, the qualifications gap must [generally] be great enough to be inherently indicative of discrimination."  *Holcomb*, 433 F.3d at 897.  If paired with other evidence of discrimination or retaliation, however, the qualification gap need not be so stark to support a reasonable jury's finding that the decision was discriminatory or retaliatory.  *See Stoe v. Barr*, No. 18-5315, 2020 WL 2781649, at *13 (D.C. Cir. May 29, 2020) (citing *Hamilton v. Geithner*, 666 F.3d 1344, 1347 (D.C. Cir. 2012)).

To support her claim that she was more qualified than Petersen, Plaintiff cites her own administrative complaint, in which she makes representations about Petersen's accomplishments and compares them to her own.  Dkt. 55 at 5 (citing Dkt. 55-2 at 33 (Ex B-4)).  The Court cannot rely on Plaintiff's representations concerning Petersen's awards, accomplishments, and trainings without any supporting evidence or basis to conclude that Plaintiff is competent to attest to Petersen's qualifications.[3]  *See Serv. Emps. Int'l Union Nat. Indus. Pension Fund*, 358 F. Supp. 3d at 24 (refusing to consider a declaration that "contains only unsupported allegations" and "provides no facts establishing personal knowledge").  Without competent evidence of Petersen's awards, accomplishments, and trainings, the Court cannot draw conclusions about

---

[3]  Plaintiff's Statement of Genuine Issues asserts that she "eventually [had] an opportunity to review documents which were relied upon to select Petersen over her."  Dkt. 55-11 at 6 (Pl. SMF ¶ 16).  But she does not explain what these "documents" were or provide them for the Court to review.

how Plaintiff and Petersen compared in those regards.  *See* Fed. R. Civ. Pro. 56(c)(4) ("An

affidavit or declaration used to support or oppose a motion must be made on personal

knowledge, set out facts that would be admissible in evidence, and show that the affiant or

declarant is competent to testify on the matters stated.").

It is, however, undisputed that Plaintiff had years of experience as a canine handler while

Petersen had no such experience.  Dkt. 52 (Def. SUMF ¶ 11); Dkt. 52-2 at 3 (Wu Dep. 23:4–

24:20).  In addition, Plaintiff cites to a chart that purports to reflect numerical ratings for each of

the applicants, based on seniority, "raw test" score, "test points," awards, and discipline.  Dkt.

55-2 at 132.  Although it is unclear whether Plaintiff or the Park Police prepared the chart, and

Plaintiff has otherwise failed to lay a foundation for its consideration, the Court will assume for

present purposes that the chart accurately reflects ratings that the Park Police used in determining

which applicants were qualified for consideration.  The memorandum announcing the canine

officer position at the SFFO, dated April 23, 2007, provides that "[a]pplicants will be evaluated

based on their past police performance and their experience and knowledge of canines" (*e.g.*,

basic canine first aid, conformation, common canine diseases).[4]  *Id.* at 128 (Ex. B-14).  The

memorandum states that "[a]pplicants shall be evaluated and placed into 'Well Qualified' and

'Qualified' categories" based on "[a]chievement or special recognition—20 percent," "[o]fficial

[d]isciplinary record—20 percent," "[p]ertinent knowledge, technical skills or qualifications—40

percent," and ".16 percent per each month or part thereof of United States Park Police service up

to a maximum of 20 percent."  *Id.* at 128 (Ex. B-14).  The chart that Plaintiff cites, presumably

---

[4]  It also provides that applicants must have "[a] minimum of three years police service" and
"must reside within 45 . . . miles of the San Francisco Field Office and must be able to kennel the
assigned canine at their place of residence."  Dkt. 55-2 at 128 (Ex. B-14).

documenting the ratings of the applicants under this system, shows that Petersen, Plaintiff, and three other individuals were considered well-qualified for the SFFO canine handler position.[5]  *Id.* at 132 (Ex. B-15).  Plaintiff had a higher total score (67) than Petersen (39.72), although another officer had an even higher total score (70) than Plaintiff.  *Id.*  Wu's uncontroverted testimony places these numerical scores in context.  As he explained at his deposition: "[b]ased on the standard operating procedure and policies of the United States Park Police, anyone who is on the well-qualified list is equally qualified, and it's management's prerogative to choose from anyone off that list."  Dkt. 52-2 at 7 (Wu Dep. 41:16–21).

The question, then, is whether Plaintiff's experience working as a canine handler (and Petersen's lack of experience) and her higher qualifying score provide sufficient basis for a reasonable jury to find that the Park Service's proffered non-discriminatory rationale is pretextual and that the actual reason she was not hired was because she had engaged in prior EEO activity.  In *Stoe v. Barr*, the D.C. Circuit recently addressed how a plaintiff's superior qualifications can support an inference of discriminatory purpose.  In that case, the plaintiff, Debra Stoe, applied for the position of Division Director for the Policy and Standards Division of the Department of Justice's Office of Science and Technology.  2020 WL 2781649, at *4–5 (D.C. Cir. May 29, 2020).  Although eminently well-qualified, she was not selected, and she subsequently brought suit alleging sex and age discrimination.  *Id.* at *2–9.  Reversing the

---

[5]  Plaintiff contests some of the calculations of her total score, arguing that some of her awards were not counted and that she should have received a total score of 75 rather than 67, whereas Petersen should have received a total score "a half point less" than what he was actually given. Dkt. 55-11 at 6–8 (Pl. SMF ¶ 16).  Even if these scores were adjusted to reflect what Plaintiff contends would be correct, both Petersen and Plaintiff would still have fallen into the "well-qualified" category.  Dkt. 55-2 at 132 (Ex. B-15) ("well-qualified" candidates are those with total scores above 45; "qualified" candidates are those with scores below 45).

district court's decision granting summary judgment in favor the Department of Justice, the D.C.
Circuit held that a reasonable jury could find that the Department's "proffered explanation" for
not selecting the plaintiff was "pretext for discrimination" because (1) she was "better qualified
than" the applicant who was selected, (2) the official who effectively controlled the hiring
process had discriminated against Stoe on the basis of her gender in the past, (3) the hiring
process was procedurally irregular and tainted by discrimination, and (4) the employer's
explanation was otherwise flawed.  *Id.* at *13–15.  Although the court, accordingly, premised its
decision on broader grounds, it observed that "'qualifications evidence may suffice, at least in
some circumstances,' to demonstrate that an employer's proffered explanation is pretext for
discrimination."  *Id*. at *12 (quoting *Ash v. Tyson Foods, Inc*., 546 U.S. 454, 457 (2006)).

    For several reasons, this is not such a case.  To start, there is no disconnect in this case
between the employer's proffered reasons for hiring Petersen over Plaintiff and their respective
qualifications.  If the Park Police claimed that it sought to hire the applicant with the most
substantial experience or who had the top qualifying score, Plaintiff's evidence would be
compelling.  As the D.C. Circuit explained in *Stoe*, "[i]f a factfinder can conclude that a
reasonable employer would have found the plaintiff to be significantly better qualified for the
job, *but this employer did not*, the factfinder can legitimately infer that the employer consciously
selected a less-qualified candidate—something that employers do not usually do, unless some
other strong consideration, such as discrimination enters into the picture."  2020 WL 2781649, at
*4–5 (quoting *Aka*, 156 F.3d at 1294) (emphasis added).  But that is not what happened here.
The Park Police did not (implausibly) claim that Petersen had more, relevant experience than
Plaintiff or that his qualifying scores were better than hers.  Its decision to hire Petersen is
entirely consistent, moreover, with the SFFO's stated desire to promote morale and lateral

mobility in the SFFO and to reduce the fiscal impact of the hiring decision.  Undoubtedly,

experience handling dogs was valuable, but it was not the only—or even predominant—

consideration.  Nor could a reasonable jury find that the Park Police's stated rationale is

implausible simply because, as in *Stoe*, Wu and McCarthy seriously misjudged (and thus must be

dissembling about or blind to) the applicants' respective qualifications for the job.  The fact that

another experienced canine handler from Plaintiff's own D.C. office—Rob Berretta—received

an even higher score on the qualifications chart but also was not chosen for the SFFO position,

Dkt. 52-1 at 5 (Psak Dep. 18–20:9); Dkt. 55-2 at 132 (Ex. B-15), lends credibility to Wu and

McCarthy's explanation that their selection of Petersen was based not on retaliatory motive but,

rather, on the desire to promote from within, boost office morale, and avoid adding another FTE.

Dkt. 52-3 at 1–2 (Wu Aff. ¶ 2).

      Even more importantly, the undisputed evidence shows that Wu—the official who

recommended the SFFO select Petersen and not Plaintiff—did not know that Psak had engaged

in any prior EEO activity.  *See* Dkt. 52-3 at 2 (Wu Aff. ¶ 7) ("At the time of the recruitment and

selection process, I did not know that Psak had engaged in prior protected activity. . . .  I had

never heard of Officer Psak prior to the selection process.").  "As a matter of law, there can

obviously be no retaliation if the [alleged] retaliator did not know about the protected activity."

*Turner v. Shinseki*, 824 F. Supp. 2d 99, 121 (D.D.C. 2011) (quoting *Barber v. Am. Sec. Bank*,

655 F. Supp. 775, 779 (D.D.C. 1987)); Dkt. 52 at 20.  Psak is skeptical about the truth Wu's

testimony, but she offers no controverting evidence of her own.[6]  To be sure, Wu was not the

---

[6]  Quinn's affidavit states that he knew of her non-selection in 2003, is aware that "Psak has filed EEO complaints in the past," and told Wu before her non-selection that she was interested in the position and would be a "suitable candidate."  Dkt. 55-2 at 86 (Quinn Aff. ¶¶ 5–7).  But that is not evidence upon which a reasonable jury could conclude that he informed Wu of her prior EEO activity.

deciding official, but Plaintiff offers no explanation—other than disbelief of Wu's uncontroverted testimony—why he would have recommended Petersen over Plaintiff, if she was, in fact, a better fit for the job.  Nor does she explain how McCarthy's decision to accept Wu's non-retaliatory recommendation was somehow retaliatory.

Defendant also contends that "McCarthy did not know of [P]laintiff's prior EEO [c]omplaint at the time he selected Peterson."  Dkt. 52 at 5 (Def. SUMF ¶ 15); Dkt. 52-4 at 5 (McCarthy Dep. 110:12–16) (testifying that he had no "knowledge of any EEO complaints that had been filed by . . . Psak" "[a]t the time [he] made the selection of . . . Petersen").  Plaintiff (arguably) disputes this.  Citing only her own declaration, she asserts in her "Statement of Genuine Issues" that several individuals, including McCarthy himself and Jeffrey Quinn, her supervisor, were interviewed in the course of the investigation of Plaintiff's 2004 EEO complaint.  Dkt. 55-11 at 5 (Pl. SMF ¶ 15).  But, in her brief in opposition to Defendant's motion for summary judgment, Plaintiff merely asserts that "McCarthy was aware of [the 2004] non[-]selection at the time," not that he was aware of her EEO activity following that non-selection.  Dkt. 55 at 2.  Notably, Plaintiff offers no documentary or other evidence to support this assertion, nor does she explain the basis for her knowledge that McCarthy had been interviewed.  Rather, she merely asserts, "I can provide th[e] report [of the interview] if necessary."  Dkt. 55-10 at 6 (Psak Decl. ¶ 8).  That, of course, is not how summary judgment works.  The opposing party must offer competent evidence controverting the moving party's version of the relevant facts.  Fed. R. Civ. P. 56(c) (requiring "cit[ations] to particular parts of materials *in the record*" (emphasis added)).  "If a party fails to properly support an assertion of fact[,] . . . the court may . . . consider the fact undisputed."  Fed. R. Civ. P. 56(e).  But even if the Court were to credit Plaintiff's unsupported assertion, there is no basis to doubt McCarthy's testimony that he relied

on Wu's recommendation and the rationale that Wu offered, including the interest in office morale and budgetary considerations.  Dkt. 52-3 at 1–2 (Wu Aff. ¶ 2).  Accepting the recommendation of a recommending officer, without more, does not give rise to an inference of retaliatory motive.

Plaintiff makes three additional factual allegations in an attempt to undermine Defendant's justification for the SFFO's selection of Petersen.  First, she asserts that Petersen was allowed to take the written examination after returning from sick leave but that other candidates were not allowed the same flexibility.  Dkt. 55 at 4.  Second, she challenges Defendant's offhand assertion that the union supported the decision to select someone from the SFFO office by asserting that a union officer named Jason Raymos[7] sent a letter recommending her to McCarthy.[8]  Dkt. 55-11 at 4–5 (Pl. SMF ¶ 14) (citing Psak Decl. ¶ 7); Dkt. 55-1 at 5–6 (Psak Dep. at 22–23).  Third, Plaintiff argues that "there existed an informal policy that current canine officers would receive first consideration for open positions."  Dkt. 55 at 4.  But, once again, the evidence Plaintiff offers to support these assertions are conclusory allegations in her own affidavit, which do not suffice at summary judgment.  *See Mokhtar*, 83 F.

---

[7]  Different pieces of Plaintiffs' briefs and supporting materials spell this name as both "Ramos" and "Raymos."  *Compare* Dkt. 55 at 4 ("Ramos") *with* Dkt. 55-1 at 5 (Psak Dep. 22:12) ("Raymos"); Dkt. 55-10 at 5–6 (Psak Decl. ¶7) (same).

[8]  Plaintiff fails to connect the dots regarding this peripheral assertion about the alleged Raymos recommendation letter.  Plaintiff testified that "union representative Jason Raymos" "wrote [a document] on [her] behalf" and "told [her]" that he sent it to McCarthy.  Dkt. 55-1 at 5 (Psak Dep. 22–23).  Although she appears to have been shown that "document" at her deposition, she has not cited it in support of her opposition to Defendant's motion.  Furthermore, at her deposition, she admitted that the "document was "not signed by . . . Raymos" and not on "letterhead."  *Id.* at 5 (Psak Dep. at 23).  Several other witnesses, when asked in the course of the EEO investigation whether Raymos had advocated to them on Plaintiff's behalf stated that he had not done so.  *See, e.g.,* Dkt. 55-2 at 86 (Ex. B-10) (Quinn Aff.); *id.* at 82 (B-9) (Wu Aff.).  Accordingly, simply because Psak states that Raymos "told [her]" that he sent this document on her behalf does not mean that he did so.  Dkt 55-1 at 6 (Psak Dep. at 23).

Supp. 3d at 74; *see also Montgomery v. Risen*, 197 F. Supp. 3d 219, 252–53 (D.D.C. 2016)

(holding that claims in affidavits that are "so conclusory—and presented without any supporting

facts in the record—that [they] [would] leave[] the jury 'in no position to assess' the veracity of

[the] statement[s]" cannot withstand a motion for summary judgment (quoting *Greene v. Dalton*,

164 F.3d 671, 675 (D.C. Cir. 1999))); *see also Dist. Intown Props. Ltd. P'ship v. District of

Columbia*, 198 F.3d 874, 878 (D.C. Cir. 1999) ("[T]he court must assume the truth of all

statements proffered by the non-movant except for conclusory allegations lacking any factual

basis in the record.").

Considering all of the (competent) evidence, the Court concludes that no reasonable jury

could find that Defendant's failure to select Plaintiff for the SFFO position was the result of

retaliation for her earlier protected activity.  Even assuming that McCarthy was aware of

Plaintiff's prior EEO activity at the time he adopted Wu's recommendation that Petersen be

selected for the canine handler position, Wu set Petersen's selection in motion, and McCarthy

testified that he saw his role in the hiring process as essentially ratifying Wu's recommendation.

*See* Dkt. 52-5 at 2 (McCarthy Dep. 49:13–17).  It is undisputed that Wu himself did not know

about Plaintiff's prior protected activity.  Dkt. 52-3 at 2 (Wu Aff. ¶ 7); *see Turner*, 824 F. Supp.

2d at 121 ("As a matter of law, there can obviously be no retaliation if the [alleged] retaliator did

not know about the protected activity." (quoting *Barber*, 655 F. Supp. at 779)).  In order to

conclude that retaliation was a but-for cause of Plaintiff's non-selection, a jury would have to

believe that, had McCarthy not been motivated by a retaliatory purpose, he would have

overridden Wu's recommendation and selected Plaintiff instead.  It would also have to find that

the legitimate, non-retaliatory reasons asserted were in fact false, even though Plaintiff has

offered no record evidence that undermines them.  The Court concludes that no reasonable jury could make this series of findings.

The Court, accordingly, will grant Defendant's motion for summary judgment as to Count 1 of Plaintiffs' 2014 Complaint.

> 2.  *Relinquishment of badge, gun, car, and credentials (2014 Am. Compl. Count 2)*

Defendant argues that Plaintiff has not established a prima facie case of retaliation with respect to Defendant's requirement that she relinquish her badge, gun, car, and credentials because Plaintiff used these items "to perform her job with the Park Police as a [c]anine [h]andler," and therefore "relieving [P]laintiff of [them] while she was in a leave status and not working cannot be considered materially adverse."[9]  Dkt. 52 at 38, 49–50.  Plaintiff responds that she continued to work until October 2, 2008, because she was caring for her canine partner until that day, even though she was not performing her other work duties.  Dkt. 55-11 at 11–12 (Pl. SMF ¶ 21) (citing Psak Decl. ¶ 13).  She further asserts that because she was a law enforcement officer, she was always working, even when she was on sick leave.  Dkt. 55-1 at 14 (Psak Dep. 157:13–15) ("Whatever jurisdiction I was in I was still a sworn law enforcement officer.  You're on duty 24 hours a day even when you're sick.").

---

[9]  Defendant also argues that the Park Police General Orders mandate retrieval of the badge, gun, and car "if an officer is out on extended sick leave" and that "Plaintiff cannot show that 'but for' retaliation the Park Police would have ignored its General Orders and allowed her to retain these items."  Dkt. 52 at 49–50.  To the extent that this constitutes a legitimate, non-retaliatory explanation for Defendant's action, the Court must turn to the ultimate question of retaliation *vel non*.  *Jones*, 557 F.3d at 678.  The Court concludes that no reasonable jury could conclude that the Park Police required Defendant to relinquish her badge, gun, car, and credentials as retaliation for her previous protected activity.  The Park Police General Orders mandated that she be required to relinquish all of these items except for Plaintiff's credentials.

The D.C. Circuit has held that a law enforcement agency's repossession of the tools that a law enforcement officer uses to do his job is not materially adverse if that repossession does not interfere with the employee's ability to perform her duties.  In *Durant v. District of Columbia Government*, the D.C. Circuit assessed a plaintiff's claim of retaliation against his employer, the Department of Corrections ("DOC"), based on DOC's "refusal to assign him a government vehicle" and its "decision to suspend his arrest authority."  875 F.3d at 698.  The court concluded that no reasonable trier of fact could conclude that the refusal to assign the plaintiff a government vehicle was a "materially adverse action" because the plaintiff "did not provide evidence, beyond his own conclusory allegations, that his inability to access a vehicle 'produced an injury or harm' such as instances in which he could not complete a particular assignment."  *Id.* (quoting *Burlington N.*, 548 U.S. at 67).  The D.C. Circuit also "reject[ed] [the plaintiff's] claim that the [DOC]'s decision to suspend his arrest authority was a materially adverse action," in part because the plaintiff "failed to offer evidence that he was unable to perform his workplace obligations due to" this suspension.  *Id.*

That same logic applies here.  Plaintiff has not pleaded facts suggesting that relinquishment of her badge, gun, car, and credentials hindered her in her performance of her job, even construing her job to include her caring for her canine partner when she was on sick leave.  "[A] reasonable worker" would not be "dissuaded" from "making or supporting a charge of discrimination" by the prospect of being deprived of items required to do a job that she was not at the time performing.  *Hinds*, 296 F. Supp. 3d at 237 (quoting *Burlington N.*, 548 U.S. at 68).

The Court will, therefore, grant Defendant's motion for summary judgment as to Count 2 of the 2014 Complaint.

3.      *Retirement of Canine Partner (2014 Am. Compl. Count 3)*

Plaintiff also alleges that Defendant retaliated against her by requiring her either to kennel her canine partner while she was on sick leave (and therefore not have the dog continue to reside with her or receive payment for caring for the dog) or to retire her canine partner from police work (and thereby allow the dog to stay with her but without receiving pay to care for the dog).  Dkt. 55 at 8–9; *see also* Dkt. 52 at 50 (Defendant agreeing that Plaintiff was given a "choice of returning her canine to the Park Police or having the Park Police retire her canine so she could keep it on a personal basis").  Plaintiff argues that this choice imposed negative emotional and financial consequences—she did not wish to be separated from her beloved canine partner or to lose financial compensation for caring for the dog.  Dkt. 55 at 8–9.  Plaintiff also asserts that other "similarly situated employee[s]" were not required to either kennel or retire their canine partners "while on extended sick leave."  Dkt. 55-10 at 18 (Psak Decl. ¶ 20).  Plaintiff asserts that both "Officer Bransom" and Officer James Austin took extended sick leaves and were not faced with the same choice Defendant imposed on her.  She attests that Austin "was also on extended sick leave during the same time frame" that she was before "his eventual medical retirement from law enforcement," but his canine partner "was never sent to a kennel" and "Austin did not have to retire [his canine partner], despite the dog not having performed work for months."  *Id.*; *see also* Dkt. 52-1 at 5 (Psak Dep. 77:3–24).

Defendant argues that "Plaintiff's claim[] concerning . . . having to choose what should happen to her Park Police canine while out on . . . leave with no anticipated date of return to work do[es] not constitute [an] adverse action[] . . . under Title VII."  Dkt. 52 at 17.  Defendant notes that, at the time that the Park Police imposed these options, "[P]laintiff was not working and had no return to work date anticipated," "[h]er canine was the property of the Park Police,"

was meant for work, but was not working, and "Plaintiff was [still] being paid to take care of a canine that was doing no work." *Id.* at 50.

The Court concludes that a reasonable jury could find that a "reasonable worker" would be "dissuaded" from "making or supporting a charge of discrimination" by the prospect of having either to temporarily kennel a canine partner and forego being paid for its care while on sick leave or to retire the dog and take on the financial responsibility for caring for it. *Hinds*, 296 F. Supp. 3d at 237 (quoting *Burlington N.*, 548 U.S. at 68).   The Court further concludes that, based on Plaintiff's testimony citing specific examples of other officers who took extended medical leaves but were not forced to make the same choice, Dkt. 55-10 at 18 (Psak Decl. ¶ 20), and the temporal proximity between her filing her initiating her 2008 EEO activity following her non-selection for the SFFO position and Defendant's challenged action, Dkt. 55-2 at 4 (Report on Investigation); Dkt. 34 at 24 (Am. Compl. ¶ 197), a reasonable jury could conclude that Defendant's action was motivated by a retaliatory purpose.

The Court will, therefore, deny Defendant's motion for summary judgment as to Count 3 of Plaintiff's 2014 Amended Complaint.

4.     *Reassignment to Explosive Detector Canine Handler Position (2014 Am. Compl. Count 4)*

Defendant offers a legitimate, non-retaliatory reason for its reassignment of Plaintiff to the explosive detector canine unit upon her return to canine handling work.   It asserts that the Park Police placed Plaintiff in the explosive detector canine unit because her doctor had recommended that she be "reassigned to another canine unit" upon her return to her old duties and because she expressed openness to moving to that unit.  Dkt. 52 at 52; *see also* Dkt. 53-3 at 2 (Ex. 13) ("I am recommending reassignment. . . . If [Plaintiff] cannot be placed into another canine unit, I recommend switching her work shift."); Dkt. 53-6 (Ex. 16) (Defendant also asserts

that Plaintiff "informed the Park Police that she would consider working" in that unit.  Dkt. 52 at

52; *see also* Dkt. 55-10 at 25 (Pl. SMF ¶ 34).

Plaintiff argues that she was "involuntarily assigned" to this new role and that another

officer was "a better fit for the bomb dog job."  Dkt. 55 at 10.  She also makes the conclusory

assertions that the "[Labor Management Agreement] prohibits involuntary reassignment" of

officers of her rank and that "[i]n the entire history of the USPP [c]anine [u]nit, . . . no handler

had ever been involuntarily reassigned to a different canine discipline."  *Id.*  In support of these

arguments, Psak cites only her own declaration, which contains essentially the same language as

her opposition to Defendant's motion.  Dkt. 55-10 at 27–28.  Plaintiff does not cite to the Labor

Management Agreement to which she refers, and she does not explain the basis for her personal

knowledge of whether or not handlers had ever been involuntarily reassigned.  *Id.*

The Court concludes that, based on the record evidence, no reasonable jury could find

that the Park Police reassigned Plaintiff to the explosive detector canine unit in retaliation for her

protected activity, rather than for the reasons that it offers—that her own doctor recommended

that she transfer units upon returning to dog handling and that she expressed openness to joining

that unit.  The Court will, accordingly, grant Defendant's motion for summary judgment with

respect to Count 4 of Plaintiff's 2014 Amended Complaint.

5.    *Documentation of Medical Reasons for Leave (2014 Am. Compl. Counts 9–12)*

Defendant argues that Plaintiff's claim of retaliation based on Defendant's requests for

medical information also fails as a matter of law.  Dkt. 52 at 38.  According to Defendant, "[n]o

reasonable employee would be dissuaded from engaging in protected activity by a mere request

for medical documentation" when she had been on leave for at least a month "and had provided

her employer with no anticipated date for her return to work."  *Id.* at 39.  With respect to the Park

Police's two later requests for additional medical information during Plaintiff's extended leave, Defendant argues that Plaintiff had already provided substantial information about her medical condition to the Park Police and that no reasonable employee would be dissuaded from engaging in protected activity by the obligation to provide follow-up medical information.  *Id.* at 39–40.

a.      September and October 2008 Requests

The Court agrees with Defendant that a reasonable employee would not be "dissuaded . . . from making or supporting a charge of discrimination," *Baloch*, 550 F.3d at 1198, merely because her employer required her to provide medical documentation justifying her lengthy medical leave from work, Dkt. 52-7 at (Sept. 4, 2008 Request); Dkt. 53-12 at (Oct. 22, 2008 Request).  The Court will, accordingly, grant Defendant's motion for summary judgment with respect to Counts 9 and 10.

b.      December 2008/January 2009 Request

Defendant's motion for summary judgment with respect to Count 11, however, fails. That claim asserts that the Park Police retaliated against Plaintiff for engaging in protected EEO activity when it requested that she identify the medications that she was taking in December 2008 and January 2009.  Defendant's sole argument for summary judgment on this claim turns on the premise that a request for information does not rise to the level of an adverse employment action, Dkt. 52 at 39, even under the lower standard applicable in retaliation cases, *Dorns*, 692 F. Supp. 2d at 132.  As the record now stands, Defendant has failed to carry its burden of showing that no reasonable jury could find that this request for sensitive medical information imposed a material negative consequence on Plaintiff.  *Baloch*, 550 F.3d at 1198.

Viewing the evidence in the light most favorable to Plaintiff, the Park Police informed Plaintiff in December 2008 and January 2009 that she could not return to work unless she either

40

underwent a fitness-for-duty examination or provided additional, sensitive information about her "medicinal regimen". Dkt. 52 at 8 (Def. SUMF ¶¶ 46–49); Dkt. 53-4 at 1 (Ex. 14). Plaintiff contends that she was ready to return to work in November 2008, *see* Dkt. 55-10 at 23 (Psak Decl.) ("I was denied the right to return to duty on November 15, 2008 at about 1930 hours."); Dkt. 53-4 at 1 (Ex. 14) (noting that Plaintiff was "ready to return to duty and wanted to know when [she] could return" on December 12, 2008), and that the Park Police would not allow her to do so until she provided a list of medications or submitted to the exam delayed that return, *see* Dkt. 55-2 at 189–90 (Ex. B-18) (third request for medical information occurred in December 2008/January 2009); Dkt. 53-1 at 7 (Psak Dep. 102:4–25) (Psak returned to work in December 2009).

Defendant has not carried its summary judgment burden of demonstrating that no reasonable jury could find that this asserted condition on her return to work, which the Park Police ultimately abandoned, Dkt. 53-4 (Ex. 14), was materially adverse. A reasonable jury could conclude that a reasonable worker would be dissuaded from engaging in protected activity if it meant that she would have to provide sensitive medical information or submit to a fitness-for-duty examination in order to return to her job.

Because Defendant seeks summary judgment on Count 11 on this ground alone, the Court will deny that portion of its motion.

### c.      2014 Request Following Physical

With respect to the Park Police's August 2014 request for additional medical information after Plaintiff did not pass her annual physical examination, the Court agrees with Defendant that Plaintiff "cannot show that anyone associated with [the 2014 medical inquir[y] had any knowledge of her prior protected activity," and, therefore, the 2014 medical inquiry cannot have

been retaliatory.  Dkt. 52 at 40; *see also Turner*, 824 F. Supp. 2d at 121 ("As a matter of law,

there can obviously be no retaliation if the [alleged] retaliator did not know about the protected

activity." (quoting *Barber*, 655 F. Supp. at 779)).  Waldman was responsible for requesting the

additional medical information from Plaintiff at the behest of the FOH, and he attests without

contravention that he had no knowledge of Plaintiff's prior protected activity.  Dkt. 53-9 at 24

(Waldman Aff.).

The Court will, accordingly, grant Defendant's motion for summary judgment with

respect to Count 12.

6.     *Subjecting Plaintiff to a Hostile Work Environment (2018 Compl. Count 3)*

"A hostile work environment can amount to retaliation under Title VII."  *Williams v.*

*Spencer*, 883 F. Supp. 2d 165, 180 (D.D.C. 2012) (citing *Hussain v. Nicholson*, 435 F.3d 359,

366–67 (D.C. Cir. 2006)).  But, because the Court has already concluded that, even accepting

Plaintiff's version of events, the conduct at issue here did not rise to the level of a hostile work

environment, Plaintiff's related retaliation claim fails as well.  *Baird*, 662 F.3d at 1250–51

(explaining that a plaintiff's retaliation claims based on a hostile work environment must

establish that the employer subjected the employee to "'discriminatory intimidation, ridicule, and

insult,' that is 'sufficiently severe or pervasive to create an abusive working environment.'"

(quoting *Baloch*, 550 F.3d at 1201)).

The Court will therefore dismiss the retaliatory hostile work environment component of

Count 3 of Plaintiff's 2018 Complaint.

7.     *2015 Performance Evaluation (2018 Compl. Count 3)*

Defendant argues that because "Plaintiff conceded in her deposition that her 2015

appraisal" rating was the same that she received in 2014 and 2016 and that "she received no

adverse consequences from having received a rating of 'Superior,'" she has not established that she suffered an adverse employment action sufficient to state a retaliation claim.  Dkt. 52 at 41–42 (citing Dkt. 52-1 at 15 (Psak Dep. 143:24–144:22)); *see also id.* at 17.  "Courts have consistently held that where there is no change in benefits or the performance rating was not tied to an employee's bonus or other tangible consequences, a negative or decreased performance rating does not constitute adverse action," even for purposes of a retaliation claim.  *Dorns*, 692 F. Supp. 2d at 133 (citing *Weber v. Battista*, 494 F.3d 179, 186 (D.C. Cir. 2007); *see also Powell v. Casteneda*, 390 F. Supp. 2d 1, 11 (D.D.C. 2005)).  Here, Plaintiff fails to identify any negative consequence resulting from the slightly lower score in one category.

As earlier discussed, Plaintiff alleges that she received a slightly lower score on her interpersonal skills in her 2015 evaluation than she had in past years, although she received the same overall score that she did in both 2014 and 2016.  Dkt. 52-1 at 15 (Psak Dep. 143:3–144:22).  But Plaintiff does not maintain that this slightly lower score in the interpersonal skills area resulted in a change in benefits, a decreased bonus, or any other tangible consequence.  *See* Dkt. 55 at 27.  And, although she asserts that she "believed she would not receive a time off award and felt betrayed/cheated" because of her 2015 performance rating, she admits that she did indeed receive the award.  Dkt. 55-11 at 39–40 (Pl. SMF ¶ 101).  Worry and feelings of having been cheated do not amount to the type of "*material* adversity" required of a successful retaliation claim.  *Dorns*, 692 F. Supp. 2d at 132 (quoting *Wiley*, 511 F.3d at 161).

The Court will dismiss the Count 3 of Plaintiff's 2018 Complaint at to her claim of retaliation based on the lowering of her 2015 performance evaluation.

**F.     Failure to Accommodate (2018 Compl. Count 1)**

Count 1 of Plaintiff's 2018 Complaint alleges that Defendant "violated the Rehabilitation Act by failing to accommodate Plaintiff's known disabilities"—a head injury and concussion from her August 2016 car accident.  No. 18-115 (Dkt. 1 at 5–6 (Compl. ¶¶ 15–18)); Dkt. 55 at 22.  The Rehabilitation Act prohibits discrimination against a "qualified individual with a disability because of the disability . . . ."  42 U.S.C. § 12112(a).  Such discrimination may take the form of "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an . . . employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity."  *Id.* § 12112(b)(5)(A).  "To prevail on a failure-to-accommodate claim, a plaintiff must establish that (1) '[she] was disabled for the purposes of the Rehabilitation Act' or the ADA; (2) the public entity 'had notice of [her] disability'; and (3) the public entity 'denied [her] request for a reasonable accommodation of [her] disability.'"  *Seth v. District of Columbia*, No. 18-1034, 2018 WL 4682023 at *13 (D.D.C. Sept. 28, 2018) (quoting *Chenari v. George Washington Univ.*, 847 F.3d 740, 747 (D.C. Cir. 2017)).

"An accommodation is 'reasonable' if it enables the employee to fulfill all essential functions of his job."  *Buie v. Berrien*, 85 F. Supp. 3d 161, 172 (D.D.C. 2015).  "The 'essential functions' of a job are its fundamental duties based on a number of factors."  *Morris v. Jackson*, 994 F. Supp. 2d 38, 46–47 (D.D.C. 2013).  These factors include "the employer's judgment as to which functions are essential, written job descriptions . . . , the amount of time required to perform the function, the consequences to the employer of not requiring the activity, and the work experiences of past incumbents of the job."  *Id.*  The Court must give "consideration . . . to

the employer's judgment as to what functions of a job are essential." *Woodruff v. Peters*, 482

F.3d 521, 527 (D.C. Cir. 2007) (quoting 42 U.S.C. § 12111(8)); *see also Saunders v. Galliher &*

*Huguely Assocs.*, 741 F. Supp. 2d 245, 248–249 (D.D.C. 2010) ("Courts frequently defer to the

employer's judgment as to what functions of a job are essential."). "'Undue hardship' means 'an

action requiring significant difficulty or expense,' as measured by various statutory factors." *Id.*

(quoting 42 U.S.C. § 12111(10)(A)). "The employee has the burden of identifying reasonable

accommodations, and the agency has the burden of showing undue hardship." *Graffius v.*

*Shinseki*, 672 F. Supp. 2d 119, 126 (D.D.C. 2009). "[A]n employer is not required to provide an

employee that accommodation [s]he requests or prefers, the employer need only provide some

reasonable accommodation." *Stewart v. White*, 118 F. Supp. 3d 321, 325 (D.D.C. 2015 (quoting

*Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1305 (D.C. Cir. 1998)).

Defendant argues that, "by her own admission[,] [P]laintiff never requested a reasonable

accommodation." Dkt. 52 at 18. Plaintiff counters that she made "an informal but effective

request for reasonable accommodation" when, in November 2016, she provided the agency her

doctor's report, which stated that she "could return to police work but should be limited to four

hours per day, increasing later to five hours per day."[10] Dkt. 55 at 23; *see also* Dkt. 52-1 at 17

---

[10] To the extent Plaintiff asserts more generally that she requested "light duty" as an accommodation of her head-injury symptoms, the Park Police did make accommodations. First, the Park Police assigned Plaintiff to Dispatch, but when she informed the Park Police that the computer work required at that post was exacerbating her symptoms, Plaintiff was "given an alternate work assignment," which her doctor "signed off on" and which did not require computer work. *Id.* (Psak Dep. 152:4–20). After performing that job for "[s]everal months," Psak's doctor approved her return to her "old job full-time," and Psak returned to canine handling in January 2017. *Id.* (Psak Dep. 153:5–14). This is precisely the type of "'flexible give-and-take' between employer and employee 'so that together they can determine what accommodation would enable the employee to continue working'" that the Rehabilitation Act contemplates. *Ward v. McDonald*, 762 F.3d 24, 32 (D.C. Cir. 2014) (quoting *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 805 (7th Cir. 2005)).

(Psak Dep. at 150:2–151:9) (explaining that she did "[n]ot really" make a request for "an accommodation" but that she did present a doctor's letter proposing that she begin working as a canine handler for four-hour shifts and then gradually increase the length of her shifts until they were full ten-hours shifts)). Defendant does not dispute that the Rehabilitation Act allows for informal accommodation requests of this type but asserts that the undisputed evidence shows that the canine handler role "could not be performed on a part-time basis." Dkt. 59 at 19; Dkt. 53-12 at 2–5 (Adamchik Dep. 15:5–18:14) (testifying that the work of a police officer was incompatible with a strict four-hour duty cut-off).

Assuming that the note from Plaintiff's doctor constituted a request for an accommodation—that is, that Plaintiff be allowed to perform four- and eventually five-hour shifts as a canine handler rather than the regular ten-hour shifts—the Court concludes that no reasonable jury could find that the request would have allowed Plaintiff "to fulfill all essential functions of [her] job." *Buie*, 85 F. Supp. 3d at 172. The Adamchik deposition explains that the nature of police work does not allow for officers to work strict four- or five-hour shifts because events often transpire that require the officer to remain at a scene or to travel to another location in order to follow up on an arrest; that this sometimes takes several hours; and that the agency, therefore, could not have guaranteed that Plaintiff would have been able to leave work after having only worked a four- or five-hour shift. Dkt. 53-12 at 2–5 (Adamchik Dep. 15:5–18:14); *see also Morris*, 994 F. Supp. 2d at 47 ("The 'essential functions' of a job are its fundamental duties, based on a number of factors, . . . [which include] . . . the amount of time required to perform the function, . . . and the work experiences of past incumbents of the job in question and similar jobs."). Adamchik testified:

> Operationally[,] I wouldn't be able to adhere to . . . the doctor's requirements
> because as a police officer I can't ensure that I could only have her working for

> four hours a day because there would be an opportunity for her to get engaged
> in something that would make her work longer than that [such as] . . . an arrest,
> a demonstration, or a prolonged assignment. . . . [A]s a uniformed working
> police officer[,] we're often held over every single day  for certain items.

Dkt. 53-12 at 2–3 (Adamchik Dep. 15:11–16:5).  Adamchik further testified that it would not be

feasible simply to allow another officer to sub in for Plaintiff once the four-hour shift had

expired because he

> couldn't ensure that she wouldn't have already made an arrest.  She would be
> required to write the probable cause statement for those arrests. . . . [T]he
> arresting officer is required to write the probable cause statement, so . . . we can
> justify legally detaining that person. . . . I can't write a probable cause statement
> for somebody else who made that arrest.

*Id.* at 3–5 (Adamchik Dep. at 16:16–18:14).  When asked about the possibility of shorter shifts in

her deposition, Plaintiff could not identify anyone in the canine unit who was permitted to work

four- or five- hour shifts.  Dkt. 52-1 at 17 (Psak Dep. 151:17–152:3); *see Morris*, 994 F. Supp. 2d

at 47 (noting that an accommodation that "is reasonable on its face" is "the sort of

accommodation that normally occurs").

The Court concludes that the undisputed evidence shows that Plaintiff's request that she

be allowed to work as a canine handler for four- or five-hour shifts was not a reasonable request

for an accommodation because it would not have allowed her to perform all of the essential

functions of the job.  *See Buie*, 85 F. Supp. 3d at 172; *Graffius*, 672 F. Supp. 2d at 126.

The Court will, accordingly, grant Defendant's motion for summary judgment as to

Plaintiff's failure-to-accommodate claim, Count 1 of the 2018 Complaint.

## G.    Medical Inquiries (2014 Compl. Counts 5–8)

Counts 5–8 of the 2014 Complaint allege that Defendant violated the Rehabilitation Act,

29 U.S.C § 701 *et seq.*, by making medical inquiries about Plaintiff that were not job-related or

necessary.  Dkt. 34 at 20–24 (Am. Compl. ¶¶ 170–94).  Defendant argues that "[i]f an employee

is out on extended sick leave, medical inquiries pertaining to the employee's ability to do his or her job are plainly job related." Dkt. 52 at 54.

The Rehabilitation Act provides that "[a] covered entity . . . shall not make inquiries of an employee as to . . . the nature or severity of [a] disability, unless such . . . inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). "Acceptable inquiries under the Rehabilitation Act include 'inquiries into the ability of an employee to perform job-related functions.'" *Klugel v. Clough*, No. 06-1886, 2009 WL 10692971, at *6 (D.D.C. Jan. 26, 2009) (quoting 42 U.S.C. § 12112(d)(4)(B)). In *Greer v. O'Neill*, No. 01-1398, 2003 WL 25653036 (D.D.C. Sept. 25, 2003), for example, the court held that an inquiry was "job-related and consistent with business necessity" where the "defendant demanded a medical certificate only in response to plaintiff's request for extended sick leave." *Id.* at *9 (collecting cases); *see also Porfiri v. Eraso*, 121 F. Supp. 3d 188, 197–98 (D.D.C. 2015) (noting that another "line of permissible, job-related inquiry relates to the employer's obligation to provide reasonable accommodations to a disabled employee"). In *Klugel v. Clough*, after the plaintiff was injured in a car accident that required her to be "out of the office two full days per week" for physical therapy, 2009 WL 10692971, at *2, her employer requested "information about the basis for [the plaintiff's] medical treatment including the dates of treatment," *id.* at *6. The employer argued that it requested this information "to protect [itself] if any future audits were done and so that [the plaintiff's supervisor] could plan for running his department." *Id.* The court granted summary judgment to the defendant because the plaintiff had "not pointed to any evidence in the record that their inquiry" "was not 'job related and consistent with business necessity.'" *Id.* (quoting 42 U.S.C. § 12112(d)(4)(A)).

Courts have also determined that "ensuring that an armed officer can perform [her] job properly and safely is a business necessity." *Scott v. Napolitano*, 717 F. Supp. 2d 1071, 1083 (S.D. Cal. 2010); *see also Watson v. City of Miami Beach*, 177 F.3d 932, 935 (11th Cir. 1999) ("In any case where a police department reasonably perceives an officer to be even mildly paranoid, hostile, or oppositional, a fitness for duty examination is job related and consistent with business necessity."). But that is not carte blanche for an employer to ask any and all questions concerning a returning officer's mental or physical health. "Any inquiries or examination . . . must be limited in scope to what is needed to make an assessment of the employee's ability to work." *Scott*, 717 F. Supp. 2d at 1083 (quoting *EEOC Compliance Man.* (BNA), 902:0190 (Nov. 2002)). This means that "inquiries or examinations" should normally be "related to the specific medical condition for which the employee took leave" and that an "employer may not use the employee's leave as a justification for making far-ranging disability-related inquiries." *Id.* (quoting same).

Plaintiff argues that to establish that a medical inquiry is "job-related and consistent with business necessity," 42 U.S.C. § 12112(d)(4)(A), an employer must show "(i) that the asserted 'business necessity' is vital to the business, (ii) that the examination genuinely serves the business necessity, and (iii) that the request is no broader or more intrusive than necessary." Dkt. 55 at 11–12 (quoting *Blake v. Baltimore Cty.*, 662 F. Supp. 2d 417, 422 (D. Md. 2009)); *see also Conroy v. N.Y. State Dep't of Corr. Servs.*, 333 F.3d 88, 97–98 (2d Cir. 2003); *Lewis v. Gov't of District of Columbia*, 282 F. Supp. 3d 169, 188 (D.D.C. 2017) (discussing the demanding standards that "[o]ther circuits" employ to evaluate the assertion of a business necessity). The Court will assume without deciding that this three-part test applies to the

determination whether a medical inquiry is "job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A).

Plaintiff challenges four separate requests for medical information that the Park Police made of her.  First, on September 4, 2008, the Park Police sought "medical documentation justifying [Plaintiff's] absence due to an alleged injury, from July 23, 2008, until [September 4, 2008]."  Dkt. 52-7 (Ex. 7).  Second, on October 22, 2008, the Park Police sought "detailed medical information from [her] physician concerning [her] current ability to perform [her] duties," including how her "condition [of post-traumatic stress disorder and major depression disorder] affect[ed] [her] ability to perform [her] job on a reliable and consistent basis," and that might be helpful in "determin[ing] if [the agency could provide] any reasonable accommodations."  Dkt. 53-2 (Ex. 12).  Third, in December 2008 and January 2009, the Park Police requested that Plaintiff either submit additional medical information pertaining to whether the medication that she was taking would affect the performance of her duties or submit to a fitness-for-duty examination.  Dkt. 53-4 (Ex. 14); Dkt. 53-5 (Ex. 15).  Fourth, in 2014, the Park Police sought further information following Plaintiff's annual physical, in which she had not been certified as fit for duty.  Dkt. 53-9 at 6–9 (Waldman Aff.).

1. *September and October Medical Inquiries*

The Court concludes that no reasonable jury could find that the first two medical inquiries were not "job-related and consistent with business necessity."  Plaintiff took an extended medical leave based on "stress" beginning on July 23, 2008, which stretched into the fall and winter of that year.  By the time the Park Police made its first request for medical documentation on September 4, 2008, Plaintiff had already been away from work for over a month without providing evidence of her condition.  Plaintiff argues that the September 8, 2008

letter from her doctor provided the requested information and should have put an end to the Park Police's inquiries.  Dkt. 55 at 13; *see* Dkt. 52-8 (Ex. 8).  But, although that letter established that Plaintiff was—as of September 8, 2008—suffering from post-traumatic stress disorder and major depression disorder and that should "not return to her job until her symptoms have stabilized," the letter said nothing about when that was likely to occur.  Dkt. 52-8 (Ex. 8).  The letter merely observed that Plaintiff's "prognosis [was] positive," *id*. at 2, but did not explain what that meant and did not provide any information that would aid the Park Police in ensuring that her eventual return to work would be successful.  After another six weeks passed without indication that Plaintiff was able or ready to return to work, it was indisputably "consistent with business necessity" for the Park Police to inquire again, this time asking for "detailed medical information from [her] physician concerning [her] current ability to perform [her] duties," including how her "condition affects [her] ability to perform [her] job on a reliable and consistent basis," and that might be helpful in "determin[ing] if there are any reasonable accommodations."  Dkt. 53-2 (Ex. 12).

2.    *December 2008/January 2009 Medical Inquiry*

With regard to the Park Police's December 2008 and January 2009 request that Plaintiff either provide information regarding the medications she was taking or submit to a fitness-for-duty examination, *see* Dkt. 53-4 (Ex. 14), the Court concludes that Defendant has not carried its summary judgment burden of establishing that no reasonable jury could find that this inquiry was not "consistent with business necessity."  42 U.S.C. § 12112(d)(4)(A).  Although this presents a close question, the existing record fails to explain why the admittedly conclusory assertions made by Plaintiff's doctor did not adequately address any job-related concerns.  It may be that

the Park Service needed to know more.  But, if so, Defendant has yet to make the requisite

showing.

In the November 15, 2008 letter, Plaintiff's doctor noted significant improvements in her

depression and stated, "I believe she is ready to return to duty beginning November 16, 2008."

Dkt. 55-2 at 193 (Ex. B-19).  According to her doctor, Plaintiff's dosage of an antidepressant was

increased and she was prescribed "a new medication."  *Id.* at 192.  At the time her doctor wrote

to the Park Police in November, Plaintiff was "transitioning to a new medication which," her

doctor opined, "should be stabilized over the next two weeks."  *Id.* at 193.  Plaintiff's doctor also

responded to a questionnaire, which, among other things, asked the doctor to "[l]ist any

medication requirement(s) (prescription and non-prescription-type and dosage) that would, or

does, affect performance, behavior or safety concerns that are directly related to the position."

*Id.* at 195.  Plaintiff's doctor wrote: "[p]rescribed medication shouldn't negatively impact

abilities or interfere with performance of duties."  *Id.*  In response to a question about Plaintiff's

"overall prognosis," Plaintiff's doctor wrote that the "[p]atient should remain stable on

medication."  *Id.* at 196.

In order to justify the Park Service's request for further information about the medication

that Plaintiff was taking (or submit to a fitness exam), Defendant must establish a lack of

genuine factual dispute concerning the "job-relatedness and business necessity," *Miller v.

Whirlpool Corp.*, 807 F. Supp. 2d. 684, 686–87 (N.D. Ohio 2011), of the Park Police's request

that Plaintiff identify the "type of medicinal regimen [she] was on," Dkt. 53-4 at 1–2 (Ex. 14).

Defendant asserts that Brodie and Payton-Williams made the requests for further information

about the medications Plaintiff was taking (or that she submit to a fitness-for-duty examination)

"because plaintiff's doctor had given no indication as to the type of medicinal regimen plaintiff

was on and how it could affect her ability to perform the duties of a law enforcement officer."
Dkt. 52 at 8 (Def. SUMF ¶ 46).

Although this response has a common-sense appeal, it does not wrestle with a number of
significant issues.  First, the Court does not doubt that certain medications or improper dosing
could interfere with a law enforcement officer's ability safely to perform her duties.  The
Department does not explain, however, why that concern was present here.  We know that
Plaintiff was suffering from post-traumatic stress disorder and depression, but Defendant offers
no evidence that the types of medications typically prescribed for these conditions pose this type
of risk; they might, but Defendant has not carried its burden of showing that such a risk was
present.

Second, Plaintiff's doctor opined that the medications she was taking "shouldn't
negatively impact [her] abilities or interfere with [the] performance of [her] duties."  Dkt. 55-2 at
195 (Ex. B-19).  It is possible that the Park Police had reason to doubt this conclusion or had
reason to verify for itself that neither the medications nor Plaintiff's underlying condition posed a
risk to job performance and safety.  But, again, Defendant points to no evidence to support such
a concern.  It does not offer evidence, for example, that it planned to have a qualified medical
professional review the medication list to confirm that Plaintiff's doctor was correct or that it had
ever asked a qualified medical professional to review a list of medications taken by any other
officer.  The Park Police may have done so, and this request may have been consistent with Park
Police practice.  The existing record, however, leaves the Court to speculate about past practice
and how the Park Police planned to use the information it requested.

Third, Defendant does not explain why a fitness-for-duty examination would provide a
reasonable substitute for a list of medications.  It does not indicate, for example, whether the

fitness-for-duty exam includes a psychological component that would have revealed the same or similar concerns that a list of medications would have revealed.  It does not explain whether its concern was reaction time, alertness, physical stamina, or some other characteristic that certain medications or dosages might affect.  Again, one can imagine that certain medications could raise concerns of this type, but Defendant has the burden and has not yet explained why the fitness-for-duty and medication list were interchangeable.

Fourth, the Park Police eventually permitted Plaintiff to return to work without identifying the "type of medicinal regimen [she] was on."  Dkt. 53-4 at 1–2 (Ex. 14) (acknowledging that Plaintiff had neither provided the requested information nor submitted to a fitness-for-duty examination, but stating that "[s]ince the previous medical documentation that you submitted is indicative of your ability to return to duty, we believe it is in the best interest of you and the Force to allow you to come back to work pending the probable scheduling of a [fitness-for-duty examination]."); Dkt. 52-1 at 7 (Psak Dep. 102:4–17) (explaining that Plaintiff returned to duty without submitting to a fitness-for-duty examination).  If the Park Police's earlier request for the list of medications constituted a business necessity, Defendant has yet to explain what changed.  *See Scott*, 717 F. Supp. 2d at 1085 ("A properly tailored mental examination may have been permissible if Defendant had a reasonable concern about Plaintiff's mental health.  However, Defendant did not require Plaintiff to submit to a mental exam upon returning from leave for his adjustment disorder with mixed depression and anxiety, canceled its request for a psychiatric exam . . ., and did not further pursue its request for a mental exam.").

Fifth, Defendant argues that the Park Police needed to know more about Plaintiff's medications because her doctor had opined that it would take two weeks for her new medications to "stabilize."  Dkt. 52 at 8 (Def. SUMF ¶¶ 42–44); *id.* at 17–18 ("Those next two weeks,

according to the doctor, would coincide with plaintiff's return to work as a law enforcement officer carrying a gun.  The Park Police reasonably continued to ask for additional medical information.").  The problem with this otherwise sound concern is that, by the time the Park Police made its third medical inquiry, the two-week stabilization period had already passed and Plaintiff had not yet returned to work.  *Compare* Dkt. 55-2 at 193 (Ex. B-19) (November 15, 2008 letter stating that Plaintiff "is currently transitioning to a new medication which should be stabilized over the next two weeks) *to* Dkt. 53-4 at 1–2 (Ex. 14) (explaining that Defendant made the third request for medical information on December 12, 2009 and January 8, 2009).  If the Park Police's concern was Plaintiff's ability to work effectively while her medication was "stabilizing," that concern was no longer an issue by the time that Defendant made its third request.  *See Miller*, 807 F. Supp. 2d at 685–87 (denying defendant employer's motion for summary judgment because there remained a genuine issue of material fact concerning whether its questions, which included inquiries into medications that employees were taking and whether they suffered from depression, "were a reasonably effective and necessary method of achieving workplace safety" (quotations omitted)).

The Court does not doubt that "a police department [may] require armed officers to report when they are taking medications that may affect their ability to use a firearm or to perform other essential functions of their job," but that right to inquire does not permit an employer, even a police department, to require—without good cause—that its employees report "prescription medications they are taking."  *Scott*, 717 F. Supp. 2d at 1085 n.7 (citing *EEOC Compliance Man.* 902:0187–88).  Requests for lists of medications must be "tailored" and no more "intrusive than necessary" to serve the relevant business necessity.  *Id.* at 1085.  The rules must also be applied with some consistency.  If Plaintiff is the only Park Police officer who was ever asked to

identify the medications she was taking, Defendants may have difficulty explaining why in her case—and in no other case—this information was needed.  It will also have to explain why her doctor's opinion was insufficient and how it planned to use the information it sought.

On the present record, however, the Court must deny Defendant's motion for summary judgment as to Plaintiff's Rehabilitation Act medical inquiry claim based on the December 2008 and January 2009 inquiries.  Defendant may be able to provide further evidence and explanation demonstrating that this third inquiry was "job-related and consistent with business necessity," 42 U.S.C. § 12112(d)(4)(A), and "no broader or more intrusive than necessary to accomplish its goal of ensuring that Plaintiff could still safely do [her] job," *Scott*, 717 F. Supp. 2d at 1085 (quotation marks omitted), but it has not carried its burden at this time.[11]

### 3.   *Post-Physical Medical Inquiry*

Finally, no reasonable jury could find, based on the current record, that Defendant's request for follow-up medical information after her unsatisfactory annual physical was not "job-related and consistent with business necessity."  42 U.S.C. § 12112(d)(4)(A).  Plaintiff was not deemed "medically qualified" for her position based on her annual physical examination, and her "medical determination [was] deferred pending further documentation."  Dkt. 52 at 10 (Def. SUMF ¶¶ 63–66); Dkt. 53-9 at 5–6, 17 (Waldman Aff.).  The FOH letter further stated that Plaintiff "has medical findings which may hinder safe and efficient performance of essential job functions.'"  Dkt. 52 at 10 (Def. SUMF ¶¶ 63–66); Dkt. 53-9 at 5–6, 17 (Waldman Aff.).  Given these findings, no reasonable jury could find that Defendant's request that Plaintiff provide

---

[11]  Defendant does not challenge Plaintiff's medical inquiry claims on the ground that Plaintiff has failed to offer "proof of actual harm" resulting from the inquiries, and the Court declines to venture into that analysis alone.  *Martino v. Forward Air, Inc.*, 609 F.3d 1, 4–5 (1st Cir. 2010) (collecting cases)

certain "detailed or diagnostic medical information" to a doctor at the FOH office, Dkt. 52 at 10

(Def. SUMF ¶¶ 66, 68); Dkt. 53-9 at 17 (Waldman Aff.), was not job-related and consistent with

business necessity.  Plaintiff has not created a genuine dispute of material fact by, for example,

pointing to the specific requests for "detailed or diagnostic medical information" and arguing

that the request did not have to do with Plaintiff's duties as a canine handler.

The Court will, accordingly, grant Defendant's motion for summary judgment as to

Count 8 of the 2014 Amended Complaint.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment, Dkt. 52, is hereby

**GRANTED** in part and **DENIED** in part.  All claims except for Counts 3, 7, and 11 of

Plaintiff's 2014 Amended Complaint are hereby **DISMISSED**.

**SO ORDERED**.

 /s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  June 1, 2020